# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

_____

PAUL HENRY,

                    Plaintiff,           Civil Action No.
                                        9:15-CV-1108 (MAD/DEP)

    v.

MATTHEW L. LIBERTY, *et al.*,

                    Defendants.

_____

APPEARANCES:                       OF COUNSEL:

FOR PLAINTIFF:

PAUL HENRY, *Pro se*
07-A-1752
Attica Correctional Facility
Box 149
Attica, NY 14011

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN        RACHEL M. KISH, ESQ.
Attorney General of the
State of New York
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Paul Henry, a New York state prison inmate, has commenced this action against three corrections officers, two of whom are identified by name and a third as "John Doe", who were employed at the facility in which he was housed at the relevant times, pursuant to 42 U.S.C. § 1983, alleging that the defendants violated his civil rights. In his complaint, plaintiff alleges that he was brutally assaulted by the two named defendants and ten other officers, in derogation of his right under the Eighth Amendment to remain free of cruel and unusual punishments.

Currently pending before the court is a pre-answer motion brought by the defendants seeking dismissal of plaintiff's complaint based on his alleged failure to exhaust available administrative remedies before commencing suit. For the reasons set forth below, I recommend that defendants' motion be denied, without prejudice to renewal at a later procedural juncture.

I.    <u>BACKGROUND</u>[1]

Plaintiff is a prison inmate currently being held in the custody of the

---

[1]    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007))).

New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Dkt. No. 1. At the times relevant to his claims in this action, plaintiff was confined in the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. Dkt. No. 18 at 2.

In his complaint, which succinctly sets forth his claim and its factual basis, plaintiff alleges that on October 28, 2012, he was "gang assaulted" by defendants Matthew Liberty, Justin Reil, and ten other corrections officers. Dkt. No. 1 at 4. Plaintiff further avers that he was "beat…to the ground [and] repeatedly kicked…with steel toed boots to his upper body, groin area, head and both of his legs." *Id.* at 6. As a result of the encounter, plaintiff sustained injuries that required hospitalization for ten days.[2] *Id.* at 5.

Despite the availability of a grievance procedure at Clinton, plaintiff did not avail himself of the specified process by filing a grievance concerning the assault that is the focus of the claims raised in his complaint. *Id.* at 2-3. In response to a question regarding why no grievance was filed, plaintiff stated the following in his complaint: "The Grievance Committees in these prisons view everything in the light most favorable to the institutions." *Id.* at 3.

---

[2]     More details regarding the incident at issue are included in plaintiff's opposition to defendants' motion. *See* Dkt. No. 18-1. The specific facts surrounding the alleged assault, however, have no bearing on the procedural issue now before the court.

## II.  PROCEDURAL HISTORY

Plaintiff commenced this action on September 14, 2015, with the filing of a complaint and an accompanying application for leave to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. Following an initial review of the matter, District Judge Mae A. D'Agostino issued an order denying plaintiff's IFP application on the ground that he is subject to the "three strikes" provision of 28 U.S.C. § 1915(g), barring him from proceeding IFP, and is not entitled to the benefit of the "imminent danger" exception under the rule. Dkt. No. 7 at 6. In that order, plaintiff was afforded the opportunity to pay the statutory filing fee if he wished to proceed with the action. *Id.* Plaintiff subsequently paid the required filing fee in full.

In response to plaintiff's complaint, defendants have moved for its dismissal, arguing that Henry is precluded from pursuing his excessive force claim based upon his failure to exhaust administrative remedies before commencing suit. *See generally* Dkt. No. 16-1. Plaintiff has since responded in opposition to the motion, Dkt. No. 18, and defendants have submitted a reply in further support of their motion. Dkt. No. 19. Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule

72.3(c). *See* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

A.   Dismissal Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading using a standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. 677-78 (quoting Fed. R. Civ. P. 8(a)(2)). While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions. *See id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citing *Twombly*, 550 U.S. at 555-56); *see also Cooper v. Pate*, 378 U.S.

546, 546 (1964); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). The tenet that a court must accept as true all of the allegations contained in a complaint does not apply, however, to legal conclusions. *Iqbal*, 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson*, 551 U.S. at 94 ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (quoting *Estelle v.*

*Gamble*, 429 U.S. 97, 106 (1976)) (citation omitted)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) ("[W]hen a plaintiff proceeds *pro se*, a court is obliged to construe his pleadings liberally." (quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.*, 804 F. Supp. 2d 100, 104 (N.D.N.Y. 2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

## B. Exhaustion of Available Administrative Remedies

### 1. Controlling Legal Principles

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) ("Exhaustion is . . . mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley*, No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section

1983.").[3] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is an affirmative defense that must be raised by a defendant in response to an inmate suit. *Jones v. Bock*, 549 U.S. 199, 212 (2007). In the event the defendant establishes that the inmate plaintiff failed "to fully complete[] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules."[4] *Woodford*, 548 U.S. at 95; *accord, Macias*, 495

---

[3]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

[4]     In his response to defendants' motion, plaintiff suggests that prison officials at Clinton should have been aware of the incident and his claims by virtue of his request to local law enforcement officials that the matter be investigated. While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "'in a substantive sense,'" an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias v. Zenk*, 495 F.3d

F.3d at 43.

Compliance with the PLRA's exhaustion requirement may be excused when administrative remedies are "unavailable" to an inmate. *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). The Supreme Court recently identified three circumstances in which unavailability can be found. *Id.* at 1859-1860. Administrative procedures are unavailable when they "operate[] as a simple dead end – with officers unable or consistently unwilling to provide any relief[.]" *Id.* at 1859. Administrative procedures are also unavailable when "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use." *Id.* at 1859-1860. Exhaustion can also be excused "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."[5] *Id.* at 1860.

Ordinarily, "[t]he exhaustion defense is one that is not particularly well-suited for resolution by a motion to dismiss, absent a clear indication in a plaintiff's complaint that a failure to exhaust has occurred." *Lewis v. Havernack*, No. 9:12-CV-0031, 2013 WL 1294606, at *4 (N.D.N.Y. Mar. 28,

---

37, 43 (2d Cir. 2007) (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)).

[5] Notably, in *Ross* the Court specifically rejected the "special circumstances" exception to the PLRA's rule of exhaustion that had previously been engrafted into the rule by the Second Circuit in such cases as *Hemphill v. New York*, 380 F. 3d 680 (2d Cir. 2004).

2013) (citing *McCoy v. Goord*, 255 F. Supp.2d 233, 250 (S.D.N.Y. 2003)).

However, where a plaintiff unequivocally states in his complaint that he did

not exhaust his administrative remedies, it is incumbent on the plaintiff to

provide a justification for overlooking that failure. *Breksa v. Rice*,

12-cv-0952, 2013 WL 5355102, at *2-*3 (N.D.N.Y. Sept. 24, 2014) (Scullin,

J., *adopting report and recommendation by* Treece, M.J.).

## 2.    The DOCCS IGP

The DOCCS has instituted a grievance procedure, entitled the Inmate

Grievance Program ("IGP"), that is available to all state prison inmates. The

IGP is comprised of three steps that an inmate must satisfy when he has a

grievance regarding prison conditions. 7 N.Y.C.R.R. § 701.5; *Mingues v.*

*Nelson*, No. 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004).

Embodied in 7 N.Y.C.R.R. § 701, the IGP requires that an inmate first file a

complaint with the facility's IGP clerk within twenty-one days of the alleged

occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). If a grievance complaint form is not

readily available, a complaint may be submitted on plain paper. *Id.*

Representatives of the facility's inmate grievance resolution committee

("IGRC") have up to sixteen days after the grievance is filed to informally

resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution,

then the full IGRC conducts a hearing within sixteen days after receipt of the

grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. *Id.* at § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal.[6] *Id.* at § 701.5(c)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

Accordingly, at each step of the IGP process, a decision must be rendered within a specified time period. Significantly, "[a]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can – and must – be appealed to the next level, including CORC, to complete the grievance process." *Murray v. Palmer*, No. 03-CV-1010, 2010 WL 1235591, at *2 (N.D.N.Y. Mar. 31, 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing, *inter alia*, 7

---

[6] Depending on the type of matter complained of by the grievant, the superintendent has either seven or twenty days after receipt of the grievant's appeal to issue a decision. *Id.* at § 701.5(c)(3)(i), (ii).

N.Y.C.R.R. § 701.6(g)(2)).

Generally, if a plaintiff fails to follow each of the required three steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

        3.   <u>Analysis</u>

In bringing this action, plaintiff utilized a *pro forma* complaint made available in this district to inmates seeking to vindicate civil rights violations pursuant to 42 U.S.C. § 1983. Contained within that form are a series of questions probing the plaintiff's efforts to fully exhaust available administrative remedies. As was previously noted, in answer to those questions plaintiff acknowledged that he did not file a grievance regarding the alleged assault. That response forms the basis for defendants' motion, in which they argue that the plaintiff's complaint should be dismissed because his responses establish that he failed to exhaust the administrative remedies available to him, without justification. Dkt. No. 16-1 at 2, 4.

While plaintiff's complaint seemingly justifies dismissal under the

PLRA, in his memorandum in opposition to defendants' motion Henry has articulated two additional reasons for his non-exhaustion, arguing that (1) pursuant to DOCCS Directive Number 3375R, he was not required to grieve the incident that is the subject of his complaint because it is "non-grievable"; and (2) during the grievance period, he was in the hospital recovering from his injuries sustained as a result of the purported "gang assault" that is the subject of this action, and then was transferred to a special housing unit ("SHU") where "grievance forms were [not] made available to him upon his request to the correction officers who worked in SHU". Dkt. No. 18 at 7-8. Because the court may treat statements in a *pro se* litigant's memorandum of law as an amendment to his complaint,[7] I will consider these excuses offered by plaintiff in his memorandum in evaluating whether dismissal of plaintiff's complaint is proper at this stage of the litigation.

The first justification offered by the plaintiff for non-exhaustion – that it was not required pursuant to "DOCCS Directive #3375R, §II(B)" – is

---

[7]     *See Washington v. James*, 782 F.2d 1134, 1138 (2d Cir. 1986) ("[B]ecause [plaintiff] was pro se and because a party may, as a matter of right, amend his complaint once at any time before a responsive pleading is served, the court, when ruling on a Rule 12 motion, should…giv[e] consideration to the affidavit and treat the complaint as if it ha[s] been amended"); *Gibson v. Rosati*, 13-cv-0503, 2014 WL 3809162, at *6 (N.D.N.Y. Aug. 1, 2014) (Sharpe, J. *adopting report and recommendation by* Dancks, M.J.) ("[A] *pro se* plaintiff's memorandum in opposition to a motion to dismiss should be seen as effectively amending the complaint, so far as there is no contradiction."); *cf. Williams v. Priatno*, ___ F.3d ___, 2016 WL 3729383, at *2, n.1 (2d Cir. July 12, 2016) (statements in *pro se* plaintiff's application to dismissal motion may be properly considered on appeal).

misplaced. That directive is specific to the City of New York Department of Correction ("DOC"), which governs the inmate grievance program available to New York City prison inmates. *See* City of New York DOC Directive 3375R-A, http://www.nyc.gov/html/doc/downloads/pdf/3375R-A.pdf (last visited June 30, 2016).[8] Clinton is not a New York City Correctional facility, and is therefore not subject to DOC Directive 3375R. Rather, the inmate grievance program at Clinton is governed by DOCCS Directive 4040, which does not list assault or matters under investigation among non-grievable issues. *See* DOCCS Directive 4040, http://www.doccs.ny.gov/Directives/4040.pdf (last visited July 11, 2016).

Plaintiff has not offered any justification for his purported reliance on a New York City DOC Directive in not grieving the incident that is the subject of his complaint.[9] In any event, because the Supreme Court recently abrogated the "special circumstances" exception to the exhaustion requirement, any subjective confusion by plaintiff regarding the applicable exhaustion policy is not a relevant consideration for the court. *See Ross*,

---

[8]    It appears the DOC Directive 3375R-A, cited by the plaintiff, was superseded by DOC Directive 3376, effective on September 10, 2012. *See* City of New York DOC Directive 3376, http://www1.nyc.gov/assets/doc/downloads/directives/Directive_3376_Inmate_Grievance_Request_Program.pdf (last visited July 15, 2016).

[9]    It bears noting that New York City DOC Directive 3375R clearly indicates on the header of each page of the directive that the Corrections Department for the City of New York is the authoring agency.

14

136 S. Ct. at 1859 (noting that whether an administrative remedy is unavailable based on the "administrative scheme [being] so opaque that it becomes, practically speaking, incapable of use" is analyzed from the perspective of an "ordinary prisoner"). Moreover, objectively speaking, the fact that a different prison system has different policies does not render the DOCCS inmate grievance program opaque, let alone so opaque that it is incapable of use.[10]

In the second reason offered by the plaintiff for his failure to exhaust administrative remedies, he raises his circumstances following the assault, including hospitalization and confinement in the Clinton SHU for the entirety of the grievance filing period, noting that, while confined in SHU, he was not allowed to make phone calls and his requests for grievance forms were ignored. Dkt. No. 18 at 8. While plaintiff can no longer rely upon a general "special circumstances" exception in the wake of *Ross*, these circumstances, if proven, could conceivably establish that the IGP was not available to him at the relevant times. A refusal to provide an inmate with the

---

[10]    While the court need not decide whether an inmate confined to a prison operated by the New York City Department of Correction would be excused from grieving in any respect a claim of assault against him by a corrections officer, as plaintiff contends, plaintiff's interpretation of the former City of New York DOC Directive is arguably contrary to Supreme Court precedent. *See Porter*, 534 U.S. at 532 ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.").

form necessary for him to utilize the grievance program would seem to satisfy the third category of unavailability, "thwart[ing] [the] inmate[] from taking advantage of [the] grievance process through machination, misrepresentation, or intimidation." *See Manon v. Albany County*, No. 11-CV-1190, 2012 WL 6202987, at *5 (N.D.N.Y. Oct. 9, 2012) (Hummel, M.J.) (denying motion to dismiss for failure to exhaust administrative remedies where the plaintiff alleged that defendant failed to "provide him the necessary grievance form," noting that such a fact, when viewed in the light most favorable to the plaintiff, "constitute behavior excusing [plaintiff]'s failure to exhaust"), *adopted by* 2012 WL 6202984 (Suddaby, J.).

At this early stage in the proceedings, viewing the statements in plaintiff's memorandum in the light most favorable to him, and accepting those statements as true, I am unable to conclude definitively that the IGP was available to the plaintiff prior to the filing of this action. Accordingly, I recommend that defendants' pre-answer motion to dismiss plaintiff's complaint for failure to exhaust available administrative remedies be denied.

IV.   <u>SUMMARY AND RECOMMENDATION</u>

In opposition to plaintiff's complaint in this action, which alleges that defendants assaulted him, defendants seek its dismissal on the procedural basis of plaintiff's alleged failure to exhaust his administrative remedies. While it is clear from plaintiff's complaint that he did not file a grievance regarding the incident, it cannot be determined at this early stage of the litigation whether the DOCCS grievance procedure was available to him at a point when he could have filed a timely grievance regarding the matter. Accordingly, I recommend that defendants' motion be denied, without prejudice to renewal upon a more robust and fully developed record, either on motion for summary judgment or at trial. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 16) be DENIED, without prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     July 18, 2016
             Syracuse, New York

_____
David E. Peebles
U.S. Magistrate Judge


Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff [FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

> FN1. Hargrove signed the complaint August 27,
> 2004. The *pro se* clerk's office received and filed
> the complaint on September 20, 2004. Under the
> prison mail-box rule, a *pro se* prisoner's
> complaint is deemed filed when it is delivered to
> prison authorities. *See, e.g., Walker v.
> Jastremski,* 430 F.3d 560, 562 (2d
> Cir.2005)(deeming *pro* se prisoner's § 1983
> action filed on date complaint was handed to
> prison officials). There is no evidence in the
> record as to when Hargrove handed the
> complaint to prison officials. However, it is clear
> the operative date is between August 27, 2004
> and September 20, 2004. As discussed, *infra,*
> both of these dates occur before Hargrove
> properly exhausted the administrative remedies
> available to him at NCCF.

> FN2. The Nassau County University Medical
> Staff are employed by the Nassau Health Care
> Corporation ("NHCC"). Pursuant to the
> Correctional Center Health Services Agreement
> between the County of Nassau and NHCC, dated
> September 24, 1999, NHCC provides medical
> services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a (1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp'n, Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp'n at 3-4.

### (3)

### NCCF's Inmate Grievance Procedure

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

> FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

> FN8. Hargrove has not argued that he was unaware of this five-day deadline.

> FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

### (4)

### Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest argument, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

**\*7** Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> **FN12.** Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams,* 418 F.Supp.2d at 101, 102 (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at \*4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams,* 418 F.Supp.2d at 101 (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at \*8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at \*8-11;*Sloane,* 2006 WL 3096031, at \*4;*Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is "mandatory," certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> **FN13.** Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at \*9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14] *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs.' Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

### c. Special circumstances

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." *Giano,* 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. *See Sloane,* 2006 WL 3096031, at *8; *Freeman v. Goord,* No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

### Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct its own mistakes with respect to the programs it administers." *Woodford,* 126 S.Ct. at 2385. *See also Ruggiero,* 467 F.3d at 178 (citing *Porter,* 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry,* 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. *Berry,* 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. *Shangold v. The Walt Disney Co.,* No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir.1988); *McMunn v. Mem'l Sloan-Kettering Cancer Center,* 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn*, 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn*, 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

### Conclusion

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
No. 9:04-CV-0471.

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

**DECISION and ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

**I. FACTS**[FN1]

> FN1. The following facts are taken from
> Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts
are deemed admitted because they are supported
by the record evidence and Plaintiff failed to
submit an opposing statement of material facts as
required by Rule 7.1(a)(3). Plaintiff was
specifically advised by Defendants of his
obligation to file an opposing statement of
material facts and to otherwise properly respond
to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2], followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

> FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the
instant litigation. On May 3, 2004, after Plaintiff filed the
Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2013 WL 1294606
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Marc LEWIS, Plaintiff,
v.
HAVERNACK, Sergeant, Mt. McGregor
Correctional Facility, et al., Defendants.

Civil Action No. 9:12–CV–0031 (GLS/DEP).
|
March 28, 2013.

**Attorneys and Law Firms**

Marc Lewis, Moravia, NY, pro se.

Hon. Eric T. Schneiderman, Office of the Attorney
General, State of New York, Department of Law, The
Capitol, Gregory J. Rodriguez, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** *Pro se* plaintiff Marc Lewis, a New York State prison
inmate with considerable prior litigation experience, has
commenced this action against five corrections officers
employed at the prison facility in which he was confined at
the relevant times, pursuant to 42 U.S.C. § 1983, alleging
deprivation of his civil rights.[1] In his complaint, plaintiff
alleges that he was assaulted by one of the defendants and
denied medical attention for his injuries arising from the
alleged assault, and that the defendants later conspired to
conceal the alleged assault. As relief, plaintiff's complaint
seeks recovery of $3 million in damages.

Currently pending before the court is a motion brought by
the defendants seeking dismissal of plaintiff's complaint
based on his failure to exhaust administrative remedies,
and for failure to state a claim as it relates to all of
plaintiff's causes of action with the exception of his Eighth
Amendment excessive force claim. For the reasons set
forth below, I recommend that defendants' motion to
dismiss for failure to exhaust be denied as premature,

without prejudice, but that their motion otherwise be
granted.

I. *BACKGROUND*[2]

Plaintiff is a New York State prison inmate currently
being held in the custody of the New York State
Department of Corrections and Community Supervision
("DOCCS"). *See generally* Complaint (Dkt. No. 1). While
he is now incarcerated elsewhere, at the times relevant
to his claims in this action, plaintiff was confined in the
Mt. McGregor Correctional Facility ("Mt.McGregor"),
located in Wilton, New York. *Id.*

During the week of February 19, 2009, plaintiff filed a
complaint with Mt. McGregor Superintendent William
T. Hagget, accusing corrections officers of stealing and
consuming state food products. Complaint (Dkt. No. 1)
at 6. Plaintiff was interviewed by a corrections lieutenant
on February 14, 2009, concerning the complaint, and was
advised that the matter would be addressed. *Id.*

On February 15, 2009, plaintiff was subjected to
an unauthorized search of his prison cell by several
corrections officers, all of whom threatened him.
Complaint (Dkt. No. 1) at 7. Plaintiff attributes the search
and threats to his complaint to Superintendent Hagget
concerning the conduct of corrections officers. *Id.* In the
morning of February 16, 2009, plaintiff mailed another
written complaint regarding corrections officers stealing
and consuming state food products to Mt. McGregor
Superintendent Hagget and DOCCS Commissioner Brian
Fischer. *Id.* at 9.

On February 20, 2009, plaintiff was asked to voluntarily
meet with defendant Havernack, a corrections sergeant,
to discuss his complaints. Complaint (Dkt. No. 1) at 9.
Believing the meeting to be a "set up," plaintiff refused
to attend and retreated to his cell. *Id.* After returning to
his cell, defendant Havernack and two other unidentified
officers arrived at plaintiff's cell, placed him in handcuffs,
and escorted him to the basement of Mt. McGregor's
administration building. *Id.* at 10. Upon arriving, and
while still in handcuffs, plaintiff was placed in a chair
in front of a desk, behind which defendant Sheridan,
a corrections lieutenant, was sitting. *Id.* At some point
during the meeting defendant Sheridan stood up, walked
behind plaintiff, and struck plaintiff on the right side of
the face with a closed fist, rendering Lewis unconscious

and knocking him out of his chair. *Id.* at 12. As a result of the incident, Lewis experienced injuries to his right upper facial cheek and lower eyelid, as well as his left upper facial cheek. *Id.* Upon returning to consciousness, plaintiff's several requests for medical attention were denied. *Id.* at 13–14.

**\*2** Shortly following the incident, defendants Imfeld and Johnson, together with an unidentified corrections sergeant, escorted plaintiff to a waiting van, where he was transported out of Mt. McGregor. Complaint (Dkt. No. 1) at 15. As the van left the facility, plaintiff continued to complain of his injuries and request medical attention. *Id.* at ¶ 31. Those requests were denied. *Id.* Eventually, after plaintiff threatened to cause an accident if he was not provided medical attention, defendants Imfeld and Johnson returned the van to Mt. McGregor, where plaintiff was taken to the prison infirmary, and ultimately seen by medical personnel. *Id.* at 15–16.

## II. *PROCEDURAL HISTORY*

Plaintiff's complaint in this action was filed on January 9, 2012. Complaint (Dkt. No. 1). That complaint names Corrections Sergeant Havernack, Corrections Lieutenant Sheridan, and Corrections Officers Chapman, Johnson and Imfeld, all of whom were stationed at Mt. McGregor at the relevant times, as defendants, and sets forth five causes of action, including excessive force and deliberate indifference claims under the Eighth Amendment, a claim for conspiracy to violate his Eighth Amendment rights, and claims that are based upon alleged threats by defendants and the issuance of a false misbehavior report. *Id.*

In answer to plaintiff's complaint, defendants moved for its dismissal on July 3, 2012, arguing that plaintiff's claims are precluded based upon his failure to exhaust available administrative remedies, and additionally that all of his claims, except the excessive force claim, fail to state a claim upon which relief may be granted. Dkt. No. 30. Plaintiff has since responded in opposition to defendants' dismissal motion. Dkt. No. 42. In addition, plaintiff seeks leave, by motion filed on September 21, 2012, to file an amended complaint in the action. Dkt. No. 46. Plaintiff's motion for leave to amend has been opposed by defendants on the basis of futility. Dkt. No. 47.

The parties' cross-motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Dismissal Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure calls upon a court to gauge the facial sufficiency of that pleading using a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *Iqbal,* 556 U.S. 677–78 (quoting Fed.R.Civ.P. 8(a)(2)). While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions. *See id* . at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

**\*3** In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citing *Twombly,* 550 U.S. at 555–56); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964); *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions. *Iqbal,* 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570); *see also Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.' " *In*

*re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 551 U.S. at 94 (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)) (internal citation omitted)); *Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir.2008) ("[W]hen a plaintiff proceeds *pro se,* a court is obliged to construe his pleadings liberally." (internal quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.,* 804 F.Supp.2d 100, 104 (N.D.N.Y.2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

**B.** *Exhaustion of Remedies*
The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) ( "Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04–CV–4587, 2007 WL 389003, at *5–6 (E.D.N.Y. Jan.31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). [3] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

**\*4** The failure of a prisoner to satisfy the PLRA's exhaustion requirement is an affirmative defense that must be raised by a defendant in response to an inmate suit. *Jones v. Block,* 549 U.S. 199, 212, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). In the event the defendant establishes that the inmate plaintiff failed "to fully complete[ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ).

Here, defendants argue that plaintiff's claims are barred based upon plaintiff's alleged failure to comply with the exhaustion requirement pursuant to the PLRA. Defs.'s Memo. of Law (Dkt. No. 30, Attach.1) at 5–7. In support, defendants have filed a declaration from Jeffrey Hale, the Assistant Director of the Inmate Grievance Program with DOCCS, who avers that, based on an examination of DOCCS's records, plaintiff "did not pursue a grievance appeal to CORC regarding an incident date of February 15, 2009[,] or February 20, 2009, including the issues presented in this action[.]" Hale Decl. (Dkt. No. 30, Attach.3) at ¶ 4. In response, plaintiff concedes that he did not file a grievance with regard to the alleged assault on February 20, 2009, because he argued these issues, instead, "at his multiple hearing proceedings," including "Superintendent hearing proceedings"—which I have presumed to be a reference to a disciplinary hearing —and his administrative appeal to the Commissioner. Plf.'s Memo. of Law (Dkt. No. 42) at 9–10.

The exhaustion defense is one that is not particularly well-suited for resolution for a motion to dismiss, absent the clearest indication in a plaintiff's complaint that a failure to exhaust has occurred. *See, e.g., Laporte v. Fisher,* No. 11–CV–9458, 2012 WL 5278543, at *5 (S.D.N.Y. Oct.24, 2012) ("Dismissal pursuant to Rule 12(b)(6) for failure to exhaust is thus appropriate only where nonexhaustion is apparent from the face of the complaint." (citing *McCoy v. Goord,* 255 F.Supp.2d 233, 251, (S.D.N.Y.2003)). In this instance, plaintiff's complaint alleges that he filed more than one grievance related to the facts in his complaint, and that his grievance was denied. Complaint (Dkt. No. 1) at 4. Plaintiff's complaint also alleges that he filed complaints to the DOCCS Commissioner, as well as the

Superintendent at Mt. McGregor. *Id.* Considering these allegations, which are contained in the four corners of plaintiff's complaint, I conclude that there is sufficient doubt as to whether plaintiff exhausted his administrative remedies to deny defendants' motion to dismiss on this ground. *See Laporte,* 2012 WL 5278543, at \*5 (holding that, absent a clear indication from the face of the complaint that a plaintiff has failed to exhaust, dismissal pursuant to Rule 12(b) (6) is not appropriate).

**\*5** While defendants have submitted extrinsic evidence, including the Hale declaration, calling into question plaintiff's representation that exhaustion has been accomplished, such extrinsic materials are not properly considered on a motion to dismiss. It is true that one potential course would be to convert the motion to one for summary judgment, pursuant to Rule 12(d), so that the extrinsic materials would then properly be considered. *See McCoy,* 255 F.Supp.2d at 251 ("If nonexhaustion is not clear from the face of the complaint, a defendant's motion to dismiss should be converted ... to one for summary judgment limited to the narrow issue of exhaustion and the relatively straightforward questions about the plaintiff's efforts to exhaust, whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused."). I recommend against conversion, however, since the plaintiff has not been put on notice that such a conversion was a possibility, or of the possible consequences of such a conversion. *See Hernandez v. Coffey,* 582 F.3d 303, 308 (2d Cir.2009) ("[A]bsent a clear indication that the *pro se* litigant understands the nature and consequences of Rule 56 [governing motions for summary judgment] ... he or she must be so informed by the movant in the notice or, failing that, by the district court.").

Moreover, although plaintiff has apparently conceded that he did not "proper [ly] exhaust[ ]" his claims, *Woodford,* 548 U.S. at 95, relating to the February 20, 2009 incident, he argues that he satisfied his exhaustion obligation by making his arguments during "multiple hearing proceedings," including "Superintendent hearing proceedings" and on appeal after he was found guilty. Plf.'s Memo. of Law (Dkt. No. 42) at 9. I note that "under certain circumstances, an inmate may exhaust his administrative remedies by raising his claim during a related disciplinary proceeding." *Murray v. Palmer,* No. 03–CV–1010, 2010 WL 1235591, at \*3 (Mar. 31, 2010) (Suddaby, J.) (emphasis omitted), *accord, Barksdale*

*v. Frenya,* No. 10–CV–0831, 2012 WL 4107805, at \*8 (N.D.N.Y. Sept. 19, 2012) (Peebles, M.J.), *adopted in its entirety by* 2012 WL 4107801 (D'Agostino, J.); *but see LaBounty v. Johnson,* 253 F.Supp.2d 496, 501–02 (W.D.N.Y.2003) ("An appeal from a disciplinary hearing does not satisfy the grievance exhaustion requirement for a [constitutional] claim, even if the hearing is based on the same set of facts underlying the grievance." (citing *McNair v. Sgt. Jones,* No. 01–CV–3253, 2002 WL 31082948, at \*7 (S .D.N.Y. Sept. 18, 2002)). Because the reasons for plaintiff's choice to pursue his complaints through a disciplinary proceeding are far from clear at this early stage of the action, I am unable to make a determination as to whether plaintiff may be excused from properly exhausting his administrative remedies.

For all of these reasons, I recommend that defendants' motion to dismiss on the basis of plaintiff's alleged failure to exhaust be denied, without prejudice to defendants' right to raise the defense at a point when it can be analyzed based upon a more fully developed record.

### C. *Eleventh Amendment*

**\*6** Plaintiff's complaint alleges that, at the relevant times, the named defendants were acting both in their individuals and official capacities in violating the plaintiff's constitutional rights. Complaint (Dkt. No. 1) at 1. In their motion to dismiss, defendants argue that, to the extent they are sued in their official capacities, plaintiff's claims are precluded under the Eleventh Amendment. Defs.' Memo. of Law (Dkt. No. 30) at 7–8.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Cory v. White,* 457 U.S. 85, 90–91, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993). This absolute immunity, which states enjoy under the Eleventh Amendment, extends to both state agencies and state officials sued for damages in their official capacities when the essence of the plaintiff's claim seeks recovery from the state as the real party in interest. [4] *See, e.g., Daisernia v. State of New York,* 582 F.Supp. 792, 798–99 (N.D.N.Y.1984) (McCurn, J.) ("[A] suit which seeks a money judgment 'which must be paid from the state treasury is barred by the Eleventh Amendment,' even

though it is nominally asserted against an individual official." (quoting *Edelman,* 415 U.S. at 663)); *see also Richards v. State of New York App. Div., Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing, *inter alia, Cory v. White,* 457 U.S. 85, 89–91, 102 S.Ct. 2325, 72 L.Ed.2d 694, (1982)). "To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." [5] *Ying Jing Gan,* 996 F.2d at 529; *see also Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State.").

Plaintiff's damage claims in this action against the named-defendants in their official capacities are, in reality, claims against the State of New York. *Daisernia,* 582 F.Supp. at 798–99. They are therefore subject to dismissal. Accordingly, I recommend that, to the extent that any of the claims asserted in plaintiff's complaint are asserted against any of the named-defendants in their official capacities, those claims be dismissed with prejudice.

### D. *Deliberate Medical Indifference*

Plaintiff's complaint alleges that he requested and was denied immediate medical treatment by various correctional officers, including defendants Imfeld and Johnson, after he was allegedly punched and rendered unconscious by defendant Sheridan on February 20, 2009. Complaint (Dkt. No. 1) at 13–14. Plaintiff's complaint also alleges that he was not provided medical assistance until, while being transferred out of Mt. McGregor and into another facility, he threatened to cause an accident on the highway if defendants Imfeld and Johnson did not return him to the Mt. McGregor infirmary. *Id.* at 15–16. Defendants argue that the nature of plaintiff's alleged injuries and the modest delay in providing plaintiff medical treatment do not give rise to a plausible claim for medical indifference. Defs.' Memo. of Law (Dkt. No. 30, Attach.1) at 8–10.

**\*7** The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society [,]' or which 'involve the unnecessary and wanton infliction of pain [.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86,

100–01, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169–73, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (internal citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)).

"These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009); *Price v. Reilly,* 697 F.Supp.2d 344, 356 (E.D.N.Y.2010). To satisfy the objective requirement, the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care .... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.

*Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006) (internal citations omitted).

The second inquiry of the objective test requires a court to look at the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter,* 316 F.3d 178, 185–

86 (2d Cir.2003). "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find it important and worthy of comment,' whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin,* 467 F.3d at 280 (internal quotation marks and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith,* 316 F.3d at 185) (internal quotations marks omitted).

**\*8** To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin,* 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837); *see also Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Farmer* ); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40).

Applying this legal framework to this action, I conclude that plaintiff's complaint fails to allege facts that plausibly satisfy either the objective or subjective requirements. First, although plaintiff's complaint alleges that defendants Imfeld and Johnson denied him medical care shortly after he regained consciousness, it does

not provide a time frame indicating how long they denied plaintiff medical care. *See generally* Complaint (Dkt. No. 1) at 13–16. Plaintiff's complaint does show that, at some point after, and on the same day of, the alleged assault by defendant Sheridan, he was treated at the Mt. McGregor infirmary for his injuries. *Id.* at 16. Accordingly, I am unable to determine whether the facts alleged plausibly suggest that defendants Imfeld and Johnson acted unreasonably under the circumstances as it relates to how quickly they provided plaintiff with medical treatment. *See Salahuddin,* 467 F.3d at 279–80 ("Thus, prison officials who act reasonably in response to an inmate-health risk cannot be found liable under the Cruel and Unusual Punishment Clause[.]" (internal quotation marks and alterations omitted)); *see also Herbert v. NYC Dep't of Corrs.,* No. 10–CV–8799, 2012 WL 3834660, at \*4 (S.D.N.Y. Aug.21, 2012) (finding that the plaintiff's complaint failed to state a claim for deliberate indifference where the plaintiff "concede[d] ... that he ultimately did receive medical treatment on the same days that he alerted Captains Williams and Brown to his condition"); *Sonds v. St. Barnabas Hosp. Corr. Health Svcs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y. May 21, 2001) (finding that the plaintiff's complaint failed to state a claim for deliberate indifference where the plaintiff suffered an injury to his finger and waited for three and one-half hours for treatment).

**\*9** In addition, and more persuasively, plaintiff's complaint fails to allege facts plausibly suggesting that the alleged denial of medical care was "sufficiently serious." *See Salahuddin,* 467 F.3d at 280 (requiring, when conducting the objective test, to determine, at the second inquiry, whether "the inadequacy of medical care is sufficiently serious"). To make this determination when a plaintiff, as in this case, alleges a "failure to provide any treatment," the court "examine[s] whether the inmate's medical condition is sufficiently serious." *Id.* (citing *Smith,* 316 F.3d at 185–86). Plaintiff's complaint alleges only that he suffered injuries to his "upper facial cheek and lower eyelid, as well as [his] left upper cheek" after being punched just once. Complaint (Dkt. No. 1) at 12. These allegations regarding his injuries do not plausibly suggest that plaintiff's daily activities were "significantly affect[ed]," or that his condition "cause[d] chronic or substantial pain." *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (listing that some of the factors relevant to determining the seriousness of a medical condition include "the presence of a medical condition that significantly affects an individual's activities[,] or

the existence of a chronic and substantial pain"). In addition, these allegations suggest plaintiff suffered only minor injuries, which are not sufficiently serious to state a deliberate indifference claim under the Eighth Amendment. *See, e.g., Harris v. Morton,* No. 05–CV–1049, 2008 WL 596891, at *3, n. 2 (N.D.N.Y. Feb. 29, 2008) (Kahn, J. and Treece, M.J.) (noting that, although plaintiff stated he suffered from a "snapped" neck, he had not indicated that he suffered from anything other than a generic neck injury); *Bennett v. Hunter,* No. 02–CV–1365, 2006 WL 1174309, *3 (N.D.N.Y. May 1, 2006) (Scullin, S.J. and Lowe, M.J.) (finding that a pinched nerve in one's wrist is not a serious medical need); *Jones v. Furman,* No. 02–CV–939F, 2007 WL 894218, at *10 (W.D.N.Y. Mar.21, 2007) (finding that soreness, pain in, and a lump behind, his right ear, lump on the back of his head, small abrasions on his nose and knuckle, and bruising to his back, ribs, and legs, do not constitute the requisite serious medical need) (citing *Hemmings v. Gorczyk,* 134 F.3d 104, 109 (2d Cir.1998)); *Tapp v. Tougas,* No. 05–CV–0149, 2008 WL 4371766, at *9 (N.D.N.Y. Aug.11, 2008) (Peebles, M.J.), *Report and Recommendation Adopted in Part and Rejected in Part,* 2008 WL 4371762 (N.D.N.Y. Sept.18, 2008) (Mordue, C.J.), (noting that a "dull pain" in plaintiff's back and kidney area and persistent rash on plaintiff's foot did not raise a constitutional issue) (citing *Peterson v. Miller,* No. 04–CV–0797, 2007 WL 2071743, at *7 (N.D.N.Y. July 13, 2007) (Hurd, J. and Peebles, M.J.); *Salaam v. Adams,* No. 03–CV–0517, 2006 WL 2827687, *10 (N.D.N.Y. Sept. 29, 2006) (Kahn, J. and Lowe, M.J.) (finding that plaintiff's injuries did not constitute a serious medical condition where plaintiff suffered from intermittent back pain requiring pain relievers and physical therapy, a gastrointestinal problem with stomach pains, and a psychological problem requiring Wellbutrin and/or Neurontin); *see also Ford v. Phillips,* No. 05–CV–6646, 2007 WL 946703, at *12 & n. 70 (S.D.N.Y. Mar. 27, 2007) (finding that plaintiff's allegations of bruises, abrasions, slight bleeding, and scratches, did not constitute a sufficiently serious condition giving rise to a medical indifference claim); *Sonds,* 151 F.Supp.2d at 311 (holding that a cut finger, even where the skin had "ripped off" was insufficiently serious); *Bonner v. New York City Police Dep't,* No. 99–CV–3207, 2000 WL 1171150, at *4 (S.D.N.Y. Aug. 17, 2000) (holding that the inability to "close" a finger due to swelling in one's hand is insufficiently serious to constitute Eighth Amendment violation); *Gomez v. Zwillinger,* 1998 U.S. Dist. LEXIS 17713, at *16 (S.D.N.Y. November 6, 1998) (holding that

back pain and discomfort were not sufficiently serious); *Jones v. New York City Health & Hosp. Corp.,* No. 84–CV–5372, 1984 WL 1280 at *1 (S.D.N.Y. November 28, 1984) (dismissing claim for deliberate medical indifference where plaintiff challenged treatment for bruises on head and body). Even construing his complaint in the light most favorable to plaintiff, I am unable to conclude that the allegations meet the objective test for a deliberate indifference claim. [6]

**\*10** Finally, even if I were to find that the allegations in plaintiff's complaint satisfy the objective test, they would not meet the subjective test. There are simply no allegations in plaintiff's complaint to plausibly suggest that, in denying plaintiff's requests for medical care, defendants Imfeld and Johnson acted with "deliberate indifference." *Salahuddin,* 467 F.3d at 280. The complaint, in contrast, alleges only that defendants Imfeld and Johnson denied plaintiff's request for medical care "after seeing [plaintiff's] injuries." Complaint (Dkt. No. 1) at 14. Bearing in mind that plaintiff's complaint provides little details as to the nature of his injuries, and only alleges that Lewis sustained an injury to his cheeks and an eyelid, I cannot conclude that, even assuming that defendants Imfeld and Johnson did deny plaintiff's medical care, that they were "actually aware of a substantial risk" to plaintiff's health in so doing. *See Salahuddin,* 467 F.3d at 280 (holding that deliberate indifference "requires that the charged official act ... while actually aware of a substantial risk that serious inmate harm will result").

For all of these reasons, I recommend that defendants' motion to dismiss for failure to state a claim be granted as to plaintiff's deliberate indifference claim against defendants Imfeld and Johnson.

### E. *Plaintiff's Claims of Threats and Harassment*

Plaintiff's complaint alleges that, on February 15, 2009, as a prelude to the assault by defendant Sheridan, he was threatened and harassed by corrections officers, including defendant Havernack. Complaint (Dkt. No. 1) at 7. In their motion, defendants also seek dismissal of any claims that may be asserted by those allegations. Defs.' Memo. of Law (Dkt. No. 30, Attach.1) at 10–11.

It is well recognized that "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003); *Aziz Zarif*

*Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Thus, "[v]erbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation." *Carpio v. Walker,* No. 95–CV–1502, 1997 WL 642543, at *6 (N.D.N.Y. Oct.15, 1997) (Pooler, J. and DiBianco, M.J.) (citing *Purcell,* 790 F.2d at 165 (holding that name-calling is insufficient to allege a constitutional violation)); *see also Moncrieffe v. Witbeck,* No. 97–CV–253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.) (finding allegations that the defendants laughed at the plaintiff while he showered did not give rise to liability under section 1983); *Alnutt v. Cleary,* 913 F.Supp. 160, 165 (W.D.N.Y. Jan.8, 1996) ("It is well established that[ ] mere threatening language and gestures of a custodial officer do not, even if true, amount to constitutional violations.").

In this instance, because plaintiff's allegations of threats are insufficient to support a claim under section 1983, I recommend that defendants' motion to dismiss as it relates to plaintiff's claims of verbal threats against defendant Havernack be granted.

### F. Conspiracy

**\*11** Plaintiff's complaint alleges the existence of a conspiracy among the defendants and other prison officials to cover-up the events giving rise to this action and falsify official documents in order to suggest that plaintiff's injuries were self-inflicted. Complaint (Dkt. No. 1) at 13, 16. Specifically, plaintiff alleges that defendants Chapman and Imfeld conspired to violate his constitutional rights when they allegedly drafted a false misbehavior report accusing Lewis of self-inflicting the injuries, which plaintiff alleges, resulted from defendant Sheridan's assault. *Id.* at 16. Plaintiff also alleges that defendant Sheridan and Havernack conspired to conceal defendant Sheridan's alleged assault on plaintiff by moving plaintiff into a different room after the alleged assault, and refusing to provide plaintiff with immediate medical care. *Id.* at 13. Defendants seek dismissal of these claims, arguing that plaintiff's complaint fails to allege facts plausibly suggesting a conspiracy, and, in any event, the claims are barred by the intra-agency conspiracy doctrine. Defs.' Memo. of Law (Dkt. No. 30, Attach.1) at 11–12.

"To prove a [section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state

actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999); *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995). "A complaint containing only conclusory, vague, or general allegations of a conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983).

As it relates to plaintiff's claim of conspiracy against defendants Chapman and Imfeld, "a prison inmate has no general right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *see also Applewhite v. Sheahan,* No. 08–CV–6045, 2013 WL 144957, at *10 (W.D.N.Y. Jan.11, 2013) (dismissing the plaintiff's claim arising from allegations that the defendant filed a false misbehavior report against the plaintiff to disguise the fact that the defendant stole the plaintiff's legal books). "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862. Where an alleged false misbehavior report is filed against a prisoner, his "due process rights are protected if he is granted a hearing on the charges and given an opportunity to rebut them[.]" *Jones v. Coughlin,* 45 F.3d 677, 679 (2d Cir.1995).

Here, the allegation that defendants Chapman and Imfeld conspired to file a false misbehavior report against plaintiff is not cognizable under section 1983 because plaintiff has no general constitutional right to be free from being falsely accused in a misbehavior report. *See Boddie,* 105 F.3d at 862 (dismissing the plaintiff's conspiracy claim arising from allegations that the defendants conspired to retaliate against him by filing a false misbehavior report). For this reason, I recommend defendants' motion to dismiss be granted as it relates to plaintiff's conspiracy claim asserted against defendants Chapman and Imfeld.

**\*12** As it relates to the conspiracy claim against defendants Sheridan and Havernack, I likewise find that plaintiff has failed to state a claim because there is no constitutional right to be free from the cover-up of a past constitutional violation. Generally, the case law that addresses allegations that a defendant conspired to conceal a violation of a plaintiff's constitutional rights assess whether the allegations are sufficient to state a claim

of conspiracy for denying the plaintiff's constitutional right to access the courts. *See, e.g., McGarty v. Town of Carmel,* 997 F.Supp. 435, 437 (S.D.N.Y.1998) (finding that, "for purposes of a motion to amend, plaintiff has made an adequate showing of deprivation of access to courts, and plaintiff's assertions are sufficient to state a [section] 1983 conspiracy claim" where the pleadings alleged that the defendants conspired to conceal evidence that they used excessive force). Here, however, plaintiff has failed to allege any facts that plausibly suggest that his right to access the courts has been denied. Indeed, plaintiff's complaint fails to allege any facts that plausibly suggest that any of plaintiff's constitutional rights have been violated as a result of the alleged conspiracy between defendants Sheridan and Havernack to conceal defendant Sheridan's alleged assault. For this reason, I recommend that defendants' motion to dismiss plaintiff's conspiracy claim as against defendants Sheridan and Havernack be granted.

For the sake of completeness, I will also briefly address whether plaintiff's conspiracy claims are barred, as argued by defendants, by the intracorporate conspiracy doctrine. That doctrine provides that "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation, acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." *See, e.g., Hermann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978); *see also Hartline v. Gallo,* 546 F.3d 95, 99 n. 3 (2d Cir.2008). While the Second Circuit has applied this doctrine in the context of claims arising under 42 U.S.C. § 1985, *see, e.g., Hermann,* 576 F .2d at 459; *Girard v. 94th and Fifth Ave. Corp.,* 530 F.2d 66, 72 (2d Cir.1976), it has not considered the doctrine's applicability to conspiracy claims arising under section 1983. *See Alvarez v. City of New York,* No. 11–CV5464, 2012 WL 6212612, at *3 and n. 21 (S.D.N.Y. Dec. 12, 2012) (finding that the Second Circuit has "applied the intracorporate conspiracy doctrine to Section 1985 claims[, b]ut it has not considered its applicability to conspiracy claims brought under Section 1983"); *see also Appel v. Spiridon,* No. 06–CV1177, 2011 WL 3651353, at *19 (D.Conn. Aug. 18, 2011) (same). Because several district courts within this circuit have applied the doctrine to section 1983 claims, [7] and I have not found any controlling authority to the contrary, I find that the intracorporate conspiracy doctrine applies to the conspiracy claims against defendants Chapman and Imfeld arising under section 1983.

*13 As it relates to the conspiracy claims against defendants Sheridan and Havernack, however, I find that the "personal stake" exception to the intracorporate conspiracy doctrine precludes its applicability. Under this exception, the doctrine does not apply "to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity." *Bond v. Bd. of Educ. of the City of New York,* No. 97–CV–1337, 1999 WL 151702, at *2 (E.D.N.Y. Mar.17, 1999). For the exception to apply, "[t]he plaintiff must ... allege that [the defendants] acted other than in the normal course of their corporate duties." *Girard,* 530 F.2d at 72 (internal quotation marks omitted). Here, plaintiff's complaint clearly alleges that defendants Sheridan and Havernack allegedly moved plaintiff from the location where he was allegedly assaulted while he was still unconscious and refused him immediate medical care in an attempt to conceal defendant Sheridan's alleged assault on plaintiff. Complaint (Dkt. No. 1) at 13. These allegations plausibly suggest that defendants Sheridan and Havernack acted in their own personal interest, not in the interest of DOCCS, in covering up defendant Sheridan's alleged excessive force. *See Hill v. City of New York,* 2005 WL 3591719, at *6 (E.D.N.Y. Dec.30, 2005) (finding that the plaintiff's allegations that the defendants conspired to cover-up one of the defendant's alleged use of excessive force was sufficient to apply the "personal stake" exception to the intracorporate conspiracy doctrine); *Alvarez,* 2012 WL 6212612, at *3 (same). I therefore recommend a finding that the intracorporate conspiracy doctrine does not apply to plaintiff's conspiracy claims against defendants Sheridan and Havernack.

### G. *Plaintiff's Motion for Leave to Amend*

In response to defendants' motion, plaintiff has requested leave to amend to his complaint. Dkt. No. 46. In his proposed amended complaint, plaintiff eliminates the claims of threats and conspiracy. *See generally* Dkt. No. 46, Attach. 2. However, the proposed amended complaint retains a medical indifference claim against defendants Sheridan, Chapman, Imfeld, and Johnson. *Id.* at 13. Defendants oppose plaintiff's motion for leave to amend, arguing that the claims set forth in his proposed amended complaint are futile in light of his failure to exhaust administrative remedies, and that the allegations set forth in that pleading do not cure the deficiencies as it relates to the medical indifference cause of action. Dkt. No. 47 at 4–11.

Motions for leave to amend are governed by Rule 15(a) of the Federal Rules of Civil Procedure which provides, in pertinent part, that unless amendment as a matter of right is permitted—circumstance that is not applicable here—a party may amend its pleading "only with the opposing party's written consent or the court's leave. Fed. Riv. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* Under Rule 15(a), leave to amend ordinarily should be liberally granted absent undue delay, bad faith, dilatory tactics, undue prejudice in being served with the proposed pleading, or futility. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Elma RT v. Landesmann Int'l Mktg. Corp.,* No. 98–CV–3662, 2000 WL 297197, at *3 (S.D.N.Y. Mar.22, 2000) (citing *Foman* ).

*14 Notwithstanding the familiar and well accepted principle that leave to amend should be granted freely, if a claim contained in a proposed amended complaint would be vulnerable in the face of a Rule 12(b)(6) motion, then permitting amendment would be an act of futility that should not be sanctioned. *See, e.g., Saxholm AS v. Dynal, Inc.,* 938 F.Supp. 120, 124 (E.D.N.Y.1996); *In re Boesky Sec. Litig.,* 882 F.Supp. 1371, 1379 (S.D.N.Y.1995). If, on the other hand, a "proposed claim sets forth facts and circumstances which may entitle the plaintiff to relief, then futility is not a proper basis on which to deny amendment." *Saxholm,* 938 F.Supp. at 124 (citing *Allstate Ins. v. Administratia Asigurarilor De Stat,* 875 F.Supp. 1022, 1029 (S.D.N.Y.1995)).

As is the case with respect to his original complaint, plaintiff's proposed amended complaint sets forth a plausible cause of action for the use of excessive force as against defendant Sheridan. [8] Dkt. No. 46, Attach. 2 at 6. Moreover, plaintiff's proposed amended complaint, like his original complaint, alleges that plaintiff fulfilled his obligation to exhaust administrative remedies before filing suit. Dkt. No. 46, Attach. 2 at 3–4. The proposed amended complaint similarly asserts a medical indifference claim, as does its predecessor, but does not cure the deficiencies identified in this report and recommendation. For example, plaintiff's proposed amended complaint fails to allege facts plausibly suggesting that his injuries were "sufficiently serious." *See Salahuddin,* 467 F.3d at 280 (finding that, to determine whether "the inadequacy of medical care is sufficiently serious" when a plaintiff alleges "failure to provide any treatment," the court

"examine[s] whether the inmate's medical condition is sufficiently serious."). Instead, plaintiff's proposed amended complaint alleges only that his face "swelled up ... with his right eye shut closed" and that he experienced pain as a result of his injuries. Dkt. No. 46, Attach. 2 at 8. As a result, I find that it would be futile to permit plaintiff to file his proposed amended complaint, and therefore recommend that his motion for leave to amend be denied.

H. *Whether to Permit Further Amendment*

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend *at least* once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (permitting leave to replead granted where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). Given the procedural history of this action, I must next determine whether to recommend that plaintiff be afforded the benefit of this general rule.

*15 As plaintiff seemingly recognizes, and as is reflected in his proposed amended complaint, the claims arising from allegations of the issuance of false misbehavior reports, harassment, threatening conduct, and conspiracy are not plausibly stated, nor are they likely to be in any future amended complaint. *See generally* Dkt. No. 46, Attach. 2. In contrast, while I also have significant reservations as to plaintiff's ability to state facts demonstrating the existence of a cognizable medical indifference claim for the reasons set forth above, I nonetheless recommend that he be granted leave to amend in order to attempt to plead facts that would support such a claim.

In formulating a new, amended complaint, plaintiff is advised that the law in this circuit clearly provides that " 'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.' " *Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (McAvoy, J.) (quoting *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987)); *Pourzandvakil v. Humphry,* No. 94–CV–

1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.). In his amended complaint, plaintiff therefore must clearly set forth the facts that give rise to the claim, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should specifically allege facts demonstrating the specific involvement of each of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986)

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint in this action states a plausible claim for use of excessive force against defendant Sheridan. However, his complaint fails to state a cognizable claim for medical indifference, filing a false misbehavior report, threats and harassment, and conspiracy against any of defendants. [9] I therefore recommend dismissal of those claims, with leave to file a proposed amended complaint, in accordance with the local rules of practice for this court, with respect to the plaintiff's medical indifference claim only.

Turning to defendants' argument that plaintiff's complaint should be dismissed on the basis of plaintiff's alleged failure to exhaust his administrative remedies, I conclude that the issue cannot be determined at this early stage of the litigation. As a result, I recommend that this portion of defendants' motion be denied, without prejudice to renewal upon a more robust record, either on motion for summary judgment or at trial.

Based upon the foregoing it is therefore hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 30) be GRANTED, and that all of plaintiff's claims, except those based upon defendant Sheridan's alleged assault of plaintiff, asserted against defendants in their individual and official capacities be DISMISSED; and it is further

**\*16** RECOMMENDED that plaintiff be given leave to replead only with respect to his deliberate medical indifference cause of action; and it is further

RECOMMENDED that plaintiff's motion for leave to amend (Dkt. No. 46) be DENIED, without prejudice to his right to submit an amended complaint to the court that cures the deficiencies identified in this report and recommendation.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1294606

Footnotes

1    In his complaint Lewis acknowledges having brought several other actions in this court, as well as the Western and Southern districts. *See* Complaint (Dkt. No. 1) at 4–5. A search of the Public Access to Court Electronic Records reveals that plaintiff has filed seven other actions, with varying results, including (1) *Lewis v. Martin et al.,* No. 1:94–CV6873–SHS (S.D.N.Y., filed Sept. 21, 1994) (settled); (2) *Lewis v. DeShore et al.,* No. 1:94–CV7574–SHS (S.D.N.Y., filed Oct. 19, 1994) (settled); (3) *Lewis v. Rodriguez, et al.,* No. 1:95–CV–3572–TPG (S.D.N.Y. filed May 18, 1995) (dismissed pursuant to 28 U.S.C. § 1915(d)); (4) *Lewis v. Irvin, et al.,* No. 1:97–CV–0789–JTE (W.D.N.Y., filed Oct. 8 1997) (summary judgment granted to the defendants); (5) *Lewis v. Johnson, et al.,* No. 9:08–CV–0482–ATB (N.D.N.Y. filed May 12, 2008) (partial verdict in favor of plaintiff after trial); (6) *Lewis, et al. v. Patterson, et al.,* No. 1:08–CV–1130–LEK–DRH (N.D.N.Y. filed Oct. 20, 2008) (dismissed, and subsequent appeal dismissed); and (7) *Lewis v. Murphy, et al.,* No. 9:12–CV–0268–NAM–CFH (N.D.N.Y., filed Feb. 12, 2012) (pending).

2    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964).

3    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

4    In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham Cnty.,* 547 U.S. 189, 193, 126 S.Ct. 1689, 164 L.Ed.2d 367 (2006).

5    By contrast, the Eleventh Amendment does not preclude lawsuits seeking to impose individual or personal liability on state officials under section 1983. *Hafer v. Melo,* 502 U.S. 21, 30–31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

6    While not considered in making a recommendation concerning defendants' dismissal motion, the medical records submitted by plaintiff in opposition to the pending motion substantiate defendants' contention that, as a result of the alleged assault, Lewis did not suffer a "sufficiently serious" medical condition. *See* Plaintiff's Response (Dkt. No. 46) at 40–42; *see also Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.) ("[I]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider matters outside of the complaint to the extent they 'are consistent with the allegations in the complaint.' "). Those records reveal that, as a result of defendant Sheridan's alleged actions, Lewis suffered from only moderate swelling to his cheek and eyelid, with no other evidence of injury or trauma. Plf.'s Response (Dkt. No. 46) at 41. They also note that, during the examination, plaintiff was argumentative and refused ice treatment to address his swelling. *Id.* at 40.

7    *See Anemone v. Metro. Transp. Auth.,* 419 F.Supp.2d 602, 603–04 (S.D.N.Y.2006) ("In the absence of controlling contrary authority, this court will continue to apply the intracorporate conspiracy doctrine to Section 1983 claims because the doctrine's logic is sound."); *Jackson v. New York State,* 381 F.Supp.2d 80, 90 (N.D.N.Y.2005) (Munson, J.); *Kamara v. City of New York,* No. 03–CV–0337, 2005 WL 3113423, at *7 (E.D.N.Y Nov. 21, 2005); *Nat'l Congress for Puerto Rican Rights v. City of New York,* 75 F.Supp.2d 154, 168–69 (S.D.N.Y.1999).

8    The amended complaint also alleges the failure on the part of other corrections officers to intervene and protect him from the assault. A corrections officer who did not participate in an assault upon an inmate, but was present while it occurred, may nonetheless bear responsibility for any resulting constitutional deprivation. *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). A law enforcement official is under an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. *See Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be used."); *Anderson,* 17 F.3d at 557; *Mowry v. Noone,* No. 02–CV–6257, 2004 WL 2202645, at *4 (W.D.N.Y. Sept. 30, 2004). In order to establish liability on the part of a defendant under this theory, the plaintiff must adduce evidence establishing that (1) the officer had a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene. *Henry v. Dinelle,* No. 9:10–CV–0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov.29, 2011) (Suddaby, J.) (citing *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008). Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *Cf., Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (finding that "liability in a [section] 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams,* 474 U.S. 327, 335–36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)).

9    In their motion, defendants also address a potential due process claim arising from plaintiff's allegation that he was issued a false misbehavior report by corrections officials during the relevant time. Defs.' Memo. of Law (Dkt. No. 30, Attach.1) at 12–13. As discussed above in connection with plaintiff's conspiracy claim against defendants Chapman and Imfeld, the mere allegation that a false misbehavior report has been filed against an inmate does not implicate constitutional conduct. *Boddie,* 105 F.3d at 862; *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). "There must be more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862; *see also Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). In this instance, none of the allegations contained in plaintiff's complaint plausibly suggest that the alleged misbehavior report was issued to further a violation of plaintiff's constitutional rights. As a result, I recommend that this claim, to the extent it is asserted in plaintiff's complaint, be dismissed.

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5355102
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David BREKSA a/k/a David Breska, Plaintiff,
v.
Sergeant RICE, Correctional Sergeant, Clinton
Correctional Facility; and John Doe, Correctional
Officer, Clinton Correctional Facility, Defendants.

No. 9:12–CV–952 (FJS/RFT).
|
Sept. 24, 2013.

**Attorneys and Law Firms**

David Breksa, Auburn, NY, pro se.

Office of the new York, State Attorney General, Gregory
J. Rodriguez, AAG, of Counsel, Albany, NY, for
Defendant.

Hon. Eric T. Schneiderman, Attorney General of the
State of New York, Gregory J. Rodriguez, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendant Rice.

## *ORDER*

SCULLIN, Senior District Judge.

 **\*1** Currently before the Court is Magistrate Judge
Treece's September 3, 2013 ReportRecommendation and
Order, in which he recommended that this Court grant
Defendant Rice's motion to dismiss pursuant to Federal
Rule of Civil Procedure 12(b)(6). *See* Dkt. 12. The parties
did not file any objections to this recommendation.

When a party does not object to a magistrate judge's
report-recommendation, the court reviews that report-
recommendation for clear error or manifest injustice. *See*
*Linares v. Mahunik,* No. 9:05–CV–625, 2009 WL 3165660,
* 10 (N.D.N.Y. July 16, 2009) (citation and footnote
omitted). After conducting this review, "the Court may
'accept, reject, or modify in whole or in part, the ...
recommendations made by the magistrate judge.' " *Id.*
(quoting 28 U.S.C. § 636(b)(1)(C)).

The Court has reviewed Magistrate Judge Treece's
September 3, 2013 ReportRecommendation and Order
for clear error and manifest injustice; and, finding none,
the Court hereby

**ORDERS** that Magistrate Judge Treece's September
3, 2013 Report–Recommendation and Order is
**ACCEPTED in its entirety** for the reasons stated therein;
and the Court further

**ORDERS** that Defendant Rice's motion to dismiss is
**GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment
in favor of Defendants and close this case; and the Court
further

**ORDERS** that the Clerk of the Court shall serve a copy
of this Order on the parties in accordance with the Local
Rules.

**IT IS SO ORDERED.**

DAVID BREKSA a/k/a DAVID BRESKA, [1]
Plaintiff,

-v-

SERGEANT RICE, *Correctional Sergeant, Clinton
Correctional Facility;* JOHN DOE, *Correctional Officer,
Clinton Correctional Facility,*
Defendants.

RANDOLPH F. TREECE, United States Magistrate
Judge.

### *REPORT–RECOMMENDATION and ORDER*

*Pro se* Plaintiff David Breksa brings this civil rights
action, pursuant to 42 U.S.C. § 1983, claiming that the
Defendants violated his constitutional rights while he was
housed at the Clinton Correctional Facility. Dkt. No.
1, Compl. Pending before the Court is Defendant Rice's
Motion to Dismiss, pursuant to Federal Rule of Civil
Procedure 12(b)(6), due to Plaintiff's failure to exhaust his
available administrative remedies prior to bringing this

action. Dkt. No. 10. Despite being granted an extension of time, Plaintiff has not filed any opposition to Defendant's Motion. For the reasons that follow, we recommend that Defendant's Motion be **granted** and this entire action be **dismissed**.

## I. DISCUSSION

### A. Exhaustion of Available Administrative Remedies

In this action, Plaintiff asserts that on April 20, 2012, he was on his way to Islamic services while "horse playing" with other inmates. He was singled out as participating in a fight and brought to the infirmary for inspection of injuries. At that time, Defendant Rice poked him in the eye multiple times while lodging derogatory insults at him. Based upon Defendant Rice's language, Plaintiff believed that he was being targeted because he is a practicing Muslim. During this interaction, Defendant Doe is also alleged to have used force against Plaintiff. *See generally* Compl.

**\*2** By his Motion to Dismiss, Defendant Rice contends that Plaintiff failed to exhaust all available administrative remedies prior to bringing this action, thus dismissal is warranted. The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion of administrative remedies under the PLRA is an affirmative defense which must be raised by the defendants. *Jenkins v. Haubert,* 179 F.3d 19, 28–29 (2d Cir.1999). Once raised, the defendants bear the burden of proving that administrative remedies have not been exhausted. *Howard v. Goord,* 1999 WL 1288679, at * 3 (E.D.N.Y. Dec.28, 1999) (citations omitted). Because the failure to exhaust is an affirmative defense, it need not be pled in the complaint. *Snider v. Melendez,* 199 F.3d 108, 112 (2d Cir.1999). Nevertheless, an affirmative defense, such as a failure to exhaust administrative remedies, may be raised in a pre-answer motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) if the defense is apparent from the face of the complaint. *See Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74–75 (2d Cir.1998).

In bringing this action, Plaintiff utilized a *pro forma* complaint typically used in this District by inmates seeking to vindicate civil rights violations pursuant to 42 U.S.C. § 1983. Contained in that form are a series of questions probing the plaintiff on his efforts to fully exhaust available administrative remedies. The responses supplied by Breksa to those questions form the basis for Defendant Rice's Motion. In accordance with the applicable standard of review, we presume the truth of the factual allegations contained in the Complaint. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

In his Complaint, Breksa states that there was a prisoner grievance procedure at the facility, but he did not present the facts relating to his Complaint in the grievance program. Compl. at ¶¶ 4(a) & 4(b). In explaining his failure to present the issue through the grievance program, Plaintiff states "per PLRA grievance must only be filed in 'prison conditions' cases. This complaint is for actions which already harmed plaintiff and is not a prison conditions suit. There is a Northern District case which supports this." *Id.* at ¶ 4(b). Then, notwithstanding this prior response, Breksa states that there was no grievance procedure at the institution and claims that he complained to other prison authorities, namely the Inspector General, about the facts alleged in his complaint; the Inspector General advised him that he could not help because there were no physical injuries. *Id.* at ¶ 4(c).

**\*3** The Court first notes that Plaintiff's belief that the issues raised in his Complaint are not grievable issues is mistaken. The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (citations omitted). Exhaustion is similarly required even if the prisoner asserts futility as an excuse. *See Booth v. Churner,* 531 U.S. 731, 741 n. 6 (2001) (refusing to "read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise") (cited in *Marvin v. Goord,* 255 F.3d 40, 43 (2d Cir.2001)). Accordingly, the exhaustion requirements apply even where the grievance process does not permit an award of money damages and the prisoner seeks only money damages, provided the grievance tribunal has the authority to take some

responsive action. *See Thomas v. Wright,* 2002 WL 31309190, at *5 (N.D.N.Y. Oct.11, 2002) (citing *Booth v. Churner,* 531 U.S. 731 (2001)).

As a preliminary matter, notwithstanding Plaintiff's conflicting responses about the presence of a grievance program at Clinton, the Court takes judicial notice, based on past decisions and upon matters easily referenced in the public docket, that Clinton Correctional Facility had a grievance program in accordance with the New York State Administrative Code. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 701 *et seq.; see also Marcus v. AT & T Corp.,* 938 F.Supp. 1158, 1164–65 (S.D.N.Y.1996) (noting that on a motion to dismiss, the court may take judicial notice of public documents even if not included in or attached to complaint). Based upon the factual allegations in the Complaint with regard to exhaustion, it is clear that Plaintiff failed to present his claims through the inmate grievance program and thus did not exhaust his available administrative remedies prior to bringing this action. The Court acknowledges that there are certain circumstances where a defendant may be estopped from asserting that a plaintiff had not exhausted administrative remedies for a particular claim. For example, a plaintiff may proceed despite a failure to exhaust where he has been "led to believe by prison officials that his alleged incident was not a 'grievance matter' and assured that his claims were otherwise investigated." *O'Connor v. Featherston,* 2002 WL 818085, at *2 (S.D.N.Y. Apr.29, 2002); *see Heath v. Saddlemire,* 2002 WL 31242204, at *4–5 (N.D.N.Y. Oct.7, 2002) (finding that defendants were estopped from asserting nonexhaustion where plaintiff relied on letter from defendants stating that he had "followed the correct procedure by notifying the Inspector General of [his] complaint"). But, because Plaintiff failed to respond to the Defendant's Motion, despite being given notice and ample

opportunity to do so, he has not supplied the Court with any rebuttal explanation as to his patent failure to follow the directives associated with the grievance program at his facility. Nor has he provided a response positing that other special circumstances exist that would justify his failure to comply. *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Thus, dismissal is warranted. *See Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

## II. CONCLUSION

**\*4** For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendant Rice's Motion to Dismiss (Dkt. No. 10) be **GRANTED** and this entire action be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

### All Citations

Not Reported in F.Supp.2d, 2013 WL 5355102

### Footnotes

1    In his Complaint, Plaintiff states that his name is spelled "Breksa," however, the Department of Corrections and Community Supervision ("DOCCS"), who has present custody of Plaintiff, lists his name as "Breska." *See* DOCS Inmate Locator Website, *available at* http://nysd occslookup.doccsny.gov/GCA00P00/WIQ1/WINQ000 (information for DIN # 11–A–2493) (last visited August 6, 2013). For purposes of our Report–Recommendation and Order, we utilize Plaintiff's spelling.

**End of Document**                                           © 2016 Thomson Reuters. No claim to original U.S. Government Works.


Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 ☞ 1395(7)

78 Civil Rights
   78III Federal Remedies in General
     78k1392 Pleading
      78k1395 Particular Causes of Action
       78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of 1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff,[FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

    FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

    FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

> FN3. The amended complaint reads as follows:
>
> That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).

> FN4. Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, also dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996. FN6 On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See, Toliver v. County of Sullivan,* 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prisoner officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g., Forster v. Bigger,* 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

**\*4** In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

**\*5** Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
James MURRAY, Plaintiff,
v.
R. PALMER, Corrections Officer, Great Meadow
Correctional Facility; S. Griffin, Corrections Officer,
Great Meadow Correctional Facility; M. Terry,
Corrections Officer, Great Meadow Correctional
Facility; F. Englese, Corrections Officer, Great Meadow
Correctional Facility; Sergeant Edwards, Great Meadow
Correctional Facility; K. Bump, Sergeant, Great
Meadow Correctional Facility; K.H. Smith, Sergeant,
Great Meadow Correctional Facility; A. Paolano,
Facility Health Director: and Ted Nesmith, Physicians
Assistant, Defendants.
No. 9:03-CV-1010 (DNH/GLS).

June 20, 2008.
James Murray, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, James Seaman, Esq., Asst. Attorney General,
of Counsel, Albany, NY, for Defendants.

### ORDER

DAVID N. HURD, District Judge.

**\*1** Plaintiff, James Murray, brought this civil rights
action pursuant to 42 U.S.C. § 1983. In a 51 page Report
Recommendation dated February 11, 2008, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted in part (i.e., to the extent that it
requests the dismissal with prejudice of plaintiff's claims
against defendant Paolano and Nesmith); and denied in
part (i.e., to the extent that it requests dismissal of
plaintiff's claims against the remaining defendants on the
grounds of plaintiff's failure to exhaust available
administrative remedies) for the reasons stated in the

Report Recommendation. Lengthy objections to the
Report Recommendation have been filed by the plaintiff.

Based upon a de novo review of the portions of the
Report-Recommendation to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted. See 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is
GRANTED in part and DENIED in part;

2. Plaintiff's complaint against defendants Paolano
and Nesmith is DISMISSED with prejudice;

3. Defendants' motion for summary judgment is
DENIED, to the extent that their request for dismissal of
plaintiff's assault claims under the Eighth Amendment
against the remaining defendants on the grounds of
plaintiff's failure to exhaust available administrative
remedies as stated in the Report-Recommendation.

IT IS SO ORDERED.

JAMES MURRAY, Plaintiff,

-v.-

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great Meadow
C.F.; F. ENGLESE, Corrections Officer, Great Meadow
C.F.; P. EDWARDS, Sergeant, Great Meadow C.F.; K.
BUMP, Sergeant, Great Meadow C.F.; K.H. SMITH,
Sergeant, Great Meadow C.F.; A. PAOLANO, Health
Director, Great Meadows C.F.; TED NESMITH,
Physicians Assistant, Great Meadows C.F., Defendants.

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great Meadow

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

C.F.; Counter Claimants,

-v.-

JAMES MURRAY, Counter Defendant.

### ORDER and REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 78.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

### I. BACKGROUND

#### A. Plaintiff's Second Amended Complaint

In his Second Amended Complaint, James Murray ("Plaintiff") alleges that nine correctional officials and health care providers employed by the New York State Department of Correctional Services ("DOCS") at Great Meadow Correctional Facility ("Great Meadow C.F .") violated his rights under the Eighth Amendment on August 17, 2000, when (1) Defendants Palmers, Griffin, Terry, and Englese assaulted him without provocation while he was incapacitated by mechanical restraints, (2) Defendants Edwards, Bump, and Smith witnessed, but did not stop, the assault, and (3) Defendants Paolano and Nesmith failed to examine and treat him following the assault despite his complaints of having a broken wrist. (Dkt. No. 10, ¶¶ 6-7 [Plf.'s Second Am. Compl.].)

#### B. Defendants' Counterclaim

**\*2** In their Answer to Plaintiff's Second Amended Complaint, three of the nine Defendants (Palmer, Griffin and Terry) assert a counterclaim against Defendant for personal injuries they sustained as a result of Plaintiff's assault and battery upon them during the physical struggle that ensued between them and Plaintiff due to his threatening and violent behavior on August 17, 2000, at Great Meadow C.F. (Dkt. No. 35, Part 1, ¶¶ 23-30 [Defs.'

Answer & Counterclaim].)

I note that the docket in this action inaccurately indicates that this Counterclaim is asserted also on behalf of Defendants Englese, Edwards, Bump, Smith, Paolano, and "Nejwith" (later identified as "Nesmith"). (*See* Caption of Docket Sheet.) As a result, at the end of this Report-Recommendation, *I direct the Clerk's Office to correct the docket sheet to remove the names of those individuals as "counter claimants" on the docket.*

I note also that, while such counterclaims are unusual in prisoner civil rights cases (due to the fact that prisoners are often "judgment proof" since they are without funds), Plaintiff paid the $150 filing fee in this action (Dkt. No. 1), and, in his Second Amended Complaint, he alleges that he received a settlement payment in another prisoner civil rights actions in 2002. (Dkt. No. 10, ¶ 10 [Plf.'s Second Am. Compl.].) Further investigation reveals that the settlement resulted in a payment of $20,000 to Plaintiff. *See Murray v. Westchester County Jail,* 98-CV-0959 (S .D.N.Y.) (settled for $20,000 in 2002).

### II. DEFENDANTS' MOTION AND PLAINTIFF'S RESPONSE

#### A. Defendants' Motion

In their motion for summary judgment, Defendants argue that Plaintiff's Second Amended Complaint should be dismissed for four reasons: (1) Plaintiff has failed to adduce any evidence establishing that Defendant Paolano, a supervisor, was personally involved in any of the constitutional violations alleged; (2) Plaintiff has failed to adduce any evidence establishing that Defendant Nesmith was deliberately indifferent to any of Plaintiff's serious medical needs; (3) at the very least, Defendant Nesmith is protected from liability by the doctrine of qualified immunity, as a matter of law; and (4) Plaintiff has failed to adduce any evidence establishing that he exhausted his available administrative remedies with respect to his assault claim, before filing that claim in federal court. (Dkt. No. 78, Part 13, at 2, 4-13 [Defs.' Mem. of Law].)

In addition, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

to honor non-life-sustaining medical prescriptions written at a former facility. (*Id.* at 3.) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

**\*3** Defendants' motion is accompanied by a Statement of Material Facts, submitted in accordance with Local Rule 7.1(a)(3) ("Rule 7.1 Statement"). (Dkt. No. 78, Part 12.) Each of the 40 paragraphs contained in Defendants' Rule 7.1 Statement is supported by an accurate citation to the record evidence. (*Id.*) It is worth mentioning that the record evidence consists of (1) the affirmations of Defendants Nesmith and Paolano, and exhibits thereto, (2) the affirmation of the Inmate Grievance Program Director for DOCS, and exhibits thereto, (3) affirmation of the Legal Liaison between Great Meadow C.F. and the New York State Attorney General's Office during the time in question, and exhibits thereto, and (4) a 155-page excerpt from Plaintiff's deposition transcript. (Dkt. No. 78.)

**B. Plaintiff's Response**

After being specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and after being granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83), Plaintiff submitted a barrage of documents: (1) 49 pages of exhibits, which are attached to neither an affidavit nor a memorandum of law (Dkt. No. 84); (2) 113 pages of exhibits, attached to a 25-page affidavit (Dkt. No. 85); (3) 21 pages of exhibits, attached to a 12-page supplemental affidavit (Dkt. No. 86); and (4) a 29-page memorandum of law (Dkt. No. 86); and a 13-page supplemental memorandum of law (Dkt. No. 88.)

Generally in his Memorandum of Law and Supplemental Memorandum of Law, Plaintiff responds to

the legal arguments advanced by Defendants. (*See* Dkt. No. 86, Plf.'s Memo. of Law [responding to Defs.' exhaustion argument]; Dkt. No. 88, at 7-13 [Plf.'s Supp. Memo. of Law, responding to Defs.' arguments regarding the personal involvement of Defendant Paolano, the lack of evidence supporting a deliberate indifference claim against Defendant Nesmith, the applicability of the qualified immunity defense with regard to Plaintiff's claim against Defendant Nesmith, and the sufficiency and timing of Plaintiff's prescription-review claim against Defendant Paolano].) Those responses are described below in Part IV of this Report-Recommendation.

However, unfortunately, not among the numerous documents that Plaintiff has provided is a *proper* response to Defendants' Rule 7.1 Statement. (*See* Dkt. No. 85, Part 2, at 45-52 [Ex. N to Plf.'s Affid.].) Specifically, Plaintiff's Rule 7.1 Response (which is buried in a pile of exhibits) fails, with very few exceptions, to "set forth ... specific citation[s] to the record," as required by Local Rule 7.1(a)(3). (*Id.*) I note that the notary's "sworn to" stamp at the end of the Rule 7.1. Statement does not transform Plaintiff's Rule 7.1 Response into record evidence so as to render that Response compliant with Local Rule 7.1. First, Local Rule 7.1 expressly states, "The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits." N.D.N.Y. L.R. 7.1(a)(3). In this way, the District's Local Rule, like similar local rules of other districts, contemplates citations to a record that is independent of a Rule 7.1 Response. *See, e.g., Vaden v. GAP, Inc.,* 06-CV-0142, 2007 U.S. Dist. LEXIS 22736, at \*3-5, 2007 WL 954256 (M.D.Tenn. March 26, 2007) (finding non-movant's verified response to movant's statement of material facts to be deficient because it did cite to affidavit or declaration, nor did it establish that non-movant had actual knowledge of matters to which he attested); *Waterhouse v. District of Columbia,* 124 F.Supp.2d 1, 4-5 (D.D.C.2000) (criticizing party's "Verified Statement of Material Facts," as being deficient in citations to independent record evidence, lacking "firsthand knowledge," and being purely "self-serving" in nature). Moreover, many of Plaintiff's statements in his Rule 7.1 Response are either argumentative in nature or lacking in specificity and personal knowledge, so as to disqualify those statements from having the effect of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

sworn testimony for purposes of a summary judgment motion. *See, infra,* notes 10-12 of this Report-Recommendation.

### III. GOVERNING LEGAL STANDARD

**\*4** Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists,FN1 the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.FN2

> FN1. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN2. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FN3 The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." FN4 Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." FN5

> FN3. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary

judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

> FN4. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN5. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

What this burden-shifting standard means when a plaintiff has failed to *properly* respond to a defendant's Rule 7.1 Statement of Material Facts is that the facts as set forth in that Rule 7.1 Statement will be accepted as true FN6 to the extent that (1) those facts are supported by the evidence in the record,FN7 and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment.FN8

> FN6. See N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* ) [emphasis in original].

> FN7. See *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted].

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

FN8. *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

Implied in the above-stated standard is the fact that a district court has no duty to perform an *independent* review of the record to find proof of a factual dispute, even if the non-movant is proceeding *pro se.*[FN9] In the event the district court chooses to conduct such an independent review of the record, any affidavit submitted by the non-movant, in order to be sufficient to create a factual issue for purposes of a summary judgment motion, must, among other things, not be conclusory.[FN10] (An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.)[FN11] Finally, even where an affidavit is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN12]

FN9. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN10. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN11. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN12. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb.15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

## IV. ANALYSIS

## A. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Paolano Was Personally Involved in the Constitutional Violations Alleged

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN13] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN14] If the defendant is a supervisory official, such as a correctional facility superintendent or a facility health services director, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN15] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN16] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN17]

FN13. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN14. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN15. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN16. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN17. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,*

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

**\*5** Defendants argue that Plaintiff has not adduced evidence establishing that Defendant Paolano, the Great Meadow C.F. Health Services Director during the time in question, was personally involved in the constitutional violations alleged. (Dkt. No. 78, Part 13, at 2 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that, during the time in which Plaintiff was incarcerated at Great Meadow C.F. (i . e., from early August of 2000 to late November of 2000), Defendant Paolano never treated Plaintiff for any medical condition, much less a broken wrist on August 17, 2000. (*Id.; see also* Dkt. No. 78, Part 4, ¶¶ 7-8 [Paolano Affid.]; Dkt. No. 78, Part 5 [Ex. A to Paolano Affid.]; Dkt. No. 78, Part 11, at 32-33 [Plf.'s Depo.].)

Plaintiff responds that (1) Defendant Paolano was personally involved since he "treated" Plaintiff on August 17, 2000, by virtue of his supervisory position as the Great Meadow C.F.'s Health Services Director, and (2) Defendant Paolano has the "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F. (Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites a paragraph of his Supplemental Affidavit, and an administrative decision, for the proposition that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care." (*Id.; see also* Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14.)

**1. Whether Defendant Paolano Was Personally Involved in Plaintiff's Treatment on August 17, 2000**

With respect to Plaintiff's first point (regarding Defendant Paolano's asserted "treatment" of Plaintiff on August 17, 2000), the problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants' assert, Defendant Paolano did not, in fact, treat Plaintiff on August 17, 2000 (or at any time when Plaintiff was incarcerated at Great Meadow C.F.). This was the fact asserted by Defendants in Paragraphs 38 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶ 38 [Defs.' Rule 7.1 Statement].) Defendants supported this factual assertion with record evidence. (*Id.* [providing accurate record citations]; *see also* Dkt. No. 78, Part 12, ¶¶ 37-38 [Defs.' Rule 7.1 Statement, indicating that it was Defendant Nesmith, not Defendant Paolano, who treated Plaintiff on 8/17/00].) Plaintiff has failed to specifically controvert this factual assertion, despite having been given an adequate opportunity to conduct discovery, and having been specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and having been granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83). Specifically, Plaintiff fails to cite any record evidence in support of his denial of Defendants' referenced factual assertion. (*See* Dkt. No. 85, Part 2, at 50 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

**\*6** The Court has no duty to perform an independent review of the record to find proof disputing this established fact. *See, supra,* Part III and note 9 of this Report-Recommendation. Moreover, I decline to exercise my discretion, and I recommend that the Court decline to exercise its discretion, to perform an independent review of the record to find such proof for several reasons, any one of which is sufficient reason to make such a decision: (1) as an exercise of discretion, in order to preserve judicial resources in light of the Court's heavy caseload; (2) the fact that Plaintiff has already been afforded considerable leniency in this action, including numerous deadline extensions and liberal constructions; and (3) the fact that Plaintiff is fully knowledgeable about the requirements of a non-movant on a summary judgment motion, due to Defendants' notification of those requirements, and due to Plaintiff's extraordinary litigation experience.

With regard to this last reason, I note that federal courts normally treat the papers filed by *pro se* civil rights litigants with special solicitude. This is because, generally, *pro se* litigants are unfamiliar with legal terminology and the litigation process, and because the civil rights claims they assert are of a very serious nature. However, "[t]here are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" that is normally afforded *pro se* litigants.[FN18] Generally, the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

rationale for diminishing special solicitude (at least in the Second Circuit) is that the *pro se* litigant's extreme litigiousness demonstrates his *experience,* the lack of which is the reason for extending special solicitude to a *pro se* litigant in the first place.[FN19] The Second Circuit has diminished this special solicitude, and/or indicated the acceptability of such a diminishment, on several occasions.[FN20] Similarly, I decide to do so, here, and I recommend the Court do the same.

> FN18. *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept.26, 2007)* (Kahn, J., adopting Report-Recommendation) [citations omitted].

> FN19. *Koehl,* 2007 WL 2846905, at *3 & n. 18 [citations omitted].

> FN20. *See, e.g., Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977) [citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

Plaintiff is no stranger to the court system. A review of the Federal Judiciary's Public Access to Court Electronic Records ("PACER") System reveals that Plaintiff has filed at least 15 other federal district court actions, [FN21] and at least three federal court appeals.[FN22] Furthermore, a review of the New York State Unified Court System's website reveals that he has filed at least 20 state court actions,[FN23] and at least two state court appeals.[FN24] Among these many actions he has had at least one victory, resulting in the payment of $20,000 to him in settlement proceeds.[FN25]

> FN21. *See Murray v. New York,* 96-CV-3413 (S.D.N.Y.); *Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y.); *Murray v. McGinnis,* 99-CV-1908 (W.D.N.Y.); *Murray v. McGinnis,* 99-CV-2945 (S.D.N.Y.); *Murray v. McGinnis,* 00-CV-3510 (S.D.N.Y.); *Murray v. Jacobs,* 04-CV-6231 (W.D.N.Y.); *Murray v. Bushey,* 04-CV-0805 (N.D.N.Y.); *Murray v. Goord,* 05-CV-1113 (N.D.N.Y.); *Murray v. Wissman,* 05-CV-1186 (N.D.N.Y.); *Murray v. Goord,* 05-CV-1579 (N.D.N.Y.); *Murray v. Doe,* 06-CV-0205 (S.D.N.Y.); *Murray v. O'Herron,* 06-CV-0793 (W.D.N.Y.); *Murray v. Goord,* 06-CV-1445 (N.D.N.Y.); *Murray v. Fisher,* 07-CV-0306 (W.D.N.Y.); *Murray v. Escrow,* 07-CV-0353 (W.D.N.Y.).

> FN22. *See Murray v. McGinnis,* No. 01-2533 (2d Cir.); *Murray v. McGinnis,* No. 01-2536 (2d Cir.); *Murray v. McGinnis,* No. 01-2632 (2d Cir.).

> FN23. *See Murray v. Goord,* Index No. 011568/1996 (N.Y. Sup.Ct., Westchester County); *Murray v. Goord,* Index No. 002383/1997 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002131/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002307/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002879/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002683/2004 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002044/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. McGinnis,* Index No. 002099/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Sullivan,* Index No. 002217/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002421/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002495/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002496/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002888/2006 (N.Y. Sup.Ct., Chemung

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

County); *Murray v. LeClaire,* Index No. 002008/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002009/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No.002010/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002011/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. Fisher,* Index No. 002762/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. New York,* Claim No. Claim No. 108304, Motion No. 67679 (N.Y.Ct.Cl.); *Murray v. New York,* Motion No. M-67997 (N.Y.Ct.Cl.).

FN24. *See Murray v. Goord,* No. 84875, 709 N.Y. S.2d 662 (N.Y.S.App.Div., 3d Dept.2000); *Murray v. Goord,* No. 83252, 694 N.Y.S .2d 797 (N.Y.S.App.Div., 3d Dept.1999).

FN25. *See Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y .) (settled for $20,000 in 2002).

I will add only that, even if I were inclined to conduct such an independent review of the record, the record evidence that Plaintiff cites regarding this issue in his Supplemental Memorandum of Law does not create such a question of fact. (*See* Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law, citing Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14].) It appears entirely likely that Defendant Paolano had the ultimate responsibility for providing medical treatment to the inmates at Great Meadow C.F.FN26 However, this duty arose solely because of his supervisory position, i.e., as the Facility Health Services Director. It is precisely this sort of supervisory duty that does *not* result in liability under 42 U.S.C. § 1983, as explained above.

FN26. To the extent that Plaintiff relies on this evidence to support the proposition that Defendant Paolano had the "sole" responsibility for such health care, that reliance is misplaced. Setting aside the loose nature of the administrative decision's use of the word "sole," and the different context in which that word was used (regarding the review of Plaintiff's grievance about having had his prescription

discontinued), the administrative decision's rationale for its decision holds no preclusive effect in this Court. I note that this argument by Plaintiff, which is creative and which implicitly relies on principles of estoppel, demonstrates his facility with the law due to his extraordinary litigation experience.

**\*7** As for the other ways through which a supervisory official may be deemed "personally involved" in a constitutional violation under 42 U.S.C. § 1983, Plaintiff does not even argue (or allege facts plausibly suggesting) FN27 that Defendant Paolano *failed to remedy* the alleged deliberate indifference to Plaintiff's serious medical needs on August 17, 2000, after learning of that deliberate indifference through a report or appeal. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano created, or allowed to continue, *a policy or custom* under which the alleged deliberate indifference on August 17, 2000, occurred. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano had been *grossly negligent* in managing subordinates (such as Defendant Nesmith) who caused the alleged deliberate indifference. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano exhibited *deliberate indifference* to the rights of Plaintiff by failing to act on information indicating that Defendant Nesmith was violating Plaintiff's constitutional rights.

FN27. *See Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (holding that, for a plaintiff's complaint to state a claim upon which relief might be granted under Fed.R.Civ.P. 8 and 12, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," or, in other words, there must be "plausible grounds to infer [actionable conduct]"), *accord, Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

original].

In the alternative, I reach the same conclusion (that Plaintiff's claim against Defendant Paolano arising from the events of August 17, 2000, lacks merit) on the ground that there was no constitutional violation committed by Defendant Nesmith on August 17, 2000, in which Defendant Paolano could have been personally involved, for the reasons discussed below in Part IV.B. of this Report-Recommendation.

**2. Whether Defendant Paolano Was Personally Involved in the Review of Plaintiff's Prescriptions in Early August of 2000**

With respect to Plaintiff's second point (regarding Defendant Paolano's asserted "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F.), there are three problems with this argument.

First, the argument regards a claim that is not properly before this Court for the reasons explained below in Part IV.E. of this Report-Recommendation.

Second, as Defendants argue, even if the Court were to reach the merits of this claim, it should rule that Plaintiff has failed to adduce evidence establishing that Defendant Paolano was personally involved in the creation or implementation of DOCS' prescription-review policy. It is an uncontroverted fact, for purposes of Defendants' motion, that (1) the decision to temporarily deprive Plaintiff of his previously prescribed pain medication (i.e., pending the review of that medication by a physician at Great Meadow C.F.) upon his arrival at Great Meadow C.F. was made by an "intake nurse," not by Defendant Paolano, (2) the nurse's decision was made pursuant to a policy instituted by DOCS, not by Defendant Paolano, and (3) Defendant Paolano did not have the authority to alter that policy. These were the facts asserted by Defendants in Paragraphs 6 through 9 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 6-9 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits two of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at 46-47 [Ex. N to Plf.'s Affid.].)

**\*8** For example, in support of his denial of Defendants' factual assertion that "[t]his policy is not unique to Great Meadow, but applies to DOCS facilities generally," Plaintiff says that, at an unidentified point in time, "Downstate CF honored doctors proscribed [sic] treatment and filled by prescriptions from Southport Correctional Facility .... Also I've been transferred to other prisons such as Auburn [C.F.] in which they honored doctors prescribe[d] orders." (*Id.*) I will set aside the fact that Defendants' factual assertion is not that the policy applies to every single DOCS facility but that it applies to them as a general matter. I will also set aside the fact that Plaintiff's assertion is not supported by a citation to independent record evidence. The main problem with this assertion is that it is not specific as to what year or years he had these experiences, nor does it even say that his prescriptions were immediately honored without a review by a physician at the new facility.

The other piece of "evidence" Plaintiff cites in support of this denial is "Superintendent George B. Duncan's 9/22/00 decision of Appeal to him regarding [Plaintiff's Grievance No.] GM-30651-00." (*Id.*) The problem is that the referenced determination states merely that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care, and has the final say regarding all medical prescriptions." (Dkt. No. 86, at 14 [Ex. 14 to Plf.'s Suppl. Affid.].) For the sake of much-needed brevity, I will set aside the issue of whether an IGP Program Director's broadly stated *rationale* for an appellate determination with respect to a prisoner's grievance can ever constitute evidence sufficient to create proof of a genuine issue of fact for purposes of a summary judgment motion. The main problem with this "evidence" is that there is absolutely nothing inconsistent between (1) a DOCS policy to temporarily deprive prisoners of non-life-sustaining prescription medications upon their arrival at a correctional facility, pending the review of those medical prescriptions by a physician at the facility, and (2) a DOCS policy to give Facility Health Service Directors the "final say" regarding the review of those medical prescriptions.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Because Plaintiff has failed to support his denial of these factual assertions with citations to record evidence that actually controverts the facts asserted, I will consider the facts asserted by Defendants as true. N.D.N.Y. L.R. 7.1(a)(3). Under the circumstances, I decline, and I recommend the Court decline, to perform an independent review of the record to find proof disputing this established fact for the several reasons described above in Part IV.A.1. of this Report-Recommendation.

Third, Plaintiff has failed to adduce evidence establishing that the policy in question is even unconstitutional. I note that, in his Supplemental Memorandum of Law, Plaintiff argues that "deliberate indifference to serious medical needs is ... shown by the fact that prisoners are denied access to a doctor and physical examination upon arrival at [Great Meadow] C.F. to determine the need for pain medications which aren't life sustaining ...." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) As a threshold matter, Plaintiff's argument is misplaced to the extent he is arguing about the medical care other prisoners may not have received upon their arrival at Great Meadow C.F. since this is not a class-action. More importantly, to the extent he is arguing about any medical care that he (allegedly) did not receive upon his arrival at Great Meadow C.F., he cites no record evidence in support of such an assertion. (*Id.*) Indeed, he does not even cite any record evidence establishing that, upon his arrival at Great Meadow C.F. in early 2000, either (1) he asked a Defendant in this action for such medical care, or (2) he was suffering from a serious medical need for purposes of the Eighth Amendment. (*Id.*)

**\*9** If Plaintiff is complaining that Defendant Paolano is liable for recklessly causing a physician at Great Meadow C.F. to excessively delay a review Plaintiff's pain medication upon his arrival at Great Meadow C.F., then Plaintiff should have asserted that allegation (and some basic facts supporting it) in a pleading in this action so that Defendants could have taken adequate discovery on it, and so that the Court could squarely review the merits of it. (Dkt. No. 78, Part 11, at 53 [Plf.'s Depo.].)

For all of these reasons, I recommend that Plaintiff's claims against Defendant Paolano be dismissed with prejudice.

**B. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Nesmith Was Deliberately Indifferent to Plaintiff's Serious Medical Needs**

Generally, to state a claim for inadequate medical care, a plaintiff must allege facts plausibly suggesting two things: (1) that he had a sufficiently serious medical need; and (2) that the defendants were deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Defendants argue that, even assuming that Plaintiff's broken wrist constituted a sufficiently serious medical condition for purposes of the Eighth Amendment, Plaintiff has not adduced evidence establishing that, on August 17, 2000, Defendant Nesmith acted with deliberate indifference to that medical condition. (Dkt. No. 78, Part 13, at 4-9 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that Defendant Nesmith sutured lacerations in Plaintiff's forehead, ordered an x-ray examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. (*Id.* at 7-9 [providing accurate record citations].) Moreover, argue Defendants, Plaintiff's medical records indicate that he did not first complain of an injury to his wrist until hours after he experienced that injury. (*Id.* at 8 [providing accurate record citation].)

Plaintiff responds that "[he] informed P.A. Nesmith that his wrist felt broken and P.A. Nesmith ignored plaintiff, which isn't reasonable. P.A. Nesmith didn't even care to do a physical examination to begin with[,] which would've revealed [the broken wrist] and is fundamental medical care after physical trauma." (Dkt. No. 88, at 11 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites *no* record evidence. (*Id.* at 11-12.)

The main problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants have argued, Defendant Nesmith (1) sutured lacerations in Plaintiff's forehead within hours if not minutes of Plaintiff's injury and (2) ordered an x-ray

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. These facts were asserted by Defendants in Paragraphs 27 through 32 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 27-32 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits most of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at 48-50 [Ex. N to Plf.'s Affid.].)

**\*10** The only denial he supports with a record citation is with regard to when, within the referenced 24-hour period, Defendant Nesmith ordered his wrist x-ray. This issue is not material, since I have assumed, for purposes of Defendants' motion, merely that Defendant Nesmith ordered Plaintiff's wrist x-ray within 24 hours of the onset of Plaintiff's injury.[FN28] (Indeed, whether the wrist x-ray was ordered in the late evening of August 17, 2000, or the early morning of August 18, 2000, would appear to be immaterial for the additional reason that it would appear unlikely that any x-rays could be conducted in the middle of the night in Great Meadow C.F.)

FN28. Furthermore, I note that the record evidence he references (in support of his argument that the x-ray was on the morning of August 18, 2000, not the evening of August 17, 2000) is "Defendants exhibit 20," which he says "contains [an] 11/20/00 Great Meadow Correctional Facility Investigation Sheet by P. Bundrick, RN, NA, and Interdepartmental Communication from defendant Ted Nesmith P.A. that state [that the] X ray was ordered on 8/18/00 in the morning." (*Id.*) I cannot find, in the record, any "exhibit 20" having been submitted by Defendants, who designated their exhibits by letter, not number. (*See generally* Dkt. No. 78.) However, at Exhibit G of Defendant Nesmith's affidavit, there is the "Investigation Sheet" to which Plaintiff refers. (Dkt. No. 78, Part 3, at 28 [Ex. G to Nesmith

Affid.].) The problem is that document does not say what Plaintiff says. Rather, it says, "Later that evening [on August 17, 2000] ... [a]n x-ray was ordered for the following morning ...." (*Id.*) In short, the document says that the x-ray was not ordered *on* the morning of August 18, 2007, but *for* that morning. Granted, the second document to which Plaintiff refers, the "Interdepartmental Communication" from Defendant Nesmith, does say that "I saw him the next morning and ordered an xray ...." (*Id.* at 29.) I believe that this is a misstatement, given the overwhelming record evidence to the contrary.

Moreover, in confirming the accuracy of Defendants' record citations contained in their Rule 7.1 Statement, I discovered several facts further supporting a finding that Defendant Nesmith's medical care to Plaintiff was both prompt and responsive. In particular, the record evidence cited by Defendants reveals the following specific facts:

(1) at approximately 10:17 a.m. on August 17, 2000, Plaintiff was first seen by someone in the medical unit at Great Meadow C.F. (Nurse Hillary Cooper);

(2) at approximately 10:40 a.m. on August 17, 2000, Defendant Nesmith examined Plaintiff; during that examination, the main focus of Defendant Nesmith's attention was Plaintiff's complaint of the lack of feeling in his lower extremities; Defendant Nesmith responded to this complaint by confirming that Plaintiff could still move his lower extremities, causing Plaintiff to receive an x-ray examination of his spine (which films did not indicate any pathology), and admitting Plaintiff to the prison infirmary for observation;

(3) at approximately 11:00 a.m. on August 17, 2000, Defendant Nesmith placed four sutures in each of two 1/4" lacerations on Plaintiff's left and right forehead;

(4) by 11:20 a.m. Plaintiff was given, or at least prescribed, Tylenol by a medical care provider;

(5) Plaintiff's medical records reflect no complaint by Plaintiff of any injury to his wrist at any point in time other than between 4:00 p.m. and midnight on August 17,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

2000;

(6) at some point after 9:00 p.m. on August 17, 2000, and 9:00 a.m. on the morning of August 18, 2000, Defendant Nesmith ordered that Plaintiff's wrist be examined by x-ray, in response to Plaintiff's complaint of an injured wrist; that x-ray examination occurred at Great Meadow C.F. at some point between 9:00 a.m. on August 17, 2000, and 11:00 a.m. on August 18, 2000, when Defendant Nesmith personally performed a "wet read" of the x-rays before sending them to Albany Medical Center for a formal reading by a radiologist;

(7) at approximately 11:00 a.m. on August 18, 2000, Defendant Nesmith placed a splint on Plaintiff's wrist and forearm with the intent of replacing it with a cast in a couple of days; the reason that Defendant Nesmith did not use a cast at that time was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith believed, based on 30 years experience treating hundreds of fractures, that it was generally not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides;

**\*11** (8) on August 22, 2000, Defendant Nesmith replaced the splint with a cast;

(9) on August 23, 2000, Plaintiff was discharged from the infirmary at Great Meadow C.F.; and

(10) on August 30, 2000, Defendant Nesmith removed the sutures from Plaintiff's forehead. (*See generally* Dkt. No. 78, Part 2, ¶¶ 3-15 [Aff. of Nesmith]; Dkt. No. 78, Part 3, Exs. A-E [Exs. to Aff. of Nesmith].)

"[D]eliberate indifference describes a state of mind more blameworthy than negligence," [FN29] one that is "equivalent to criminal recklessness." [FN30] There is no evidence of such criminal recklessness on the part of Defendant Nesmith, based on the uncontroverted facts before the Court, which show a rather prompt and responsive level of medical care given by Defendant Nesmith to Plaintiff, during the hours and days following the onset of his injuries.

FN29. *Farmer v. Brennan,* 511 U.S. 825, 835,

114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at \*4 (N.D.N.Y. Apr.9, 1998) (Pooler, J.) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

FN30. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *cf. Farmer,* 511 U.S. at 827 ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment.").

In his argument that his treatment in question constituted deliberate indifference to a serious medical need, Plaintiff focuses on the approximate 24-hour period that appears to have elapsed between the onset of his injury and his receipt of an x-ray examination of his wrist. He argues that this 24-hour period of time constituted a delay that was unreasonable and reckless. In support of his argument, he cites two cases. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). However, the facts of both cases are clearly distinguishable from the facts of the case at hand.

In *Brown v. Hughes,* the Eleventh Circuit found a genuine issue of material fact was created as to whether a correctional officer knew of a prisoner's foot injury during the four hours in which no medical care was provided to the prisoner, so as to preclude summary judgment for that officer. *Brown,* 894 F.2d at 1538-39. However, the Eleventh Circuit expressly stated that the question of fact was created because the prisoner had "submitted affidavits stating that [the officer] was called to his cell because there had been a fight, that while [the officer] was present [the prisoner] began to limp and then hop on one leg, that his foot began to swell severely, that he told [the officer] his foot felt as though it were broken, and that [the officer] promised to send someone to look at it but never did." *Id.* Those are *not* the facts of this case.

In *Loe v. Armistead,* the Fourth Circuit found merely that, in light of the extraordinary leniency with which *pro se* complaints are construed, the court was unable to conclude that a prisoner had failed to state a claim upon which relief might be granted for purposes of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) because the prisoner had alleged that the defendants-*despite being (at some point) "notified" of the prisoner's injured arm*-had inexplicably delayed for 22 hours in giving him medical treatment for the injury. *Loe,* 582 F.2d at 1296. More specifically, the court expressly construed the prisoner's

complaint as alleging that, following the onset of the plaintiff's injury at 10:00 a.m. on the day in question, the plaintiff was immediately taken to the prison's infirmary where a nurse, while examining the prisoner's arm, heard him complain to her about pain. *Id.* at 1292. Furthermore, the court construed the prisoner's complaint as alleging that, "[t]hroughout the day, until approximately 6:00 p.m., [the prisoner] repeatedly requested that he be taken to the hospital. He was repeatedly told that only the marshals could take him to a hospital and that they had been notified of his injury." *Id.* at 1292-93. Again, those are *not* the facts of this case.

*12 Specifically, there is no evidence in the record of which I am aware that at any time before 4:00 p.m. on August 17, 2000, Defendant Nesmith either (1) heard Plaintiff utter a complaint about a wrist injury sufficient to warrant an x-ray examination or (2) observed physical symptoms in Plaintiff's wrist (such as an obvious deformity) that would place him on notice of such an injury. As previously stated, I decline, and I urge the Court to decline, to tediously sift through the 262 pages of documents that Plaintiff has submitted in the hope of finding a shred of evidence sufficient to create a triable issue of fact as to whether Plaintiff made, and Defendant Nesmith heard, such a complaint before 4:00 p.m. on August 17, 2000.

I note that, in reviewing Plaintiff's legal arguments, I have read his testimony on this issue. That testimony is contained at Paragraphs 8 through 12, and Paragraph 18, of his Supplemental Affidavit. (*See* Dkt. No. 86, at ¶¶ 8-10, 18 [Plf.'s Supp. Affid., containing two sets of Paragraphs numbed "5" through "11"].) In those Paragraphs, Plaintiff swears, in pertinent part, that "[w]hile I was on the x-ray table I told defendant Ted Nesmith, P.A. and/or Bill Redmond RN ... that my wrist felt broken, and was ignored." (*Id.* at ¶ 9.) Plaintiff also swears that "I was [then] put into a room in the facility clinic[,] and I asked defendant Ted Nesmith, PA[,] shortly thereafter for [an] x-ray of [my] wrist[,] pain medication and [an] ice pack but wasn't given it [sic]." (*Id.* at ¶ 10.) Finally, Plaintiff swears as follows: "At one point on 8/17/00 defendant Nesmith told me that he didn't give a damn when I kept complaining that my wrist felt broken and how I'm going to sue him cause I'm not stupid

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

[enough] to not know he's supposed to do [a] physical examination [of me], [and not] to ignore my complaints about [my] wrist feeling broke and feeling extreem [sic] pain. He told me [to] stop complaining [and that] he's done with me for the day." (*Id.* at ¶ 18.)

This last factual assertion is important since a response of "message received" from the defendant appears to have been critical in the two cases cited by Plaintiff. It should be emphasized that, according to the undisputed facts, when Plaintiff made his asserted wrist complaint to Defendant Nesmith during the morning of August 17, 2000, Defendant Nesmith was either suturing up Plaintiff's forehead or focusing on Plaintiff's complaint of a lack of feeling in his lower extremities. (This complaint of lack of feeling, by the way, was found to be inconsistent with Defendant Nesmith's physical examination of Plaintiff.)

In any event, Defendant Nesmith can hardly be said to have, in fact, "ignored" Plaintiff since he placed him under *observation* in the prison's infirmary (and apparently was responsible for the prescription of Tylenol for Plaintiff).[FN31] Indeed, it was in the infirmary that Plaintiff was observed by a medical staff member to be complaining about his wrist, which resulted in an x-ray examination of Plaintiff's wrist.

> FN31. In support of my conclusion that this fact alone is a sufficient reason to dismiss Plaintiff's claims against Defendant Nesmith, I rely on a case cited by Plaintiff himself. *See Brown*, 894 F.2d at 1539 ("Although no nurses were present [in the hospital] at the jail that day, the procedure of sending [the plaintiff] to the hospital, once employed, was sufficient to ensure that [the plaintiff's broken] foot was treated promptly. Thus, [the plaintiff] has failed to raise an issue of deliberate indifference on the part of these defendants, and the order of summary judgment in their favor must be affirmed.").

**\*13** Even if it were true that Plaintiff made a wrist complaint directly to Defendant Nesmith (during Defendant Nesmith's examination and treatment of Plaintiff between 10:40 a.m. and 11:00 a.m. on August 17,

2000), and Defendant Nesmith heard that complaint, and that complaint were specific and credible enough to warrant an immediate x-ray examination, there would be, at most, only some *negligence* by Defendant Nesmith in not ordering an x-ray examination until 9:00 p.m. that night.

As the Supreme Court has observed, "[T]he question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle*, 429 U.S. at 107.[FN32] For this reason, this Court has actually held that a *17-day* delay between the onset of the prisoner's apparent wrist fracture and the provision of an x-ray examination and cast did not constitute deliberate indifference, as a matter of law. *Miles v. County of Broome*, 04-CV-1147, 2006 U.S. Dist. LEXIS 15482, at *27-28, 2006 WL 561247 (N.D.N.Y. Mar. 6, 2006) (McAvoy, J.) (granting defendants' motion for summary judgment with regard to prisoner's deliberate indifference claim).

> FN32. *See also Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) (prisoner's "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention [with regard to the treatment of his broken finger], are not adequate grounds for a section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.") [citation omitted]; *cf. O'Bryan v. Federal Bureau of Prisons*, 07-CV-0076, 2007 U.S. Dist. LEXIS 65287, at *24-28 (E.D.Ky. Sept. 4, 2007) (holding no deliberate indifference where prisoner wore wrist brace/bandage on his broken wrist for two months even though he had asked for a cast; finding that "the type of wrap would only go the difference of opinion between a patient and doctor about what should be done, and the Supreme Court has stated that a difference of opinion regarding the plaintiff's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

diagnosis and treatment does not state a constitutional claim.").

As I read Plaintiff's complaints about the medical care provided to him by Defendant Nesmith in this action, I am reminded of what the Second Circuit once observed:

It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] understandably seeks .... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves ....

*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotations and citations omitted].

For all of these reasons, I recommend that Plaintiff's claims against Defendant Nesmith be dismissed with prejudice.

### C. Whether Defendant Nesmith Is Protected from Liability by the Doctrine of Qualified Immunity, As a Matter of Law

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " [FN33] In determining whether a particular right was *clearly established,* courts in this Circuit consider three factors:

FN33. *Williams,* 781 F.2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ).

*14 (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. [FN34]

FN34. *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted).

Regarding the issue of whether *a reasonable person would have known* he was violating a clearly established right, this "objective reasonableness" [FN35] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." [FN36] As the Supreme Court explained,

FN35. See *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

FN36. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law .... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

should be recognized.[FN37]

> FN37. *Malley,* 475 U.S. at 341.

Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law."[FN38]

> FN38. *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases].)

Here, I agree with Defendants that, based on the current record, it was not clearly established that, between August 17, 2000, and August 22, 2000, Plaintiff possessed an Eighth Amendment right to receive an x-ray examination and casting of his wrist any sooner than he did. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].) I note that neither of the two decisions cited by Plaintiff (discussed earlier in this Report-Recommendation) were controlling in the Second Circuit. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). I also note that what was controlling was the Supreme Court's decision in *Estelle v. Gamble,* holding that "the question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.

Furthermore, I agree with Defendants that, at the very least, officers of reasonable competence could have believed that Defendant Nesmith's actions in conducting the x-ray examination and casting when he did were legal.[FN39] In his memorandum of law, Plaintiff argues that Defendant Nesmith *intentionally* delayed giving Plaintiff an x-ray for 12 hours, and that the four-day delay of placing a hard cast on Plaintiff's wrist caused Plaintiff *permanent injury to his wrist.* (Dkt. No. 88, at 12-13 [Plf.'s Supp. Memo. of Law].) He cites no portion of the

record for either assertion. (*Id.*) Nor would the fact of permanent injury even be enough to propel Plaintiff's Eighth Amendment claim to a jury.[FN40] I emphasize that it is an undisputed fact, for purposes of Defendants' motion, that the reason that Defendant Nesmith placed a splint and not a cast on Plaintiff's wrist and arm on the morning of August 18, 2000, was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith's medical judgment (based on his experience) was that it was not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides.[FN41] Officers of reasonable competence could have believed that decision was legal.

> FN39. (*Id.*)

> FN40. This particular point of law was recognized in one of the cases Plaintiff himself cites. *Loe,* 582 F.2d at 1296, n. 3 ("[Plaintiff's] assertion that he suffered pain two and one-half weeks after the injury and that the fracture had not healed do not establish deliberate indifference or lack of due process. Similarly, his allegation that he has not achieved a satisfactory recovery suggests nothing more than possible medical malpractice. It does not assert a constitutional tort.").

> FN41. (Dkt. No. 78, Part 12, ¶¶ 31-33 [Defs.' Rule 7.1 Statement]; *see also* Dkt. No. 78, Part 2, ¶¶ 11-13 [Affid. of Nesmith]; Dkt. No. 78, Part 3, Ex. C [Exs. to Affid. of Nesmith] )

**\*15** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Nesmith based on the doctrine of qualified immunity.

**D. Whether Plaintiff Has Adduced Evidence Establishing that He Exhausted His Available Administrative Remedies with Respect to His Assault Claim**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

or other correctional facility until such administrative remedies as are available are exhausted." [FN42] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN43] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[FN44]

FN42. 42 U.S.C. § 1997e.

FN43. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

FN44. 7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure.[FN45] *First,* an inmate must file a complaint with the facility's IGP clerk within fourteen (14) calendar days of the alleged occurrence. A representative of the facility's inmate grievance resolution committee ("IGRC") has seven working days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within seven (7) working days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within four (4) working days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within ten (10) working days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within four (4) working days of receipt of the superintendent's written decision. CORC is to render a written decision within twenty (20) working days of receipt of the appeal. It is important to emphasize that *any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.* [FN46]

FN45. 7 N.Y.C.R.R. § 701.7; *see also White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

FN46. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g ., Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. [FN47] However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA.[FN48] *First,* "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [FN49] *Second,* if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [FN50] *Third,* if the remedies were available and some of the defendants did not forfeit, and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [FN51]

> FN47. _Rodriguez v. Hahn,_ 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); _Reyes v. Punzal,_ 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

> FN48. _See Hemphill v. State of New York,_ 380 F.3d 680, 686, 691 (2d Cir.2004).

> FN49. _Hemphill,_ 380 F.3d at 686 (citation omitted).

> FN50. _Id._ [citations omitted].

> FN51. _Id._ [citations and internal quotations omitted].

*16 Defendants argue that Plaintiff never exhausted his available administrative remedies with regard to his claim arising out of the assault that allegedly occurred on August 17, 2000. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].)

Plaintiff responds with four different legal arguments. First, he appears to argue that he handed a written grievance to an unidentified corrections officer but never got a response from the IGRC, and that filing an appeal under such a circumstance is merely optional, under the PLRA (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) Second, he argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (_Id._ at 25-29.) In support of this argument, he cites unspecified record evidence that, although he sent a letter to one "Sally Reams" at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (_Id._ at 29.) Third, he argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (_Id._ at 30-38.) Fourth, he argues that Defendants rendered any

administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (_Id._ at 39-45.) [FN52]

> FN52. I note that the breadth of Plaintiff's creative, thoughtful and well-developed legal arguments further demonstrates his extraordinary experience as a litigant.

For the reasons set forth below, I reject each of these arguments. However, I am unable to conclude, for another reason, that Plaintiff has failed to exhaust his administrative remedies as a matter of law, based on the current record.

### 1. Plaintiff's Apparent Argument that an Appeal from His Lost or Ignored Grievance Was "Optional" Under the PLRA

Plaintiff apparently argues that filing an appeal to CORC when one has not received a response to one's grievance is merely optional under the PLRA. (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) If this is Plaintiff's argument, it misses the point.

It may be true that the decision of whether or not to file an appeal in an action is always "optional"-from a metaphysical standpoint. However, it is also true that, in order to satisfy the PLRA's exhaustion requirement, one _must_ file an appeal when one has not received a response to one's grievance (unless one of the exceptions contained in the Second Circuit's three-party inquiry exists). _See, supra,_ note 46 of this Report-Recommendation.

### 2. Plaintiff's Argument that Defendants "Can't Realistically Show" that Plaintiff Never Sent any Grievances or Appeals to the Great Meadow C.F. Inmate Grievance Clerk

Plaintiff also argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (Dkt. No. 86,

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

at 25-29 [Plf.'s Memo. of Law].) This argument also fails.

**\*17** Plaintiff appears to misunderstand the parties' respective burdens on Defendants' motion for summary judgment. Even though a failure to exhaust is an affirmative defense that a defendant must plead and prove, once a defendant has met his initial burden of establishing the absence of any genuine issue of material fact regarding exhaustion (which initial burden has been appropriately characterized as "modest"),[FN53] the burden then shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial regarding exhaustion. *See, supra,* Part III of this Report-Recommendation.

> FN53. *See Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at \*8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at \*9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at \*17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.).

Here, it is an uncontroverted fact, for purposes of Defendants' motion, that (1) grievance records at Great Meadow C.F. indicate that Plaintiff never filed a timely grievance alleging that he had been assaulted by corrections officers at Great Meadow C.F. in 2000, and (2) records maintained by CORC indicate that Plaintiff never filed an appeal (to CORC) regarding any grievance alleging that he had been so assaulted. (*See* Dkt. No. 78, Part 12, ¶¶ 39-40 [Defs.' Rule 7.1 Statement, providing accurate record citations].) Plaintiff has failed to properly controvert these factual assertions with specific citations to record evidence that actually creates a genuine issue of fact. (*See* Dkt. No. 85, Part 2, at 50-51 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

With respect to Plaintiff's argument that the referenced factual assertions are basically meaningless because Great Meadow C.F. did not (during the time in question) have a grievance "receipt system," that argument also fails. In support of this argument, Plaintiff cites unspecified record evidence that, although he sent a letter to Sally Reams (the IGP Supervisor at Great Meadow C.F. in May 2003) at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) (*See* Dkt. No. 86, at 29 [Plf.'s Memo. of Law].) After examining Plaintiff's original Affidavit and exhibits, I located and carefully read the documents in question. (Dkt. No. 85, Part 1, ¶ 23 [Plf.'s Affid.]; Dkt. No. 85, Part 2 [Exs. F and G to Plf.'s Affid.].)

These documents do not constitute sufficient evidence to create a triable question of fact on the issue of whether, in August and/or September of 2000, Great Meadow C.F. did not have a grievance "receipt system." At most, they indicate that (1) at some point, nearly three years after the events at issue, Plaintiff (while incarcerated at Attica C.F.) wrote to Ms. Reams complaining about the alleged assault on August 17, 2000, (2) she responded to Plaintiff, on May 5, 2003, that he must grieve the issue at Attica C .F., where he must request permission to file an untimely grievance, and (3) at some point between April 7, 2003, and June 23, 2003, Ms. Reams informed Mr. Eagen that she did not "remember" receiving "correspondence" from Plaintiff. (*Id.*) The fact that Ms. Reams, after the passing of several weeks and perhaps months, did not retain an independent memory (not record) of receiving a piece of "correspondence" (not grievance) from Plaintiff (who was not an inmate currently incarcerated at her facility) bears little if any relevance on the issue of whether Great Meadow C.F. had, in April and/or May of 2003, a mechanism by which it recorded its receipt of *grievances.* Moreover, whether or not Great Meadow C.F. had a grievance "receipt system" in April and/or May of 2003 bears little if any relevance to whether it had a grievance "receipt system" in August and/or September of 2000.

**\*18** It should be emphasized that Defendants have adduced record evidence specifically establishing that, in August and September 2000, Great Meadow C.F. had a *functioning* grievance-recording process through which,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

when a prisoner (and specifically Plaintiff) filed a grievance, it was "assign[ed] a number, title and code" and "log[ged] ... into facility records." (Dkt. No. 78, Part 6, ¶¶ 7-9 [Bellamy Decl.]; Dkt. No. 78, Part 7, at 2 [Ex. A to Bellamy Decl.] Dkt. No. 78, Part 8, ¶ 4 [Brooks Decl.]; Dkt. No. 78, Part 9, at 6 [Ex. B to Brooks Decl.].)

Finally, even if Great Meadow C.F. did not (during the time in question) have a functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never being responded to), Plaintiff still had the duty to appeal that non-response to the next level. *See, supra,* note 46 of this Report-Recommendation.

### 3. Plaintiff's Argument that the Determination He Received from CORC Satisfied the PLRA's Exhaustion Requirement

Plaintiff argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (Dkt. No. 86, at 30-38 [Plf.'s Memo. of Law].) This argument also fails.

Plaintiff does not clearly articulate the specific portion of the record where this determination is located. (*See id.* at 30 [Plf.'s Affid., referencing merely "plaintiff's affidavit and exhibits"].) Again, the Court has no duty to *sua sponte* scour the 209 pages that comprise Plaintiff's "affidavit and exhibits" for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed what I believe to be the material portions of the documents to which Plaintiff refers. I report that Plaintiff appears to be referring to a determination by the Upstate C.F. Inmate Grievance Program, dated June 20, 2003, stating, "After reviewing [your June 11, 2003, Upstate C.F.] grievance with CORC, it has been determined that the grievance is unacceptable. It does not present appropriate mitigating circumstances for an untimely filing." (Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.]; *see also* Dkt. No. 85, Part 1, ¶¶ 22-34 [Plf.'s Affid.].)

There are two problems for Plaintiff with this document. First, this document does *not* constitute a written determination by *CORC* on a written appeal by

Plaintiff to *CORC* from an Upstate C.F. written determination. (*See* Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.].) This fact is confirmed by one of Plaintiff's own exhibits, wherein DOCS IGP Director Thomas Eagen advises Plaintiff, "Contrary to the IGP Supervisor's assertion in his memorandum dated June 20, 2003, the IGP Supervisor's denial of an extension of the time frames to file your grievance from Great Meadow in August 2000 has not been reviewed by the Central Office Review Committee (CORC). The IGP Supervisor did review the matter with Central Office staff who is [sic] not a member of CORC." (*See* Dkt. No. 85, Part 2, at 39 [Ex. K to Plf.'s Affid.].) At best, the document in question is an indication by Upstate C.F. that the success of an appeal by Plaintiff to CORC would be unlikely.

**\*19** Second, even if the document does somehow constitute a written determination by CORC on appeal by Plaintiff, the grievance to which the determination refers is a grievance filed by Plaintiff on June 11, 2003, at Upstate C.F., not a grievance filed by Plaintiff on August 30, 2000, at Great Meadow C.F. (Dkt. No. 85, Part 2, at 32-35 [Ex. I to Plf.'s Affid.].) Specifically, Plaintiff's June 11, 2003, grievance, filed at Upstate C.F., requested permission to file an admittedly *untimely* grievance regarding the injuries he sustained during the assault on August 17, 2000. (*Id.*)

A prisoner has not exhausted his administrative remedies with CORC when, years after failing to file a timely appeal with CORC, the prisoner requests *and is denied* permission to file an untimely (especially, a two-year-old) appeal with CORC due to an unpersuasive showing of "mitigating circumstances." *See Burns v. Zwillinger,* 02-CV-5802, 2005 U.S. Dist. LEXIS 1912, at *11 (S.D.N.Y. Feb. 8, 2005) ("Since [plaintiff] failed to present mitigating circumstances for his untimely appeal to the IGP Superintendent, the CORC, or this Court, [defendant's] motion to dismiss on the grounds that [plaintiff] failed to timely exhaust his administrative remedies is granted."); *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004) ("Without mitigating circumstances, courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies.") [collecting cases]. If the rule were to the contrary, then, as

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

a practical matter, no prisoner could ever be said to have failed to exhaust his administrative remedies because, immediately before filing suit in federal court, he could perfunctorily write to CORC asking for permission to file an untimely appeal, and whatever the answer, he could claim to have completed the exhaustion requirement. The very reason for requiring that a prisoner obtain permission before filing an untimely appeal presumes that the permitted appeal would be required to complete the exhaustion requirement. Viewed from another standpoint, a decision by CORC to refuse the filing of an untimely appeal does not involve a review of the merits of the appeal.

**4. Plaintiff's Argument that Defendants Rendered any Administrative Remedies "Unavailable" to Plaintiff**

Plaintiff also argues that Defendants rendered any administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (Dkt. No. 86, at 39-45 [Plf.'s Memo. of Law].) This argument also fails.

In support of this argument, Plaintiff "incorporates by reference all the previously asserted points, Plaintiff's Affidavit in Opposition with supporting exhibits, as well as[ ] the entire transcripts of Defendants['] deposition on [sic] Plaintiff ...." (*Id.* at 40, 45.) Again, the Court has no duty to *sua sponte* scour the 265 pages that comprise Plaintiff's Affidavit, Supplemental Affidavit, exhibits, and deposition transcript for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed the documents to which Plaintiff refers, and I report that I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.

**\*20** For example, Plaintiff has adduced no evidence

that he possesses any *personal knowledge* (only speculation) of any Defendant in this action having "trashed" his alleged grievance(s) and appeal(s),[FN54] nor has he even adduced evidence that it was *one of the named Defendants in this action* to whom he handed his alleged grievance(s) and appeal(s) for delivery to the Great Meadow C.F. Inmate Grievance Program Clerk on August 30, 2000, September 13, 2000, and September 27, 2000.[FN55] Similarly, the legal case cited by Plaintiff appears to have nothing to do with any Defendant to this action, nor does it even have to do with Great Meadow C.F.[FN56]

> **FN54.** (*See* Dkt. No. 85, Part 1, ¶¶ 13-14, 16-17 [Plf.'s Affid., asserting, "Prison officials trashed my grievances and appeals since they claim not to have them despite [the] fact I sent them in a timely manner. It's [the] only reason they wouldn't have them.... Prison officials have a history of trashing grievances and appeals.... I've been subjected to having my grievances and appeals trashed prior to and since this matter and have spoken to alot [sic] of other prisoners whom [sic] said that they were also subjected to having their grievances and appeals trashed before and after this incident, in alot [sic] of facilities.... Suspecting foul play with respect to my grievances and appeals, I wrote, and spoke to[,] prison officials and staff that did nothing to rectify the matter, which isn't surprising considering [the] fact that it's an old problem ...."].)

> **FN55.** (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk ... which contained the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail, in F-Block

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

SHU [at] Great Meadow CF ...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid., asserting only that "[o]n September 27th, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

FN56. (*See* Dkt. No. 85, Part 1, ¶ 15 [Plf.'s Affid., referencing case]; Dkt. No. 85, Part 2, at 16-17 [Ex. B to Plf.'s Affid., attaching a hand-written copy of case, which mentioned a prisoner's grievances that had been discarded in *1996* by an *unidentified* corrections officer at *Sing Sing Correctional Facility* ].)

**5. Record Evidence Creating Genuine Issue of Fact**

Although I decline to *sua sponte* scour the lengthy record for proof of a triable issue of fact regarding exhaustion, I have, while deciding the many issues presented by Defendants' motion, had occasion to review in detail many portions of the record. In so doing, I have discovered evidence that I believe is sufficient to create a triable issue of fact on exhaustion.

Specifically, the record contains Plaintiff's testimony that (1) on August 30, 2000, he gave a corrections officer a grievance regarding the alleged assault on August 17, 2000, but he never received a response to that grievance, (2) on September 13, 2000, he gave a corrections officer an appeal (to the Superintendent) from that non-response, but again did not receive a response, and (3) on September 27, 2000, he gave a corrections officer an appeal (to CORC) from that non-response, but again did not receive a response.[FN57]

FN57. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk in which contained [sic] the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent

by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail; in F-Block SHU [at] Great Meadow CF...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid ., asserting only that "[o]n September 27h, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

The remaining issue then, as it appears to me, is whether or not this affidavit testimony is so self-serving and unsubstantiated by other direct evidence that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN58] Granted, this testimony appears self-serving. However, based on the present record, I am unable to find that the testimony is so wholly unsubstantiated by other direct evidence as to be incredible. Rather, this testimony appears corroborated by two pieces of evidence. First, the record contains what Plaintiff asserts is the grievance that he handed to a corrections officer on August 30, 2000, regarding the alleged assault on August 17, 2000. (Dkt. No. 85, Part 2, at 65-75 [Ex. Q to Plf.'s Affid.].) Second, the record contains two pieces of correspondence between Plaintiff and legal professionals *during or immediately following the time period in question* containing language suggesting that Plaintiff had received no response to his grievance. (Dkt. No. 85, Part 2, at 19-21 [Exs. C-D to Plf.'s Affid .].)

FN58. *See, supra,* note 12 of this Report-Recommendation (collecting cases).

Stated simply, I find that sufficient record evidence exists to create a genuine issue of fact as to (1) whether Plaintiff's administrative remedies were, with respect to his assault grievance during the time in question, "available" to him, for purposes of the first part of the Second Circuit's three-part exhaustion inquiry, and/or (2) whether Plaintiff has shown "special circumstances" justifying his failure to comply with the administrative procedural requirements, for purposes of the third part of the Second Circuit's three-part exhaustion inquiry.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

**\*21** As a result, I recommend that the Court deny this portion of Defendants' motion for summary judgment.

**E. Whether Plaintiff Has Sufficiently Alleged, or Established, that Defendants Were Liable for the Policy to Review the Non-Life-Sustaining Medical Prescriptions of Prisoners Upon Arrival at Great Meadow C.F.**

As explained above in Part II.A. of this Report-Recommendation, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing to honor non-life-sustaining medical prescriptions written at a former facility. (Dkt. No. 78, Part 13, at 3 [Defs.' Mem. of Law].) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

Plaintiff responds that "[he] didn't have to get in particular [sic] about the policy [of] discontinuing all incoming prisoners['] non[-]life[-]sustaining medications without examination and indiscriminently [sic] upon arrival at [Great Meadow] C.F. in [his Second] Amended Complaint. Pleading[s] are just supposed to inform [a] party about [a] claim[,] and plaintiff informed defendant [of] the nature of [his] claims including [the claim of] inadequate medical care. And discovery revealed [the] detail[s] [of that claim] as [Plaintiff had] intended." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) In addition, Plaintiff responds that Defendant Paolano must have been personally involved in the creation and/or implementation of the policy in question since he was the Great Meadow Health Services Director. (*Id.* at 10.)

I agree with Defendants that this claim is not properly

before this Court. Plaintiff's characterization of the notice-pleading standard, and of the contents of his Amended Complaint, are patently without support (both legally and factually). It has long been recognized that a "claim," under Fed.R.Civ.P. 8, denotes "the aggregate of operative facts which give rise to a right enforceable in the courts." [FN59] Clearly, Plaintiff's Second Amended Complaint alleges no facts whatsoever giving rise to an asserted right to be free from the application of the prescription-review policy at Great Meadow C.F. Indeed, his Second Amended Complaint-which asserts Eighth Amendment claims arising *solely* out of events that (allegedly) transpired on August 17, 2000-says nothing at all of the events that transpired immediately upon his arrival at Great Meadow C.F. in early August of 2000, nor does the Second Amended Complaint even casually mention the words "prescription," "medication" or "policy." (*See generally* Dkt. No. 10 [Second Am. Compl.].)

> FN59. *Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.,* 133 F.2d 187, 189 (2d Cir.1943); *United States v. Iroquois Apartments, Inc.,* 21 F.R.D. 151, 153 (E.D.N.Y.1957); *Birnbaum v. Birrell,* 9 F.R.D. 72, 74 (S.D.N.Y.1948).

**\*22** Furthermore, under the notice-pleading standard set forth by Fed.R.Civ.P. 8(a)(2), to which Plaintiff refers in his Supplemental Memorandum of Law, Defendants are entitled to *fair notice* of Plaintiff's claims.[FN60] The obvious purpose of this rule is to protect defendants from undefined charges and to facilitate a proper decision on the merits.[FN61] A complaint that fails to provide such fair notice "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims."[FN62] This fair notice does not occur where, as here, news of the claim first springs up in a deposition more than two years after the action was commenced, approximately seven months after the amended-pleading deadline expired, and approximately two weeks before discovery in the action was scheduled to close. (*Compare* Dkt. No. 1 [Plf.'s Compl., filed 8/14/03] *with* Dkt. No. 42, at 1-2 [Pretrial Scheduling Order setting amended-pleading deadline as 2/28/05] *and* Dkt. No. 78, Part 11, at 52-53 [Plf.'s Depo.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Transcript, dated 9/30/05] *and* Dkt. No. 49 [Order setting discovery deadline as 10/14/05].)

FN60. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (the statement required by Fed.R.Civ.P. 8 [a][2] must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").

FN61. *Ruffolo v. Oppenheimer & Co., Inc.,* 90-CV-4593, 1991 WL 17857, at *2 (S.D.N.Y. Feb.5, 1991); *Howard v. Koch,* 575 F.Supp. 1299, 1304 (E.D.N.Y.1982); *Walter Reade's Theatres, Inc. v. Loew's Inc.,* 20 F.R.D. 579, 582 (S.D.N.Y.1957).

FN62. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Tech., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

Under the circumstances, the mechanism by which to assert such a late-blossoming claim was a motion to reopen the amended-pleading filing deadline (the success of which depended on a showing of cause), coupled with a motion for leave file a Third Amended Complaint (the success of which depended, in part, on a showing of lack of prejudice to Defendants, as well as a lack of futility). Plaintiff never made such motions, nor showed such cause.

I acknowledge that, generally, the liberal notice-pleading standard set forth by Fed.R.Civ.P. 8 is applied with even greater force where the plaintiff is proceeding *pro se.* In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are

generally construed with an *extra* degree of liberality. As an initial matter, I have already concluded, based on my review of Plaintiff's extensive litigation experience, that he need not be afforded such an extra degree of leniency since the rationale for such an extension is a *pro se* litigant's inexperience with the court system and legal terminology, and here Plaintiff has an abundance of such experience. *See, supra,* notes 21-25 of this Report-Recommendation. Moreover, even if he were afforded such an extra degree of leniency, his phantom prescription-review claim could not be read into his Second Amended Pleading, for the reasons discussed above. (I note that, even when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended.")[FN63]

FN63. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

Nor could Plaintiff's late-blossoming prescription-review claim properly be read into his papers in opposition to Defendants' motion for summary

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

judgment. Granted, a *pro se* plaintiff's papers in opposition to a *motion to dismiss* may sometimes be read as effectively amending a pleading (e.g., if the allegations in those papers are consistent with those in the pleading). However, a *pro se* plaintiff's papers in opposition to a *motion for summary judgment* may not be so read, in large part due to prejudice that would inure to the defendants through having the pleading changed after discovery has occurred and they have gone through the expense of filing a motion for summary judgment.[FN64]

> **FN64.** *See Auguste v. Dept. of Corr.*, 424 F.Supp.2d 363, 368 (D.Conn.2006) ("Auguste [a *pro se* civil rights plaintiff] cannot amend his complaint in his memorandum in response to defendants' motion for summary judgment.") [citations omitted].

**\*23** Finally, in the event the Court decides to construe Plaintiff's Second Amended Complaint as somehow asserting this claim, I agree with Defendants that the Court should dismiss that claim, also for the reasons discussed above in Part IV.A.2. of this Report-Recommendation. Specifically, Plaintiff has failed to adduce evidence establishing that Defendant Paolano (or any named Defendant in this action) was personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided evidence establishing that the policy is even unconstitutional. *See, supra,* Part IV.A.2. of this Report-Recommendation.

**ACCORDINGLY,** it is

**ORDERED** that the Clerk's Office shall, in accordance with note 1 of this Order and Report-Recommendation, correct the docket sheet to remove the names of Defendants Englese, Edwards, Bump, Smith, Paolano, and Nesmith as "counter claimants" in this action; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 78) be **GRANTED in part** (i.e., to the extent that it requests the dismissal with prejudice of Plaintiff's claims against Defendants Paolano and Nesmith) and **DENIED in part** (i.e., to the extent that it requests dismissal of Plaintiff's claims against the remaining Defendants on the grounds of Plaintiff's failure to exhaust available administrative remedies) for the reasons stated above.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2008.

Murray v. Palmer
Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2012 WL 6202987
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Marcos A. MANON, Jr., Plaintiff,
v.
ALBANY COUNTY, Defendant. [1]

No. 11–CV–1190 (GTS/CFH).
|
Oct. 9, 2012.

**Attorneys and Law Firms**

Marcos A. Manon, Jr., Lisbon, OH, pro se.

Thomas Marcelle, Esq., Albany County Attorney, Adam
G. Giangreco, Esq., Assistant Albany County Attorney,
of Counsel, Albany, NY, for Defendant.

**REPORT–RECOMMENDATION AND ORDER** [2]

CHRISTIAN F. HUMMEL, United States Magistrate
Judge.

**\*1** Plaintiff pro se Marcos A. Manon, Jr. ("Manon"),
formerly an inmate of the Albany County Correctional
Facility ("ACCF"), brings this action pursuant to Title
II of the Americans with Disabilities Act ("ADA"), 42
U.S.C. § 12101 *et seq.,* against Albany County. Compl.
(Dkt. No. 1) at 8. Manon alleges that Albany County
discriminated against him by placing him in segregated
confinement because of his disability. *Id.* at 7. Presently
pending is Albany County's motion to dismiss pursuant
to Fed.R.Civ.P. 12(b)(6). Dkt. No. 23. Manon opposes
the instant motion. Resp. in Opp. to Mot. to Dismiss
(Dkt. No. 30). Albany County filed a reply to Manon's
response on October 1, 2012. Reply (Dkt. No. 32). For
the following reasons, it is recommended that Albany
County's motion be granted and Manon's complaint be
dismissed.

**I. Background**

The facts are related in the light most favorable to Manon
as the non-moving party. *See* subsection II(A) *infra.*

Manon, who was formerly an inmate at ACCF,
commenced this action while he was in custody of
the United States Marshal after entering a guilty plea,
awaiting placement in a facility operated by the United
States Bureau of Prisons. Compl. at 1; *see* Dkt. No. 10 n.
1. Manon specifically alleges that while in ACCF custody,
Albany County discriminated against him by placing
him in segregated confinement, twenty-three hours a
day, because the liner of his prosthetic leg contained a
metal screw. Compl. at 7–8. During his incarceration at
ACCF, Manon swore at an ACCF staff member, resulting
in his transfer to another unit pending his subsequent
disciplinary hearing. Compl. at 6. Manon was confined
to a cell for four days, twenty-four hours a day, before
attending his disciplinary hearing where he was awarded
time served. *Id.* at 6–7. Despite the hearing disposition,
Manon remained continually confined on that unit in his
cell for twenty-three hours a day. *Id .* at 7. During this
confinement period, Manon asked a sergeant and a nurse
for the underlying reason for his continued segregation,
to which they replied that it was because the liner of
his prosthetic leg contained a metal screw. Compl. at
7; Resp. in Opp. to Mot. to Dismiss at 7. Manon also
asked a corrections officer for a plastic bag to cover
his prosthetic leg in an attempt to avoid water damage.
Resp. in Opp. to Mot. to Dismiss at 6. When the officer
discovered Manon's disability, specifically that he had a
prosthetic leg, the officer, along with another officer and
surrounding inmates, began to ridicule Manon by calling
him a "pirate" and "Captain Hook." *Id.*

Manon never filed a grievance concerning the alleged
ADA violation. Compl. at 2. While another inmate
advised Manon to ask about filing a grievance, advice
which Manon followed, Manon's requests to the sergeants
were repeatedly denied. *Id.* at 2–3; Resp. in Opp. to Mot.
to Dismiss at 2, 7, 9–10. Manon acknowledges that ACCF
believes the metal screw in his liner may be dangerous.
Resp. in Opp. to Mot. to Dismiss at 8, 9.

**\*2** Manon's leg was amputated when he was five-years-
old. Resp. in Opp. to Mot. to Dismiss at 7. He never
used a wheelchair or crutches to move around. *Id.* at
8. Manon considers himself a self-reliant person and
that his prosthetic leg has "never been an impediment
for [him to] do what [he has] to do." *Id.* Nevertheless,
Manon has "flash backs of the humiliation, rejection,
and discrimination" that he felt from being placed in

segregated confinement. Resp. in Opp. to Mot. to Dismiss at 2.

Manon filed a complaint on October 5, 2011 while he was housed at ACCF. Compl. at 1. Attached to the complaint was a cover letter in which Manon indicated that he may be transferring to a federal reception facility in Brooklyn, New York. Dkt. No. 1–1 at 1. On December 8, 2011, Manon filed a Notice of Change of Address, indicating that he is now an inmate at the Elkton Federal Correctional Institution in Ohio. Dkt. No. 5. This motion followed.

## II. Discussion

Manon contends that his ADA rights were violated when he was placed in segregated confinement because the liner used for his prosthetic leg contained a metal screw. As a result, he incurred emotional injuries. Resp. in Opp. to Mot. to Dismiss at 2, 6, 7, 9–10. However, Manon does not assert the specifics or nature of the relief sought. Albany County moves for dismissal pursuant to Fed.R.Civ.P. 12(b)(6), contending that (1) Manon failed to exhaust his administrative remedies as required under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C.A. § 1997e, (2) Manon failed to allege a physical injury as required under the PLRA, (3) Manon lacks standing to bring this action, and that (4) Manon's claim is now moot. Dkt. No. 23.

### A. Legal Standard

Under Fed.R.Civ.P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." *Selevan v. N.Y. Thruway Auth.,* 584 F.3d 82, 88 (2d Cir.2009). However, this "tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 664 (2009)) (internal quotation marks and alterations omitted).

Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is "plausible on its face." *Iqbal,* 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007) (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct] .")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 680. Consideration of a motion to dismiss "is limited to the facts asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007).

**\*3** When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law....

*Id.* (internal quotation marks, citations, and footnote omitted); *see also Sealed Plaintiff # 1,* 537 F.3d 185, 191–92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff

proceeds pro se, ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).

## B. Exhaustion

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, provides that "[n]o action shall be brought with respect to prison conditions under section 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); see also Porter v. Nussle, 534 U.S. 516, 524 (2002). This exhaustion requirement applies to all prison condition claims. Porter, 534 U.S. at 532. "[A]ny deprivation that does not affect the fact or duration of a prisoner's overall confinement is necessarily a condition of that confinement." Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir.1999). The exhaustion requirement also applies even if the administrative grievance process does not provide for all the relief requested by the inmate. Porter, 534 U.S. at 524. Exhaustion must be proper, meaning that all agency requirements are timely complied with, as "untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement." Ruggiero v. Cnty. of Orange, 467 F.3d 170, 176 (2d Cir.2006) (citing Woodford v. Ngo, 548 U.S. 81, 83, 90–91 (2006)). Courts in the Second Circuit have looked at the plain language of § 1997e(a) and concluded that "[t]he ADA falls within the rubric of 'any other federal law.' " Carrasquillo v. City of New York, 324 F.Supp.2d 428, 442 (S.D.N.Y.2004)). Thus, the exhaustion requirement under the PLRA is enforced against ADA claims. Pacheco v. Zurlo, No. 9:09–CV–1330 (TJM/ATB), 2011 WL 1103102, *2 (N.D.N.Y.), report and recommendation adopted by, 2011 WL 1102769 (N.D.N.Y. Mar. 23, 2011);[3] Alster v. Goord, 745 F.Supp.2d 317, 332 (S.D.N.Y.2010); but see, Parkinson v. Goord, 116 F.Supp.2d 390, 398 (W.D.N.Y.2000) (opining that neither Title I or Title II of the ADA has an exhaustion of administrative remedies requirement).

**\*4** As an initial matter, under the PLRA, failure to exhaust administrative remedies is an affirmative defense. Jones v. Bock, 549 U.S. 199, 216 (2007). Thus, an inmate is "not required to specially plead or demonstrate exhaustion in [his] complaint," and a defendant must raise the issue of exhaustion and establish plaintiff's failure to demonstrate it in his responsive pleading. Id.; Pacheco,

2011 WL 1103102, at \*3. Because, Albany County raises exhaustion in its motion to dismiss, in response to Manon's complaint, this Court may appropriately consider this issue at this time.

While the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero, 467 F.3d at 175 (citing Giano v. Goord, 380 U.S. 670, 677 (2d Cir.2004)). A court must conduct a three-part inquiry to determine if an inmate's failure to follow the applicable grievance procedures is fatal to his or her claims. A court must consider whether

> (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

Ruggiero, 467 F.3d at 175 (citing Hemphill v. New York, 380 F.3d 680, 686 (2d Cir.2004)).

Administrative remedies are unavailable when there is no "possibility of [ ] relief for the action complained of." Abney v. McGinnis, 380 F.3d 663, 667 (2d Cir.2004) (citing Booth v. Churner, 532 U.S. 731, 738 (2001)). The test to determine the availability of an administrative remedy is an objective one, asking whether "a similarly situated individual of ordinary firmness" would have deemed it accessible. Id. at 688. Estoppel occurs when "an inmate reasonably understands that pursuing a grievance through the administrative process will be futile or impossible ... [as evidenced by] prison officials' threats, beatings, ... denials of grievance forms, or by other misconduct deterring [the inmate] from fulfilling the requisite procedure." Kasiem v. Switz, 756 F.Supp.2d 570, 577 (S.D.N.Y.2010) (internal quotation marks and citations omitted). If an inmate claims estoppel and continues to file complaints and grievances, the exception is inapplicable. Id. Special circumstances exist when an inmate's failure to comply can be justified. Id. (citations omitted). Justification is found "by looking at the circumstances which might understandably lead usually uncounselled prisoners to fail

to grieve in the normally required way." *Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004) (citations omitted).

The ACCF maintained a three-step procedure for inmates to file grievances concerning the conditions of their confinement. [4] ACCF Rules & Regs. (Dkt. No. 24) at 26 (handbook given to inmates upon admission). First, an inmate must file a grievance with the Grievance Coordinator. *Id.* If dissatisfied with the Coordinator's determination, an inmate may then appeal to a Chief Administrative Officer within the facility. *Id.* If still dissatisfied, an inmate may then appeal to the State Commission on Correction. *Id.* This procedure requires that a grievance be filed in writing on a particular form to be provided to an inmate by the unit supervisor upon request of the inmate. *Id.*

**\*5** Manon contends that his efforts to pursue administrative remedies were impeded by defendant's failure to provide him the necessary grievance form. Viewing the facts in the light most favorable to Manon, if proven, would constitute behavior excusing Manon's failure to exhaust. Compl. 2–3; Resp. in Opp. to Mot. to Dismiss at 2, 7, 9–10. The necessity for Manon to file his grievances on the form designated by ACCF is underscored by the ACCF inmate handbook. *See* ACCF Rules & Regs. at 26. Thus, construing the facts in the light most favorable to Manon, Albany County's failure to provide the necessary form when requested by Manon reasonably prevented compliance with the procedures. *Id.* Repeated failures by defendant to provide an inmate with the form when requested would deter a similarly situated individual from attempting to pursue a grievance. Compl. at 2–3; Resp. in Opp. to Mot. to Dismiss at 2, 7, 9–10. Moreover, because Manon's assertions are devoid of any mention of the handbook and Manon was advised by an inmate to file a grievance concerning the segregated confinement, Compl. 2–3, it can be reasonably inferred that Manon did not receive a copy of the inmate's handbook, or was unaware of the grievance procedures or did not understand it.

Assuming their truth for purposes of this motion, Manon's assertions suffice to raise plausible factual allegations surrounding whether Manon received the inmate handbook or the requested grievance form. These allegations defeat defendants' motion on this ground. Accordingly, defendant's motion on this ground should be denied.

### C. Physical Injury Requirement

Section 1997e(e) of the PLRA provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U .S.C. § 1997e(e). Because this physical injury requirement operates as "a limitation on recovery of damages for mental and emotional injury in the absence of a showing of physical injury, it does not restrict a plaintiff's ability to recover compensatory damages for actual injury, nominal or punitive damages, or injunctive and declaratory relief." *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002).

The physical injury requirement equally applies to ADA claims. Some Circuits have expressly stated that § 1997e(e) precludes an inmate's ADA claim for an emotional injury if there is no prior showing of a physical injury. *See e.g., Cassidy v. Indiana Dep't of Corr.,* 199 F.3d 374, 376–77 (7th Cir.2004) (reasoning that the plain language of § 1997e(e) makes no exception for ADA claims); *Davis v. District of Columbia,* 158 F.3d 1342, 1349 (D.C.Cir.1998) (concluding that regardless of whether the alleged legal wrong is statutory or constitutional, § 1997e(e) bars claims for emotional injury without a prior physical injury). Courts in the Second Circuit have similarly deferred to the plain language of § 1997e(e), that the physical injury requirement applies to all federal civil actions. *Thompson,* 284 F.3d at 416.

**\*6** Manon does not allege that he suffered any physical injury as a result of Albany County's alleged discriminatory conduct. The only injuries that Manon asserts are the limited liberty that resulted from the segregated confinement and the humiliation caused by the defendant's ridiculing of his prosthetic leg. Compl. 6–8; Resp. in Opp. to Mot. to Dismiss at 6–7. Neither of these injuries constitutes a physical injury under the PLRA. Instead, Manon contends that he suffered emotional distress from flashbacks of the incidents at ACCF. Resp. in Opp. to Mot. to Dismiss at 2. Because Manon makes clear that he only suffered emotional injuries from the alleged misconduct without a prior physical injury, Manon is prevented from recovering compensatory damages for an actual injury.

Assuming Manon seeks an injunction or a declaratory judgment, he is prevented from such relief. When a prisoner is transferred to a different correctional facility, that prisoner's claim for injunctive relief against the transferor facility is generally considered moot. *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (per curiam). Manon was transferred from ACCF, a correctional facility in New York State, to a correctional facility in Ohio. Dkt. No. 5. Manon contends that the maltreatment he endured was in the forms of continued segregation and humiliation. Because Manon does not allege that he is subjected to the same alleged misconduct in Ohio, and there is no reasonable expectation that the alleged misconduct is "capable of repetition, yet evading review," injunctive relief is not available to Manon, and declaratory relief would be meaningless. *Pugh v. Goord,* 571 F.Supp.2d 477, 488–89 (S.D.N.Y.2008) (citations omitted).

Finally, even though Manon is not required to allege a physical injury in order to recover nominal or punitive damages, *Thompson,* 284 F.3d at 416, the sufficiency of his assertions does not save this action from dismissal. *See* Subsection II(D) *infra.* Accordingly, defendant's motion on this ground should be granted.

### D. ADA Claim

Even if the Court assumes that Manon surpasses the PLRA requirements, Manon has failed to allege sufficient facts to state a claim under the ADA. Title II of the ADA is applicable to inmates in state prisons. *Allah v. Goord,* 405 F.Supp.2d 265, 274–75 (S.D .N.Y.2005). In order to state an ADA claim, 42 U.S.C. § 12132 requires an inmate to demonstrate that:

> (1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity [that] provides the service, program, or activity is a public entity.

*Id.; see also Pennsylvania Dep*'t. *of Corr. v. Yeskey,* 524 U.S. 206, 209 (1998).

As to the first element, a person is an individual with a qualified disability if "(A) a physical or mental impairment ... substantially limits one or more of the major life activities of such individual, (B) [there is] a record of such an impairment, or (C) [the individual is] being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C).

> **\*7** To determine if an individual meets any of the above criteria, courts apply a three part test ... First, a plaintiff must show that [he or] she suffers from a physical or mental impairment. Second, the plaintiff must establish that the activity [he or] she alleges to be impaired constitutes a "major life activity." Third, the plaintiff must show that [his or] her impairment "substantially limits" the major life activity previously identified.

*Smith v. Masterson,* 538 F.Supp.2d 653, 657 (S.D.N.Y.2008) (internal citations omitted). Major life activities are defined as "caring for oneself, performing manual tasks, ... walking, standing, sitting, ... interacting with others, and working." 29 C.F.R. § 1630.2(i)(1).

Manon fails to plausibly demonstrate the first prong of the analysis, specifically, that he suffers from a qualifying disability that substantially limits a major life activity. To the contrary, Manon alleges that his disability "has never been an impediment for [him to] do what [he has] to do." Resp. in Opp. to Mot. to Dismiss at 7. Manon has not alleged, nor would the record support, any difficulties in ambulation, interaction, or working.

Manon also fails to establish the second prong of the analysis. Manon was placed in segregated confinement due to safety concerns as Manon acknowledges that ACCF believes the metal screw in his liner is dangerous. Resp. in Opp. to Mot. to Dismiss at 8, 9. Prison authorities should be accorded great deference with regards to the prison's programming and placement of inmates as they see fit "to preserve internal order and discipline and to maintain institutional security." *Allen v. Couglin,* 527 F.Supp. 1096, 1097 (N.D.N.Y.1981) (citing *Bell v. Wolfish,* 441 U.S. 520, 547 (1979)). There is nothing in the complaint indicating that the security concerns are unreasonable. Additionally, the ADA requires that an inmate cannot be excluded from beneficial services,

programs, or activities. *Yeskey,* 524 U.S. at 209. Manon does not allege that he was denied access to beneficial services, programs, or activities. Moreover, there is nothing in the complaint suggesting that Manon was excluded from participation in, or denied the benefits of some service, program, or activity by reason of his disability.

Because a liberal reading of Manon's assertions does not suggest a legitimate ADA claim and Manon asserts only emotional injuries, granting Manon an opportunity amend his complaint would be futile. Cf. *Thompson,* 284 F.3d at 419 (granting plaintiff an opportunity to amend his complaint because plaintiff's allegations suggest he may have a legitimate claim of deliberate indifference to a serious medical condition and the court knew that plaintiff wanted damages despite its lack of knowledge of the nature of the damages). Accordingly, Manon's complaint should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

### E. Standing and Mootness

Albany County also contends that Manon's claim should be dismissed because Manon lacks standing to bring this action and the claim is now moot. Article III, Section 2, Clause 1 of the United States Constitution limits the jurisdiction of federal courts to resolve "cases" or "controversies." U.S. Const. Article III, § 2, cl.1. An element of the case-or-controversy requirement is that a plaintiff bears the burden of establishing standing to sue. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992). At an "irreducible constitutional minimum," Article III standing consists of three elements: (1) an "actual or imminent" injury-in-fact that is a "concrete and particularized" harm to a "legally protected interest"; (2) causation that acts as a "fairly traceable" connection between the injury-in-fact and the alleged unlawful conduct; and (3) redressability, which is a non-speculative likelihood that the injury can be remedied by the requested relief. *Id.* at 560–61, 564; *see also Allen v. Wright,* 468 U.S. 737, 751 (1984). Similarly, "the mootness doctrine

ensures" that the plaintiff's "standing persists throughout the life of a lawsuit." *Amador v. Andrews,* 655 F.3d 89, 99–100 (2d Cir.2011) (citing *Comer v. Cisneros,* 37 F.3d 775, 798 (1994)).

**\*8** Because Manon sought no specific relief related to an identifiable harm, Manon's complaint should also be dismissed based on a lack of standing and mootness. Manon alleges that he suffered concrete and particularized emotional injuries, such as flashbacks, which are fairly traceable to Albany County's alleged discriminatory conduct. Resp. in Opp. to Mot. to Dismiss at 2. However, these injuries cannot be remedied by any relief sought in the present complaint as Manon has demanded none. As discussed, even if the Court construes Manon's complaint as a request for damages and relief, none of the exceptions under *Thompson* would survive and granting Manon a chance to amend his complaint would be futile. Accordingly, defendant's motion on these grounds should also be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion to dismiss (Docket No. 23) be **GRANTED** and Manon's complaint be **DISMISSED** with prejudice.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); *see also* 28 U.S.C. § 636(b) (1); Fed R. Civ. P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2012 WL 6202987

### Footnotes

1    By Decision and Order dated June 12, 2012, this Court substituted Albany County as the named defendant in place of Albany County Correctional Facility. Dkt. No. 10. In addition, the Court dismissed Manon's (1) First Amendment claim against Albany County that he was issued a false misbehavior report, (2) Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12101 *et seq.,* claim against Weagler, and (3) Eighth Amendment conditions of confinement claims against Albany County and Weagler. *Id.*

2    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

3    All unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

4    The Court takes judicial notice of the ACCF Rules and Regulations that outlines ACCF's grievance procedures and various administrative remedies, a copy of which was filed by the defendant. Dkt. No. 24 at 4–27.

---

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 3809162
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Dana GIBSON, Plaintiff,

v.

C. ROSATI, et al., Defendants.

No. 9:13–cv–503 (GLS/TWD).
|
Signed Aug. 1, 2014.

**Attorneys and Law Firms**

Dana Gibson, Alden, NY, pro se.

Hon. Eric T. Schneiderman, The Capitol, Joshua E. Mcmahon, Esq., of Counsel, Albany, NY, for the State of New York.

### *ORDER*

GARY L. SHARPE,, Chief Judge.

 **\*1** The above-captioned matter comes to this court following a ReportRecommendation by Magistrate Judge Therese Wiley Dancks, duly filed June 30, 2014. Following fourteen days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the Magistrate Judge's Report–Recommendation for clear error, it is hereby

ORDERED that the Report–Recommendation of Magistrate Judge Therese Wiley Dancks filed June 30, 2014 (Dkt. No. 70) is ACCEPTED in its entirety for the reasons stated therein; and it is further

ORDERED that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 47) is DENIED; and it is further

ORDERED that the Defendants' motion to sever (Dkt. No. 47) is DENIED; and it is further

ORDERED that the Defendants shall respond to all causes of action within thirty days of this order; and it is further

ORDERED that this matter be scheduled for an evidentiary hearing on the matter of exhaustion for all causes of action; and it is

ORDERED that the Clerk provide a copy of this Order to the parties in accordance to the local rules.

IT IS SO ORDERED.

DANA GIBSON,

Plaintiff,

v.

C. ROSATI; D. MAGUIRE; P. MCNALLY; R. LOWRY; P. LAROSE; S. DELONG; S. SHATTUCK; J. JOHNSTON; JOHN KITCHNER; THERESA A. KNAPP–DAVID; J. SCROGGY; WILLIE J. TABB, JR.; VERNON FONDA; DELUCCIA; BIRRELL; C. BURNELLE;[1] JOHN DOE; ALBERT PRACK; DONALD UHLER,

Defendants.

### *REPORT–RECOMMENDATION AND ORDER*

THÉRSE WILEY DANCKS, United States Magistrate Judge.

This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Dana Gibson alleges that he was subject to mistreatment by nineteen employees of the New York Department of Corrections and Community Supervision ("DOCCS") between 2011 and 2013. (Dkt. No. 7.) Currently pending before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and a motion to sever pursuant to Federal Rule of Civil Procedure 21. (Dkt. No. 47.) For the reasons that follow, I recommend that Defendants' motions be denied.

## I. BACKGROUND

The following facts are derived from the face of the operative complaint and are accepted as true for the purposes of deciding the pending motion to dismiss. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007). Under this Court's broad discretion in deciding motions to sever, *see New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1082 (2d Cir.1988), these facts are also considered for the pending motion to sever.

In May 2011, while incarcerated at Upstate Correctional Facility ("Upstate"), Plaintiff wrote a letter requesting separation from staff at the Great Meadow Correctional Facility ("Great Meadow"), in response to threats of retaliation by Great Meadow staff for prior civil rights litigation. (Dkt. No. 7 ¶ 21.) This request was denied, first by Defendant Tabb, then by Defendant Knapp–David. *Id.* ¶¶ 21–22. In July 2011, the Prisoners' Rights Project sent a letter to Defendant Fonda, but he "refused to take any action." *Id.* ¶ 23. In October of that year, Plaintiff was transferred from Upstate to Great Meadow, where the threatened retaliation later occurred. *Id.* ¶ 24.

**\*2** On February 10, 2013, Defendant Burnelle called Plaintiff to the Sergeant's Stand in the recreation yard, where Defendants Maguire and Burnelle threatened to harm Plaintiff for previous litigation against the Defendants' friends. (Dkt. No. 7 ¶¶ 12–13.) When Plaintiff attempted to walk away, Defendant Rosati placed him in a choke hold and told him that the officers could kill him. *Id.* ¶ 13. Defendant Rosati then forced Plaintiff to the ground, where Defendants Rosati, Maguire, Burnelle, LaRose, Delong, and Shattuck repeatedly kicked him. *Id.* ¶¶ 13–14. Defendant McNally watched and did not intervene, and Defendant Maguire said, "This is what you get for taking us to court." *Id.* ¶ 14. Defendants Maguire and Shattuck handcuffed and chained Plaintiff, and the other officers resumed punching and kicking him for approximately fifteen minutes. *Id.* Defendants Maguire and Rosati concluded by again threatening Plaintiff, and Defendant Maguire warned him not to try to report the events or the officers would "see [his] ass again." *Id.* Defendants Maguire and Burnelle then submitted misbehavior reports which alleged various misbehavior on the part of Plaintiff, including attempted assault and "threats." *Id.* ¶ 35.

On February 20, 2013, once Plaintiff had reported the events of February 10, 2013, Defendants Kitchner, Lowry, and Johnston confronted Plaintiff in his cell, reminded him that Defendant Maguire had warned him not to report the previous assault, and proceeded to "forcefully punch Plaintiff about his upper body and right rib area ... [for] ten to twenty minutes." (Dkt. No. 7 ¶¶ 17–18.) Defendant Johnston submitted a false misbehavior report alleging (amongst other things) assault, attempted assault, and "violent conduct." *Id.* ¶ 48.

Correctional staff conducted two disciplinary hearings in connection with the two misbehavior reports. (Dkt. No. 7 ¶¶ 30, 50.) The two hearings were initiated on March 14, 2013, and then both were adjourned until March 22, 2013. *Id.* ¶¶ 38–43, 50–53. Plaintiff alleges various misconduct in relation to these hearings.

First, Defendants DeLuccia and Scroggy provided inadequate pre-hearing assistance to Plaintiff during their meetings on March 11, 2013, and March 13, 2013, respectively. (Dkt. No. 7 ¶¶ 35–37, 48–49.) Both Defendants refused all requests for documentation, which Plaintiff sought in order to prepare his defenses. *Id.* ¶¶ 37,49. On March 14, 2013, Plaintiff requested the documents from Defendant Birrell, the officer presiding at both hearings, but Defendant Birrell only partially granted these requests, and refused to give Plaintiff the Unusual Incident Reports or most of the portions of the Use of Force reports. *Id.* ¶¶ 39, 51.

On March 22, 2013, Defendant Birrell reconvened the proceedings, and took testimony from Defendant Doe, a mental health clinician with access to Plaintiff's mental health records. (Dkt. No. 7 ¶ 31.) Defendant Doe disclosed to Defendant Birrell confidential information regarding Plaintiff's "psychiatric health state, care, disorder and treatment." *Id.* Defendant Birrell then considered this information at the hearings. *Id.* ¶ 32.

**\*3** At the hearing concerning the February 10, 2013, events, Plaintiff tried to call for an eyewitness, Inmate Lopez, to contradict the misbehavior reports. (Dkt. No. 7 ¶ 41.) Defendant Birrel ruled that Inmate Lopez's testimony would be relevant and not cumulative, granted Plaintiff's request for the testimony, and adjourned the hearing to locate Inmate Lopez. *Id.* An unknown corrections officer reported to Defendant Birrell that Inmate Lopez had stated that he would not testify because, on February 10, 2013, he was being transferred, and was therefore not at Great Meadow to witness the events. *Id.*

¶ 42. Plaintiff then pointed out to Defendant Birrell that this was not possible, because February 10, 2013, was a Sunday, and prisoners are not transported on Sundays. *Id.* ¶ . Nevertheless, Defendant Birrell refused to make a further inquiry. *Id.*

Plaintiff was found guilty of all charges in both misbehavior reports. (Dkt. No. 7 ¶¶ 43, 53.) Plaintiff appealed both decisions that same day. *Id.* ¶¶ 44, 54. Defendant Prack reviewed the appeal in May 2013, and reduced Plaintiff's sentence for the events of February 10, 2013. *Id.* ¶¶ 45, 55. He did not remedy the disposition of guilt in either case, which Plaintiff contends was rendered in violation of his due process rights. *Id.*

While Plaintiff was serving his punishment in the Special Housing Unit ("SHU"), Defendant Uhler subjected Plaintiff to increasingly restrictive restraint orders with indefinite duration. (Dkt. No. 7 ¶¶ 26–28.) Defendant Uhler first placed Plaintiff on a Retention Strap Order, citing an event in which Plaintiff attempted to pull mechanical restraints into his cell. *Id.* ¶ 26. Plaintiff claims this event never occurred. *Id.* When Plaintiff complained about this treatment, Defendant Uhler placed him on an even more restrictive restraint order. *Id.* ¶ 27. In response to a further objection, Defendant Uhler came to Plaintiff's cell and told him that the SHU was "his house" and that "no court, you or anyone going to tell me what to do or how to run my jail." *Id.* ¶ 28. Defendant Uhler then told Plaintiff that the restraint order would last until he felt like retracting it. *Id.*

In Plaintiff's complaint, he organizes these events into six causes of action:

(1) an Eighth Amendment violation based on the events of February 10, 2013 (Dkt. No. 7 ¶ 11);

(2) an Eighth Amendment violation based on the events of February 20, 2013 (*id.* ¶ 16);

(3) an Eighth Amendment violation based on the events in 2011 (*id.* ¶ 20);

(4) Eighth Amendment and Due Process violations based on the restraint orders (*id.* ¶ 25);

(5) violations of the First Amendment and due process based on the medical disclosures (*id.* ¶ 30); and

(6) violations of due process based on the events of the two hearings (*id.* ¶ 33).

Plaintiff also explains that, while he attempted to exhaust his administrative remedies, he filed this suit before receiving final disposition from the Central Office Review Committee ("CORC"). (Dkt. No. 7 ¶¶ 4–5.) In the complaint, he states that his failure to exhaust is justified by threats of violence from Defendant Burnelle and the failure of the Great Meadow Superintendent and CORC to respond in a timely manner. *Id.* Plaintiff does not specify in the complaint the content of the grievance on appeal, or how it applies to the six causes of action. *Id.*

## II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

**\*4** A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements,

do not suffice." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555).

## III. ANALYSIS

Defendants argue that Plaintiff's claims should be dismissed because he failed to exhaust administrative remedies prior to filing this suit. (Dkt. No. 47–1 at 3–6.[2]) Plaintiff admits that he failed to exhaust, but asserts in his complaint that he should be excused from this requirement because Defendant Burnelle threatened him and CORC failed to render a disposition within the amount of time required by regulation. (Dkt. No. 7 ¶ 4.) For the reasons below, I recommend that Defendants' motion be denied.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo,* 548 U.S. 81, 88 (2006)). In New York state prisons, DOCCS has a wellestablished three-step inmate grievance program. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5 (2013).

**\*5** Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a) (2010). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*Id.* at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id.* at § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* at 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* at § 701.5(c)(3) (ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to CORC for a decision under the process applicable to the third step. *Id.* at 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* at 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* at 701.5(d)(3) (ii). If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford,* 548 U.S. at 93.

A prisoner has no independent duty to plead facts plausibly suggesting that he exhausted his available administrative remedies in order to state an actionable civil rights claim. *Jones,* 549 U.S. at 211–17. "[T]his is not to say that failure to exhaust cannot be a basis for dismissal for failure to state a claim." *Id.* at 216. If a prisoner chooses to plead facts regarding exhaustion, and those facts show that he failed to exhaust his available administrative remedies, then his complaint may be dismissed for failure to state a claim. *Id.* at 215–16.

### A. Facts Considered in This Analysis

In this case, Plaintiff initially pled very sparsely concerning his grievance(s), admitting only that some grievance was still on appeal with CORC at the time the suit was filed. (Dkt. No. 7 ¶ 4.) In Plaintiff's subsequent memorandum in opposition to Defendants' motion to dismiss, he laid out the procedural history of his grievances for the events contained in his complaint. (Dkt. No. 52 at 9–11.) Plaintiff clearly explains in his opposition papers that all but the first two claims have been exhausted, having been appealed as grievances through all three levels and decided by CORC. *Id.*

**\*6** In reply, Defendants maintain that all claims should be dismissed despite the clarification in Plaintiff's opposition. (Dkt. No. 55 at 2.) They contend that, because this is a 12(b)(6) motion, Plaintiff's language in the complaint, a "broad concession that he failed to

[exhaust]," is the only statement this Court may consider when deciding the motion. *Id.* This is not the case.

As Plaintiff correctly states (Dkt. No. 61 at 2–3), while motions to dismiss are usually constrained to facts in the complaint, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside of the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (quoting *Donahue v. United States Dep't of Justice,* 751 F.Supp. 45, 49 (S.D.N.Y.1990)) (*vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004)). Specifically, a pro se plaintiff's memorandum in opposition to a motion to dismiss should be seen as effectively amending the complaint, so far as there is no contradiction. *Cusamano v. Sobek,* 604 F.Supp.2d 416, 461 (N.D.N.Y.2009). Here, none of the new facts in Plaintiff's memorandum contradict any facts stated in the complaint. (Dkt. Nos. 7 and 52.) Therefore, the additional, clarifying information in that memorandum may be considered when deciding this motion to dismiss.

**B. Whether Plaintiff Has Exhausted**

The new facts in Plaintiff's opposition allege that a grievance concerning events in the third and fourth causes of action "proceeded through all three steps of the review and was unanimously accepted by CORC." (Dkt. No. 52 at 10–11.)

As to the fifth and sixth causes of action, DOCCS has a separate and distinct administrative process for inmates to appeal the result of disciplinary hearings, which is not referred to as a "grievance" process. In fact, the regulations specifically state that the results of disciplinary hearings are "non-grievable." N.Y. Comp.Codes R. & Regs. tit. 7, § 701.3(e)(2) (2010). For Tier I and Tier II disciplinary hearings, the appeal is to the facility superintendent or a designee. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 252.6, 253.8 (2010). For Tier III disciplinary hearings, the appeal is to the DOCCS Commissioner or a designee. N.Y. Comp.Codes R. & Regs. tit. 7, § 254.8. An inmate's appeal of a disciplinary hearing decision "constitutes exhaustion under the PLRA for purposes of rendering his due process claim ripe for adjudication in federal court." *Davis v. Barrett,* 576 F.3d 129, 132 (2d Cir.2009).

Plaintiff appealed the decision of the hearing, based on the same facts as he presented in the fifth and sixth causes of action, to the facility superintendent. (Dkt. No. 52 at 11.) Defendant Prack ruled on this appeal, and granted a partial reduction in Plaintiff's punishment. (Dkt. No. 7 ¶¶ 44–45, 54–55.) As such, this appeal is complete and Plaintiff exhausted his administrative remedies with regard to the fifth and sixth causes of action for the purposes of the PLRA.

**\*7** Plaintiff states that he submitted a grievance to the IGRC regarding the first and second causes of action. (Dkt. No. 52 at 9.) The IGP supervisor forwarded the grievance directly to the superintendent on March 11, 2013. *Id.* The superintendent failed to respond within the time required by the regulations. *Id.* At Plaintiff's request, the IGP supervisor forwarded Plaintiff's grievance to CORC on April 2, 2013. *Id.* On April 7, 2013, Defendant Burnelle threatened to harm Plaintiff if he proceeded with the grievance. *Id.* Plaintiff filed the complaint in this action on May 2, 2013. (Dkt. No. 1.) On May 24, 2013, Plaintiff wrote to the IGP Director of DOCCS inquiring about the status of his grievance. (Dkt. No. 52 at 10.) She did not respond. *Id.* As of November 15, 2013, CORC had not issued a decision. *Id.* at 10, 19.

This grievance was the subject of the Plaintiff's original estoppel and excuse arguments contained in the complaint. (Dkt. No. 52 at 9–10.) The only causes of action which Plaintiff has failed to exhaust are the first and second.

Plaintiff's failure to exhaust, however, does not end the review. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). [3]

First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available:

> the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of nonexhaustion by failing to raise

or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense.

*Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations omitted).

*1. Availability of Remedy*

Plaintiff argues in his complaint that threats by Defendant Burnelle and CORC's failure to render a disposition within the regulations' time frame made the grievance process functionally unavailable to him. (Dkt. No. 7 ¶ 5.)

Generally speaking, the three phase appeals process used in New York is sufficiently "available" to inmates. *See Hemphill,* 380 F.3d at 686–87. "The test for deciding whether the ordinary grievance procedures were functionally available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." *Hemphill,* 380 F .3d at 688 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). The *Hemphill* decision held that, even though a plaintiff may have attempted to grieve according to procedure (and therefore not all administrative remedies were rendered unavailable), "some procedures that would ordinarily be available were effectively unavailable" if the prisoner was threatened. *Hemphill,* 380 F.3d at 687.

**\*8** In this case, it may be difficult for the Plaintiff to prove that the grievance procedure was unavailable to him in fact, because he had successfully utilized it at least twice, and he admits that his appeal to CORC was pending when he filed this suit. (Dkt. No. 7 ¶ 4.) However, there is still a question as to whether alleged threats by Defendant Burnelle may have caused Plaintiff to fail to wait until CORC responded before filing this action. Because there is little evidence available to evaluate the effect these threats may have had in this case, the matter should be set for an evidentiary hearing. Furthermore, even if the evidence is not sufficient to establish that the grievance procedure was

unavailable to Plaintiff, threats may nevertheless create "special circumstances" which justify failure to exhaust. This matter is discussed below.

*2. Estoppel*

Plaintiff argues that Defendant Burnelle's threats should estop Defendants from invoking non-exhaustion. (Dkt. No. 52 at 10.) "Defendants have been estopped from asserting the exhaustion defense where threats made by prison staff prevented plaintiff from filing a grievance ... [or] where plaintiff was denied grievance forms or writing materials." *Hale v. Rao,* 768 F.Supp.2d 367, 376 (N.D.N.Y.2011) (citation omitted). Here, Plaintiff states that Defendant Burnelle threatened to harm him if he pursued the grievance regarding the first and second causes of action. (Dkt. No. 52 at 9.) A reasonable trier of fact could conclude, if Plaintiff's statement is credited, that Defendant Burnelle's conduct estops him from asserting the exhaustion defense. Therefore, I recommend that this matter be set for an evidentiary hearing.

*3. Special Circumstances*

In *Giano v. Goord,* the Second Circuit held that:

> there are certain "special circumstances" in which, though administrative remedies may have been available and though the government may not have been estopped from asserting the affirmative defense of non-exhaustion, the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified.

380 F.3d 670, 676 (2d Cir.2004). The standard for determining whether such circumstances justifying failure to follow DOCCS procedures exist is the same as is applicable in a retaliation claim, namely "whether 'a similarly situated individual of ordinary firmness' would have been deterred from following regular procedures ." *Hemphill,* 380 F.3d at 690 (quoting *Davis,* 320 F.3d at 353 (2d Cir.2003)).

Failure by CORC to respond in a timely manner is not alone sufficient to qualify as a "special circumstance." *Ford v. Smith,* No. 9:12–CV–1109 (TJM/TWD), 2014 U.S.

Dist. LEXIS 20581, at *8–9, 2014 WL 652933, at *3 (N.D.N.Y Jan. 16, 2014). [4] However, threats of retaliation for attempting to exhaust remedies, even if they do not render the grievance process unavailable, may still justify non-exhaustion as a "special circumstance" that might cause such an inmate to fail to grieve in the "normally required way." *Hemphill,* 380 F.3d at 689 (quoting *Giano,* 380 F.3d at 678).

**\*9** In *Hemphill,* the court observed that "it is arguable that Hemphill may have reasonably concluded that writing directly to the Superintendent involved an acceptable level of risk, whereas filing a level 1 grievance ... was too fraught with danger." *Hemphill,* 380 F.3d at 690. The court also observed that "filing a civil rights complaint may enable an inmate to draw outside attention to his complaints, thereby neutralizing threatened retaliatory conduct from prison employees." *Id.* at 688.

In this case, Plaintiff's procedural anomaly did not lie in failing to file a grievance, but in failing to wait until the final appeal had been decided. (Dkt. No. 7 ¶ 4.) Nevertheless, it is arguable that a similarly situated prisoner of ordinary firmness would not have deemed waiting for a response from CORC a safe course of action.

If Plaintiff's allegations are taken as true, then he had already been assaulted at least once for reporting the conduct which is also the subject of the grievance in question. (Dkt. No. 7 ¶ 18.) The superintendent did not respond, forcing Plaintiff to appeal it without disposition directly to CORC. (Dkt. No. 52 at 9–10.) Defendant Burnelle threatened to physically harm him if he proceeded with the appeal of the grievance. (Dkt. No. 7 ¶ 4.) CORC failed to respond in a timely manner, after the superintendent had done the same, which could reasonably lead Plaintiff to fear that no disposition was forthcoming and that Defendant Burnelle might harm him before a decision was rendered. *Id.* at 10. Based on the record, I cannot say as a matter of law that an individual of ordinary firmness in such circumstances would have continued to await a response from CORC when he had actual knowledge that his jailers were capable of committing committing physical retaliation, and he had received credible threats that they would do so if he proceeded grieving.

Plaintiff "should have the opportunity to develop facts that would demonstrate that [Defendants' actions] would deter a reasonable inmate." *Hemphill,* 380 F.3d at 690 (quoting *Davis,* 320 F.3d at 354) (internal quotations omitted). This evidence could establish either that the grievance procedure was effectively unavailable or that special circumstances justified his failure to exhaust. Therefore, I recommend that Defendants' motion to dismiss be denied and that this matter be set for an evidentiary hearing on the exhaustion issue.

## IV. LEGAL STANDARD GOVERNING MOTIONS TO SEVER

Federal Rule of Civil Procedure 21 allows a court to add or drop parties, or sever claims, on a motion or sua sponte. Fed.R.Civ.P. 21. The decision whether to sever a claim "is committed to the sound discretion of the trial court." *Greystone Cmty. Reinv. Ass'n v. Berean Capital, Inc.,* 638 F.Supp.2d 278, 293 (D.Conn.2009) (internal quotations omitted). Courts in this circuit generally consider whether: (1) the claims arise out of the same transaction, occurrence, or series of transactions or occurrences; (2) the claims present some common question of law or fact; (3) settlement of the claims or judicial economy would be facilitated; (4) prejudice would be avoided; and (5) different witnesses and documentary proof are required for the separate claims. *Id.*

**\*10** The first two factors are also the requirements for proper permissive joinder under Rule 20. Fed.R.Civ.P. 20. It is therefore necessary, in analyzing whether severance under Rule 21 is appropriate, to analyze whether joinder was proper under Rule 20.

In assessing whether the requirements of Rule 20 are met, courts must accept the factual allegations in a plaintiff's complaint as true. *Deskovic v. City of Peekskill,* 673 F.Supp.2d 154, 159 (S .D.N.Y.2009). The plaintiff bears the burden of demonstrating that joinder is warranted under Rule 20. *Id.* The requirements of Rule 20 are to be interpreted liberally to enable the court to promote judicial economy by permitting all reasonably related claims for relief by or against different parties to be tried in a single proceeding. *Viada v. Osaka Health Spa, Inc.,* 235 F.R.D. 55, 61 (S.D.N.Y.2006) (quotation and citation omitted).

## V. ANALYSIS

In moving to sever, Defendants argue that Plaintiff's claims are all unrelated, and that "defendants are substantially prejudiced" by inclusion of these claims in the same complaint. (Dkt. No. 47–1 at 6.) Plaintiff argues that his claims are properly joined, and that they are logically related in a chain of events which began at Upstate in 2011 and ended at Great Meadow in 2013. (Dkt. No. 52 at 14–15.) For the reasons below, I recommend that Defendants' motion to sever be denied.

### A. "Arising Out of" Requirement

"What will constitute the same transaction or occurrence ... is approached on a case by case basis." *Kehr v. Yamaha Motor Corp., U.S.A.,* 596 F.Supp.2d 821, 826 (S.D.N.Y.2008) (citing 7 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1653 at 270 (1972)). Defendants argue that "plaintiff offered no basis upon which to find that his claims are related," and that his claims should be severed because Plaintiff chose to plead discrete claims, "rather than the retaliation conspiracy he refers to in his Memorandum of Law." (Dkt. No. 55 at 4.) These arguments are both without merit.

It is well-established that "when [a] plaintiff proceeds pro se ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations." *Hemphill,* 380 F.3d at 687 (quoting *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004)). Further, a court must also interpret the pleadings in a way that will "raise the strongest arguments they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

Construed liberally, Plaintiff's complaint contains allegations of an atmosphere of retaliation, based on litigation by Plaintiff prior to the events in 2011. (Dkt. No. 7.) While it is true that the timeline was made much more apparent in Plaintiff's memorandum of law, there are facts in the complaint to connect the events into a series of occurrences sufficient to satisfy the first half of the requirements for permissive joinder.

**\*11** First, Plaintiff began (in the third cause of action) by requesting separation from Great Meadow staff "based upon ... threats of retaliation [for] his success in prior civil rights litigations against officers at Great Meadow." (Dkt. No. 7 ¶ 21.) He was nevertheless transferred to Great Meadow, where he was allegedly attacked for his prior litigation. *Id.* ¶ 24. When Plaintiff was attacked on

February 10, 2013, (the first cause of action), Defendant Maguire specifically referenced that prior civil rights litigation. *Id.* ¶ 13, n. 1. Then, on February 20, 2013, (the second cause of action), officers told Plaintiff that they were retaliating because he reported the February 10, 2013, incident. *Id.* ¶ 18. The fifth and sixth causes of action arose from hearings for the misbehavior reports submitted for the incidents alleged in the first and second causes of action. *Id.* ¶¶ 33, 35, 48. The fourth cause of action further supports an atmosphere of retaliation, and was only made possible by the punishment handed down at the hearing described in the sixth cause of action. *Id.* ¶ 26.

The six claims in the complaint are logically related in a series of occurrences, apparent on the face of the liberally construed complaint. The fact that Plaintiff chose to plead six causes of action is not relevant. The complaint may have been inartfully drafted, but that does not make the facts of each claim less related.

### B. Common Question of Law or Fact

Given this Court's obligation to construe the complaint in a way that will raise the strongest arguments it suggests, the complaint alleges an atmosphere of retaliation surrounding the Plaintiff. A common question of fact exists, namely, whether some common practice of retaliation in fact pervaded the acts committed by Defendants from Plaintiff's transfer in 2011 through his punishment in the SHU in 2013. A question of whether multiple defendants constitute some sort of joint enterprise to cause harm to a plaintiff is a common question sufficient to satisfy Rule 20(b). *Streeter v. Joint Indus. Bd. of Electrical Indus.,* 767 F.Supp. 520, 529 (S.D.N.Y.1991).

Therefore, the threshold requirements of Rule 20 are satisfied, and the claims have all been properly joined.

### C. Discretionary Factors

Defendants contend that allowing these claims to move forward in a single lawsuit is prejudicial because of the "suggestion" of a grand conspiracy. (Dkt. No. 47–1 at 7–8.) While his complaint falls short of pleading conspiracy, Plaintiff's complaint does allege, on the whole, that the acts were all related based on retaliation for earlier events. (Dkt. No. 7.) This is not a prejudicial side effect of pleading these claims together, but an intended yet inartfully pleaded allegation. Contrary to Defendants'

assertions that granting the motion to sever would prevent prejudice, it would actually prejudice Plaintiff, who would find it more difficult to allege an atmosphere of retaliation across multiple suits. Furthermore, courts in this circuit have found that joinder of seemingly unrelated acts of the same type may be proper if the plaintiff alleges a pattern or practice of misconduct, even if he does not allege an official policy. *See, e.g., Costello v. Home Depot U.S.A., Inc.,* 888 F.Supp.2d 258, 264 (D.Conn.2012).

**\*12** Nor is it true, as Defendants claim, that the causes of action would all utilize totally different evidence and witnesses. While some evidence and witnesses are unique to a single cause of action, there is substantial overlap. For example, the officers who witnessed the attacks in February 2013 may also have information that contradicts the misbehavior reports which gave rise to the hearings in March 2013. It is not clear that judicial economy would be served by severing the counts at this point, before discovery.

Defendants argue that "permitting inmate plaintiffs to lump together numerous unrelated claims in a single complaint ultimately impacts judicial economy in a negative way insofar as the practice frustrates the intent of the Prison Litigation Reform Act." (Dkt. No. 47–1 at 8.) Defendants' argument hinges on the PLRA's "three-strikes rule." The three-strikes rule provides that:

> [i]n no event shall a prisoner bring a civil action ... under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g) (2006). Defendants argue that allowing unrelated claims in one proceeding would unfairly benefit a theoretical prisoner plaintiff who filed "35 unrelated claims in three complaints, 27 of which fail to state a claim." (Dkt. No. 47–1 at 9.) Defendants do not argue, however, that any of Plaintiff's claims (as opposed to the claims of their theoretical prisoner

plaintiff) are frivolous, malicious, or fail to state a claim upon which relief may be granted. Rather, as discussed above, Defendants' motion to dismiss is based entirely on exhaustion grounds. Moreover, this Court has previously found Plaintiff's complaint sufficiently wellpleaded to survive initial review. (Dkt. No. 10.)

Based on the reasoning set forth above, I find that the claims are related, are properly joined, and that to sever them would create undue prejudice against the pro se Plaintiff. Therefore, I recommend that Defendants' motion to sever be denied.

## VI. CONCLUSION

For the foregoing reasons, I recommend that the Defendants' motion to dismiss and motion to sever be denied, and that Defendants be directed to answer all claims in the complaint within thirty days of any order adopting this Report–Recommendation. Further, because of the issues of fact surrounding exhaustion, I recommend that the matter be scheduled for an evidentiary hearing concerning exhaustion on all six causes of action. *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011).

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 47) be **_DENIED;_** and it is further

**RECOMMENDED** that Defendants' motion to sever (Dkt. No. 47) be **_DENIED;_** and it is further

**\*13 RECOMMENDED** that Defendants be directed to answer all causes of action within thirty days of any order adopting this Report–Recommendation; and it is further

**RECOMMENDED** that this matter be scheduled for an evidentiary hearing on the matter of exhaustion for all causes of action; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Ford v. Smith,* No. 9:12–CV–1109 (TJM/TWD), 2014 U.S. Dist. LEXIS 20581, 2014 WL 652933 (N.D.N.Y Jan. 16, 2014).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to

the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp.2013); Fed.R.Civ.P. 72, 6(a).

Filed June 28, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 3809162

Footnotes

| | |
|---|---|
| 1 | The parties differ on the spelling of Defendant Burnelle's name. This Court will use the spelling in Defendants' submitted documents. (Dkt. No. 47–1.) |
| 2 | Citations to page numbers in Defendants' memorandum of law and Plaintiff's opposition refer to the page numbers in the original documents rather than to the page numbers assigned by the Court's electronic filing system. |
| 3 | The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford,* 548 U.S. 81. *Amador v. Andrews,* 655 F.3d 89, 102 (2d Cir.2011). |
| 4 | The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam). |

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 3729383
United States Court of Appeals,
Second Circuit.

Mark Williams, Plaintiff–Appellant,

v.

Correction Officer Priatno, Correction
Officer Gammone, Defendants–Appellees,
Correction Officer John DOE, State of New
York, New York State Department of Corrections
and Community Service, Defendants. [*]

Docket No. 14-4777
|
August Term, 2015
|
Argued: February 29, 2016
|
Decided: July 12, 2016

Plaintiff–Appellant Mark Williams appeals from an order
of the District Court for the Southern District of New
York that dismissed his claim under 42 U.S.C. § 1983
and the Eighth Amendment for failure to exhaust all
available administrative remedies as required by the
Prison Litigation Reform Act, 42 U.S.C. § 1997e(a).
We conclude that administrative remedies beyond the
submission of his initial complaint were unavailable to
Williams because the applicable grievance procedures are
"so opaque" and confusing that they were, "practically
speaking, incapable of use." *Ross v. Blake*, 136 S. Ct.
1850, 1859 (2016). Accordingly, we reverse the decision
of the district court and remand for further proceedings
consistent with this opinion.

**Attorneys and Law Firms**

BRIAN M. FELDMAN (Michael J. Rooney, on the
brief), Harter Secrest & Emery LLP, Rochester, NY, for
Plaintiff–Appellant.

HOLLY A. THOMAS (Barbara D. Underwood and
Anisha S. Dasgupta, on the brief), for Eric T.
Schneiderman, Attorney General of the State of New
York, New York, NY, for Defendants–Appellees.

Before: KATZMANN, Chief Judge, SACK and
LOHIER, Circuit Judges.

**Opinion**

KATZMANN, Chief Judge:

**\*1** Plaintiff–Appellant Mark Williams alleges in this 42
U.S.C. § 1983 case that Defendants–Appellees Correction
Officer Priatno and Correction Officer Gammone violated
his Eighth Amendment rights when they brutally beat
him for talking back to another officer when he was an
inmate at Downstate Correctional Facility ("Downstate")
in New York. We are presented with the threshold
question of whether Williams exhausted all available
administrative remedies prior to filing this lawsuit in the
United States District Court for the Southern District of
New York, as required by the Prison Litigation Reform
Act ("PLRA"), 42 U.S.C. § 1997e(a). More specifically,
we must decide whether the prison's grievance process
was actually "available" to Williams in light of the
extraordinary circumstances of his case. We conclude
that that process was not available to Williams because
the applicable grievance procedures are "so opaque" and
confusing that they were, "practically speaking, incapable
of use." *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016).
We reverse the decision of the district court that granted
defendants' motion to dismiss and remand for further
proceedings consistent with this opinion.

## I. BACKGROUND

### A. Department of Corrections and Community
### Supervision Grievance Procedures

The New York State Department of Corrections and
Community Supervision ("DOCCS") regulations outline
the procedures that apply to the Inmate Grievance
Program ("IGP") at Downstate. The grievance process
begins with the filing of a complaint within 21 days
of an alleged incident. N.Y. Comp. Codes R. & Regs.
("NYCRR") tit. 7, § 701.5(a)(1). Typically, inmates file
grievances with the grievance clerk. *Id.* However, if an
inmate is housed in the special housing unit ("SHU"), and
therefore segregated from the regular prison population,
he may give the grievance complaint to a correction officer
to file for him. *See id.* § 701.7. Upon filing, the grievance
clerk numbers and logs the grievances. *Id.* § 701.5(a)(2).

Ordinarily, there are three levels of review of a grievance.
The first is by the inmate grievance resolution committee
("IGRC"); the second is by the facility superintendent;

and the third is by the central office review committee ("CORC"). *Id.* §§ 701.1(c), 701.5. However, "harassment grievances"—those that involve "employee misconduct meant to annoy, intimidate or harm an inmate," *id.* § 701.2(e)—are subject to expedited first-level review by the facility superintendent, *id.* § 701.8. When the grievance clerk identifies a harassment grievance, the clerk must forward the grievance to the superintendent on the same day that the grievance was filed. *Id.* § 701.8(b). If the grievance presents a bona fide harassment issue, then the superintendent must initiate an investigation, render a decision on the grievance, and inform the inmate of the decision within 25 days of receipt of the grievance. *Id.* § 701.8(d), (f). "If the superintendent fails to respond within the required 25 calendar day time limit the grievant may appeal his/her grievance to CORC." *Id.* § 701.8(g); *see also id.* § 701.6(g)(2) (stating generally that matters not decided within designated time limits "may be appealed to the next step").

**\*2** If an inmate is transferred to another facility while a grievance is pending, a response to the grievance shall be mailed to the inmate at the new facility. *Id.* § 701.6(h)(1). "If the grievant wishes to appeal, he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed within seven calendar days after receipt." *Id.* § 701.6(h)(2). If an inmate wishes to file a new grievance about an incident that occurred prior to a transfer, he must file the grievance in the facility where he is currently housed, "even if it pertains to another facility." *Id.* § 701.5(a)(1).

### B. Facts and Procedural History

Williams was formerly incarcerated at Downstate. He alleges that, on December 31, 2012, he was in a search room (also known as a "drafting" room) while his personal items were being searched. A correction officer was "thoroughly probing [his] legal work" and he asked her to stop. Joint App. at 32. Williams explains that the legal papers were related to a separate action seeking damages for an assault he experienced while an inmate at Rikers Island. The officer instructed Williams to sit down, which he did while "admonishing" her. *Id.* At that point, defendant correction officers Priatno and Gammone approached Williams. They grabbed Williams and dragged him to another room that had no cameras, where they were out of eyesight of the other 15 to 20 inmates who were seated in the drafting room. Williams alleges that the officers proceeded to assault him—

thrusting his forehead against the wall, causing him to fall to the ground, and then kicking and stomping on any uncovered part of his body. Defendant Gammone allegedly picked him up and said, "this is what running your mouth gets you," and punched him on his right eye. *Id.* at 37. Williams fell to the floor again, and defendant Priatno allegedly kicked his face and head. Following the assault, the officers sent him to the infirmary. He suffered injuries to his head, knee, eye, elbow, lower back, jaw, and nose, and he now takes medication for anxiety and panic attacks.

Williams alleges that on January 15, 2013, while he was housed in the SHU at Downstate, he drafted a grievance detailing the officers' misconduct. [1] He gave the grievance to a correction officer to forward to the grievance office on his behalf, in accordance with DOCCS grievance procedures that apply to inmates in the SHU. *See* NYCRR tit. 7, § 701.7. One week later, Downstate superintendent Ada Perez was making rounds in the SHU. Williams told her about the incident and said he had not yet received a response to his grievance. Perez told him she had no knowledge of the grievance and that she would look into it. About a week after that conversation, Williams was transferred to another facility. He never received a response to the grievance and alleges that the correction officer in the SHU never filed it for him. There is no dispute that Williams never appealed the grievance.

Proceeding pro se, Williams filed a complaint in the United States District Court for the Southern District of New York on January 13, 2014, asserting a claim under 42 U.S.C. § 1983 and the Eighth Amendment. The initial complaint named as defendants Correction Officer Priatno, Correction Officer John Doe, the State of New York, and DOCCS. Pursuant to screening procedures that apply to pro se complaints under 28 U.S.C. § 1915A, the district court dismissed the claims against the State and DOCCS and directed the Attorney General's Office to ascertain the identity of defendant John Doe and provide that information to Williams. Williams filed an amended complaint on February 19, 2014, naming correction officers Priatno and Gammone as defendants.

**\*3** Defendants moved to dismiss the complaint on the basis that Williams failed to exhaust administrative remedies as required by the PLRA, citing records that show Williams never filed an appeal. In a decision dated December 10, 2014, the district court (Seibel, *J.*) granted

defendants' motion. The court reasoned that, even if Williams's grievance had never been filed, he still could have appealed the grievance to the next level because the regulations allow an appeal in the absence of a response. The district court also *sua sponte* denied Williams leave to file a second amended complaint, concluding that "better pleading would not lead to a different result." Joint App. at 66.

Williams filed a timely notice of appeal and subsequently moved for appointment of pro bono counsel. In granting his motion, we directed pro bono counsel to brief, among other issues, the following questions:

> (1) whether the framework in *Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004) for excusing non–compliance with exhaustion of administrative remedies is still good law in light of *Woodford v. Ngo*, 548 U.S. 81 (2006); and (2) if so, whether a prison's failure to respond to a grievance renders an administrative remedy "unavailable" so as to excuse the prisoner's non–compliance with administrative exhaustion.

Motion Order, filed Mar. 18, 2015, Docket No. 33. While this case was pending, the Supreme Court decided *Ross v. Blake*, 136 S. Ct. 1850 (2016), which clarified the framework under which courts should assess whether a prisoner has complied with the PLRA exhaustion requirement. Because that framework can be easily applied to the parties' arguments and the record on appeal, we review the district court's decision under *Ross* and conclude that the court erred in granting defendants' motion to dismiss. Accordingly, we reverse and remand for further proceedings.

## II. DISCUSSION

We review a grant of a motion to dismiss *de novo*. *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011). Specifically, the issue of "[w]hether a plaintiff has exhausted administrative remedies under the [PLRA] is also a question reviewed *de novo*." *Amador v. Andrews*, 655 F.3d 89, 94–95 (2d Cir. 2011). For purposes of this review, we accept all of the factual allegations in the complaint as true, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and, because Williams appeared pro se before the district court, we are "constrained to conduct our examination with 'special solicitude,' interpreting the complaint to raise the 'strongest claims that it suggests,' " *Hill*, 657 F.3d

at 122 (alterations omitted) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006) (per curiam)).

The PLRA instructs that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Failure to exhaust administrative remedies is an affirmative defense under the PLRA, not a pleading requirement. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013). Accordingly, "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones*, 549 U.S. at 216. However, a district court still may dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement. *See id.* at 215.

In *Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004), we set forth a three–part inquiry to guide our analysis of whether a plaintiff has satisfied the PLRA. *See id.* at 686–91. The first part involves an assessment whether administrative remedies were in fact available to the plaintiff; the second part instructs courts to consider whether defendants forfeited the affirmative defense of exhaustion by failing to preserve it or should be estopped from raising it because their own actions inhibited the plaintiff's ability to exhaust administrative remedies; and the third part directs courts to determine whether special circumstances existed that justified a plaintiff's failure to exhaust remedies that were available and not subject to estoppel. *See Amador*, 655 F.3d at 102 (summarizing *Hemphill* inquiry).

**\*4** Two years later, in *Woodford v. Ngo*, 548 U.S. 81 (2006), the Supreme Court weighed in on the importance of the PLRA exhaustion requirement without directly opining on the validity of the exceptions we outlined in *Hemphill*. In *Woodford*, a prisoner's grievance was denied because it was not timely filed. *Id.* at 86–87. He then filed a lawsuit in federal court and argued he should be relieved from the PLRA exhaustion requirement on the basis that, as a result of his untimely filing, the grievance process was no longer available to him. *Id.* The Court rejected this position, emphasizing that the PLRA "requires proper exhaustion," *id.* at 93, "which 'means using all steps that

the [prison grievance system] holds out, and doing so *properly* (so that the [prison grievance system] addresses the issues on the merits)," *id.* at 90 (emphasis in original) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). "Proper exhaustion demands compliance with [a prison grievance system's] deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90–91.

In the aftermath of *Woodford*, we were left to determine the extent to which our *Hemphill* framework remained intact. The text of the statute convinced the court that the first part of our inquiry—determination of whether an administrative remedy was in fact "available" to the inmate—was still valid. *See, e.g.*, *Macias v. Zenk*, 495 F.3d 37, 44–45 (2d Cir. 2007) (discussing *Woodford* and analyzing whether the grievance process was actually available to the plaintiff); *Johnston v. Maha*, 460 F. App'x 11, 15 n.6 (2d Cir. 2012) (summary order) ("Although [*Woodford*] requires that prisoners 'properly' exhaust the available remedies under the PLRA, it certainly does not abrogate the unavailability defense to nonexhaustion."); *see also Woodford*, 548 U.S. at 85 (focusing its analysis on "all 'available' remedies"). However, the continued viability of *Hemphill*'s inquiries regarding estoppel and special circumstances was less clear. *See, e.g.*, *Amador*, 655 F.3d at 102; *Macias*, 495 F.3d at 43 n.1; *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006).

The Supreme Court's recent decision in *Ross v. Blake*, 136 S. Ct. 1850 (2016), squarely addresses that ambiguity and guides our decision here. In *Ross*, the Court held that, aside from the "significant" textual qualifier that "the remedies must indeed be 'available' to the prisoner," there are "no limits on an inmate's obligation to exhaust —irrespective of any 'special circumstances.' " *Id.* at 1856. The Court stressed "the mandatory nature of [the PLRA's] exhaustion regime," *id.* at 1857, noting that the text of the PLRA and its legislative history refute the existence of a special circumstances exception to the statute's exhaustion requirement, *id.* at 1857–58. Therefore, to the extent that our special circumstances exception established in *Giano v. Goord*, 380 F.3d 670, 675–76 (2d Cir. 2004), and *Hemphill*, 380 F.3d at 689–91, permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*. Indeed, *Ross* largely supplants our *Hemphill* inquiry by framing

the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate. *See Ross*, 136 S. Ct. at 1858–59.

Accordingly, we will shift our focus to an analysis of whether the PLRA's textual "unavailability" exception applies here. Our decision in *Hemphill* touches on that question, noting that "the behavior of the defendants may render administrative remedies unavailable." 380 F.3d at 686. But we are significantly aided by *Ross* in interpreting the meaning of the word "available" as used in the PLRA. In *Ross*, the Court highlights "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Ross*, 136 S. Ct. at 1859.[2] First, an administrative remedy may be unavailable when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* In other words, "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

**\*5** Turning to the facts of this case, we assume for purposes of our analysis that an administrative remedy was "officially on the books." *Id.* at 1859. Prison regulations provide that inmates in the SHU may file grievances by giving the complaint to a correction officer to forward to the grievance clerk. *See* NYCRR tit. 7, § 701.7. The regulations also provide that an inmate may appeal a grievance "to the next step" if he does not receive a timely response. *Id.* § 701.6(g)(2); *see also id.* § 701.8(g). Defendants assert that, even if Williams's grievance had not been filed and despite the fact that he had been transferred to a new facility prior to receiving a response, he still could have attempted to appeal the grievance in accordance with sections 701.6(g)(2) and 701.8(g).

However, even if Williams technically could have appealed his grievance, we conclude that the regulatory scheme providing for that appeal is "so opaque" and "so confusing that ... no reasonable prisoner can use [it]." *Ross*, 136 S. Ct. at 1859 (quoting Tr. of Oral Arg. 23). The regulations simply do not contemplate the situation

in which Williams found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance.

We accept as true Williams's allegation that the correction officer never filed his grievance. [3] *See Erickson*, 551 U.S. at 94. Under that circumstance, the regulations do not adequately outline the process to appeal or otherwise exhaust administrative remedies. On their face, the regulations only contemplate appeals of grievances that were actually filed. For example, if the grievance had never been filed, the superintendent would never have received it and the timeline for her to provide a response within 25 days "of receipt of the grievance" would never have been triggered. NYCRR tit. 7, § 701.8(f). In turn, the textual provision allowing a grievant to appeal to the CORC would never have come into effect. *See id.* § 701.8(g) ("If the superintendent fails to respond within the required 25 calendar day time limit the grievant may appeal his/her grievance to CORC."). Accordingly, the regulations give no guidance whatsoever to an inmate whose grievance was never filed.

Defendants assure us, however, that if Williams had attempted to appeal his grievance, it would have "allow[ed] the facility to alert the inmate that his original complaint ha[d] not been received, and to inform him about how to proceed with his complaint." Post–Argument Letter from Holly A. Thomas, Special Counsel to the Solicitor Gen., State of N.Y. Office of the Attorney Gen. ("Defendants' Post–Argument Letter") (Mar. 16, 2016), Docket No. 97, at 1. At oral argument, counsel for defendants stated that there is no time limit to appeal to the next step if an inmate does not receive a response to a grievance. *See* Oral Arg. Recording at 1:59:13–38. In their post–argument letter, defendants explain how this would work in practice by outlining three options that would be presented to an inmate following his appeal of an unfiled grievance: (1) if it is still within 21 days of the incident, the inmate can re–file the complaint; (2) if it is beyond 21 days but within 45 days of the incident, the inmate can request an exception to the 21–day time limit if he can show mitigating circumstances; or (3) if it is more than 45 days since the incident, the inmate may file a separate complaint grieving the denial of an extension to the time limit. Defendants' Post–Argument Letter, at 2–3; *see also id.*, App. 1b, 2c. [4]

**\*6** These options are pieced together from various provisions in the regulations that do not involve appeals of grievances but provide instructions on the timelines that apply to the filing of new complaints. *See* NYCRR tit. 7, § 701.5(a)(1); *id.* § 701.6(g)(1)(i)(a); *id.* § 701.6(g)(1)(ii). A close review of the regulations shows, contrary to defendants' assertions at oral argument, that an "appeal" in Williams's circumstance is, indeed, subject to time limitations and procedural hurdles that in all but the rarest of circumstances would preclude him from pursuing his unfiled and unanswered grievance, and that are, in any event, "so confusing that ... no reasonable prisoner can use them." *Ross*, 136 S. Ct. at 1859 (quoting Tr. of Oral Arg. 23).

Looking at the first option, an inmate does not even have the right to appeal a grievance to the next step until the time for the superintendent to respond has already passed —a date which, in the case of a harassment grievance, is already well beyond 21 days of the incident. *See id.* §§ 701.5(a)(1), 701.8(g). Regarding the second option, for similar reasons, the window to request an extension between 21 and 45 days of the incident will occur only where the inmate took less than the allowed 21 days to submit his original complaint. If the inmate took full advantage of the time the regulations give him to act and then had to wait 25 days for a response, 46 days will have passed before he learns with certainty that the superintendent failed to respond. [5] Finally, where options one and two are unavailable, the third option is wholly inapplicable as a mechanism to appeal an unfiled grievance, because the regulations state unequivocally that "[a]n exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence." *Id.* § 701.6(g)(1)(i)(a). Therefore, even though option three suggests that an inmate could file a separate complaint grieving the denial of an exception to the filing deadline, such a grievance would be futile given that the regulations do not give the IGP supervisor authority to grant an exception beyond 45 days of the initial incident.

In sum, the regulations plainly do not describe a mechanism for appealing a grievance that was never filed. Moreover, the purported options for relief provided by defendants, to the extent they are even available to an inmate in Williams's situation, only increase confusion regarding the avenues available to pursue an appeal. For these reasons, the process to appeal an unfiled and

unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it. [6]

**\*7** Furthermore, if the regulations outlined above, as applied to a prisoner in Williams's situation, were not already "so confusing" that "no ordinary prisoner can discern or navigate [them]," *Ross*, 136 S. Ct. at 1859, their obscurity was compounded by the fact that Williams was transferred to another facility approximately two weeks after giving his grievance to the correction officer. Defendants contend that a transfer does not affect an inmate's ability to appeal his grievance to the next step, pointing to a provision in the regulation that provides: "If the [transferred] grievant wishes to appeal, he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed within seven calendar days after receipt." NYCRR tit. 7, § 701.6(h)(2). However, this provision presumes not only that the grievance was actually filed, but also that the inmate received an appeal form that he can sign and mail back. The regulations plainly do not provide guidance on how a transferred inmate can appeal his grievance with the original facility without having received a response.

For the foregoing reasons, we conclude that the grievance procedures that were technically available to Williams are so opaque and confusing that they were, "practically speaking, incapable of use." *Ross*, 136 S. Ct. at 1859. Accordingly, in giving his grievance to the correction officer, Williams exhausted all administrative remedies that were available to him. 42 U.S.C. § 1997e(a). [7] To avoid confusion going forward, we recommend that DOCCS revise its grievance procedures to instruct inmates how to appeal grievances that were not properly filed by prison staff, and how to appeal a grievance, to which the inmate never received a response, after being transferred.

### III. CONCLUSION

Having concluded that Williams satisfied the PLRA's exhaustion requirement, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings in accordance with this opinion.

**All Citations**

--- F.3d ----, 2016 WL 3729383

---

Footnotes

\*  The Clerk of Court is directed to amend the caption to conform to the listing above.

1  Some allegations concerning the circumstances of Williams's attempted filing of his grievance are taken from his pro se opposition to the motion to dismiss, which we may consider in resolving this appeal. *See Wright v. Comm'r of Internal Revenue,* 381 F.3d 41, 44 (2d Cir. 2004) (construing pro se submissions "liberally"); *Oritz v. McBride,* 323 F.3d 191, 194 (2d Cir. 2003) ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

2  We note that the three circumstances discussed in *Ross* do not appear to be exhaustive, given the Court's focus on three kinds of circumstances that were "relevant" to the facts of that case. *Ross,* 136 S. Ct. at 1859. Because those circumstances are also relevant to the facts of this case, we do not opine on what other circumstances might render an otherwise available administrative remedy actually incapable of use.

3  We consider this claim to be plausible given Williams's allegations that he asked superintendent Perez about his grievance one week after giving it to the correction officer and Perez said that she had no knowledge of it. There is no question that Williams's grievance was a harassment grievance. *See* NYCRR tit. 7, § 701.2(e) (defining harassment grievances). Had the correction officer filed it, it should have been forwarded to Perez the same day in accordance with procedures that govern the processing of harassment grievances. *See* NYCRR tit. 7, § 701.8(b). At the motion to dismiss stage, the allegation that she had no knowledge of the grievance supports Williams's allegation that it was not filed.

4  Defendants offer a fourth option for an inmate to address an unfiled grievance: submitting "a new complaint grieving the alleged willful mishandling of his original complaint by DOCCS's personnel." Defendants' Post–Argument Letter at 3. However, because such a grievance would not itself address the substantive allegations in the original unfiled grievance —and it is unclear how prevailing on the former would affect the ability to pursue the latter—under the circumstances of this case, it is at a minimum a roundabout, if not ineffectual, means for an inmate to attain relief.

5  Even when an inmate submits his initial grievance before the 21–day deadline specified in section 701.5(a)(1), and, therefore, it is possible that he could have filed a request for an extension under the second option, he would still not learn of that option until the prison responds to his "appeal" of the unanswered grievance and informs him of these options.

In the examples provided by defendants, the amount of time the prison takes to provide a response to these types of inquiries varies. *See, e.g.*, Defendants' Post–Argument Letter, App. 1 (1 day); App. 2 (7 days); App. 3 (3 days); App. 4 (1 day); App. 5 (17 days).

6    Defendants argue that an inmate's claim that he submitted a grievance that was unfiled and unanswered (which the district court would accept as true at the motion to dismiss stage), and that was not appealed, cannot excuse compliance with the PLRA's exhaustion requirement. If the inmate's allegation to that effect alone sufficed for purposes of the PLRA, he could thereby "avoid the prison grievance process altogether ... without the administrative process ever having been initiated." Defendants' Br. at 22–23. Indeed, many district courts have concluded that a "nonresponse" to a grievance "must be appealed" in order to exhaust administrative remedies under the PLRA. *See, e.g.*, *Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013); *see also id.* at 281 n.8 (collecting cases). Nonetheless, defendants bear the initial burden of establishing the affirmative defense of non–exhaustion "by pointing to 'legally sufficient sources' such as statutes, regulations, or grievance procedures" which demonstrate that "a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (alteration omitted) (quoting *Mojias v. Johnson*, 351 F.3d 606, 610 (2d Cir. 2003)). Because, as we explained above, the process of appealing an unfiled grievance is practically unavailable to inmates under current DOCCS regulations, defendants have not met their initial burden here.

7    In light of this conclusion, we need not decide whether administrative remedies also may have been unavailable to Williams for other reasons, such as officer misconduct. *See Ross*, 136 S. Ct. at 1860.

---

**End of Document**      © 2016 Thomson Reuters. No claim to original U.S. Government Works.